FILED 20 JUL '22 10:12 USDC-ORP

JANE DOE

1dissident@pm.me

3055 NW Yeon Ave

Portland, OR 97210

Tel.: 541-556-9987

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

JANE DOE,

      *Plaintiff*

    **v.**

LOUISIANA DEPARTMENT OF JUSTICE;
STATE OF LOUISIANA; CITY OF BATON
ROUGE AND PARISH OF EAST BATON ROUGE;
BATON ROUGE POLICE DEPARTMENT; JAMES
WEBER; JEFFREY LANDRY; MURPHY PAUL;
KYLE POULICEK; CAITLIN CHUGG;
SHALIMAR SMALL; LOUISIANA STATE
BOARD OF MEDICAL EXAMINERS;
KATIE CRAFT; WILSON FIELDS; ZANTAVIA
BOGAN; KENDAL BROOKINS; PPQBR, LLC;
CARDINAL GROUP MANAGEMENT, LLC;
MELANIE FIELDS; HILLAR MOORE;
LISA WOODRUFF-WHITE;
HEATHER-RENEE SRCH-THADEN;
ECHO HOLLOW VETERINARY HOSPITAL
AND URGENT CARE; CURT DALY; GINA
SCHLUCKEBIER; OREGON VETERINARY
REFERRAL ASSOCIATES; JILL CHAPLIN;
JAMES SIMS; CELESTE SATHER;
PEACEHEALTH OREGON WEST NETWORK;
PEACEHEALTH PRIMARY CARE CLINIC;
THE METROPOLITAN COUNCIL OF THE
CITY OF BATON ROUGE AND PARISH OF EAST

Case No.: 3:22-CV-1056-MO

**COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**

**Racketeer Influenced and Corrupt
Organizations Act and
Constitutional Rights Action**

**DEMAND FOR JURY TRIAL**

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**         **1**

BATON ROUGE; STEPHEN MURPHY; SHANARD
CAREY; JOHN WINDHAM; JAMES KNIPE; TODD
TYSON; BRENDEN CRAIG; EBONY CAVALIER;
LISA FREEMAN; KIMBRA BROOKS; DEELEE
MORRIS; SHONA STOKES; BENJAMIN
SANDERS; HEATHER ANDERSON; CAPITAL
AREA FAMILY VIOLENCE INTERVENTION
CENTER, INC.; "RANDY" BONAVENTURE;
ROBERT HUNT; RENETTA ANTEE-GRIFFIN;
MARIA BERNAL; MARIA VIVES; JASMINE
ELISON; MICHAEL SIMON; PATRICK MAGEE;
RONALD BEAVER; BRAD CRANMER;
CHRISTOPHER NAKAMOTO; DAWN SHARP;
WILLIAM MORVANT; ASHTON HOLLOWAY;
DANIEL NELSON; BLAKE BOOTH; BLAKE
WILLIAMSON; Dr. LAURA HETZLER; OUR
LADY OF THE LAKE PHYSICIAN GROUP, LLC;
GIDEON CARTER; RICHARD WELLS; GRAEME
MORGAN; MARK BURTON; YUEN HANN KWOK;
NINETEENTH JUDICIAL DISTRICT COURT OF
LOUISIANA; LOUISIANA COURT OF APPEAL,
FIRST CIRCUIT; LOUISIANA SUPREME COURT;
BATON ROUGE CITY COURT; PHILIP
MORRIS USA, INC.; ALTRIA GROUP, INC.;
ITG BRANDS, LLC; R. J. REYNOLDS TOBACCO
COMPANY; LIGGETT GROUP, INC; JAPAN
TOBACCO INTERNATIONAL USA, INC; U.S.
DISTRICT COURT FOR THE MIDDLE DISTRICT
OF LOUISIANA; BRANDON FREMIN; JOHN
DEGRAVELLES; SHELLY DICK; ERIN
WILDER-DOOMES; SCOTT JOHNSON;
GOOGLE, LLC; REDDIT, INC.; ADVAMEG, INC.
AND CITY-DATA.COM; U.S. COURT OF
APPEALS FOR THE FIFTH CIRCUIT;
PATRICK HIGGINBOTHAM; STEPHEN
HIGGINSON; KYLE DUNCAN; CHRISTOPHER
HESTER; CONS 1 TO 500 INCLUSIVE,
                    *Defendants*.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                              2

Plaintiff Jane Doe brings her COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES against the above-named defendants:

## INTRODUCTION

1.    This is a Racketeer Influenced and Corrupt Organizations Act and Constitutional Rights legal action. The Louisiana defendants-criminals persecuted Plaintiff in Louisiana in retaliation for Plaintiff's dedication to justice and willingness to expose their crimes and boundless corruption. Among various criminal dealings, described in this complaint, the Louisiana criminals-in-law had attacked Plaintiff and her Family with chemical weapons to induce systemic serious diseases. When Plaintiff and her Family moved to Oregon, the criminals followed Plaintiff to Oregon and got the corrupt public officials and private actors to join their conspiracy to injure Plaintiff, obstruct her access to federal courts, and criminally destroy evidence of their horrendous crimes against Plaintiff and her Family. The criminals secured assistance and complicity of the dirty and corrupt private actors, working in the "medical" and "veterinary medicine" fields in order to cover up the fact and evidence that Plaintiff and her precious Family – all three previously absolutely healthy individuals – have been seriously injured by the foul Louisiana scumbags-criminals, sued in this complaint, and that their criminal attacks with chemical weapons upon Plaintiff and her Family induced serious systemic injuries in all three previously healthy victims. The full-blown racketeering enterprise, formed amongst the Louisiana and Oregon public and private actors have been advancing their criminal dealings in the state Oregon and targeting Plaintiff. Plaintiff and her Family have been malisously denied access to certain medical and veterinary care, which was already scheduled and ordered and then maliciously and criminally secretly cancelled upon directive of the criminal racketeering enterprise. Plaintiff's and her Family's internal organs, removed surgically due to grave injuries,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                      **3**

inflicted on them by the sued herein criminals, had been criminally and maliciously stolen and destroyed in order to prevent them from being studied histologically to reveal that all three victims of the criminal attacks sustained the same injuries and the same systemic illnesses, criminally induced on them by the filthy scumbags, sued herein. Plaintiff's "medical" and other records had been falsified, including the copies that had been stolen from Plaintiff's home by the criminals.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to the United States Constitution. The district court in Oregon has jurisdiction of this action by virtue of 18 U.S. Code § 1964(a), 28 U.S.C. §§ 1331, 1343(a), 1367(a), 2201, and 2202. Plaintiff seeks relief under 18 U.S.C. § 1964(c), 28 U.S.C. §§ 2201, 2202, 42 U.S.C. §§ 1983, 1985, 1981, and Equal Protection Clause of the Fourteenth Amendment.

3.      Venue is proper by virtue of 18 U.S.C. § 1965. The legislative history expressly refers to both § 1965 (a) and (b) as venue provisions. The Oregon and Louisiana defendants-co-conspirators are each other agents, and have been perpetuating their criminal dealings jointly. The Oregon and Louisiana defendants, upon criminal conspiratorial agreement, have been targeting Plaintiff and her Family in the state of Oregon through the racketeering enterprise that they have formed. There is no other district in which a court will have personal jurisdiction over all co-conspirators.

Venue is also proper per 28 U.S.C. § 1391(b)(2) because a substantial portion of the events has happened in Oregon and per 28 U.S.C. § 1391(b)(3) as there is no district in which this action may otherwise be brought. Venue is also proper through 28 U.S.C. § 2201 which

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    4

authorizes any district court of the U.S. to adjudicate the controversy. Further, venue is proper under ORS 14.030 and 14.060.

As an additional consideration, venue is also proper per §1391(e)(1)(C). Defendants, amenable to general jurisdiction of the district court in Oregon have no legal right to contest venue based on *Neirbo* doctrine and ORS.14.080.

Many defendants have expressly waived improper venue defense by not asserting it at all or not complying with Rule 12(a)(1)(A)(i) and the requirement of the timely and sufficient objection to venue in accordance with 1406(b). Finally, waiver occurred through appearance and litigation conduct.

4.      Although a complaint need not provide the basis for personal jurisdiction, it is being briefly addressed below.

a.      This is a Racketeer Influenced and Corrupt Organizations Act (RICO) legal action. Therefore, 18 U.S.C. § 1965 confers nationwide service of process and jurisdiction over all defendants for all RICO claims is provided by virtue of the federal statute's nationwide service of process provision.

b.      Jurisdiction over the defendants in regard to the remaining claims is obtained by virtue of the pendent personal jurisdiction doctrine.

c.      A large group of the defendants has explicitly consented to jurisdiction over them of the district court in Oregon.

d.      The Supreme Court's law of the sufficient "minimum contacts" states that "[p]hysical presence in the forum is not a prerequisite to jurisdiction, *Burger King*, *supra*, at 476, 105 S. Ct. 2174, [but] physical entry into the State — either by the defendant in person or through an agent, goods, mail, or some other means — is certainly a relevant contact. See, *e.g., Keeton*, *supra*, at

773-774, 104 S. Ct. 1473," *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The defendants' tortious conduct in the state of Oregon – in person, through an agent, goods, mail, and other means – directed at Plaintiff and at Oregon, also provides personal jurisdiction over the defendants.

e.      All defendants have strong and sufficient contacts with the U.S. – the sovereign that created federal district courts. Therefore, jurisdiction over the defendants by the federal district court in Oregon comports with the due process clause and notions of fair play and substantial justice.

## PROCEEDING PSEUDONYMOUSLY

5.      Plaintiff had previously proceeded in this action under pseudonym and requests to be permitted to proceed pseudonymously. The courts listed the "challeng[ing of] governmental activity" as a number one reason in their short list of the possible reasons where anonymity could or should be allowed, see *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981). This suit expressly challenges the criminal misconduct of the "government."

Plaintiff requests that the fifth paragraph of the instant complaint be construed as a motion for leave to proceed pseudonymously.

Plaintiff's legal name is provided on the payment of the filing fee to initiate this legal action. In the event that a sealed affidavit, providing her legal name to the Court, is required, Plaintiff requests to be notified about it by the court's staff. Plaintiff requests this relief to ensure that her action is properly and timely commenced.

## PLAINTIFF

6.      Plaintiff Jane Doe is a natural person and a citizen of the State of Oregon.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                          **6**

## DEFENDANTS

7.    Defendant state of Louisiana has waived its "immunity" through its "arm," Louisiana

department of justice, in accordance with *Lapides v. Board of Regents of Univ. System of Ga.*,

535 U.S. 613 (2002), while not being a defendant, repeatedly appearing voluntarily. Defendant

Louisiana department of "justice" ("Ladoj") is a criminal organization that has been persecuting

Plaintiff for her willingness to expose its corruption. It has waived its "sovereign immunity" by

repeatedly appearing voluntarily while not being a defendant in the action.

8.    Defendant the city of Baton Rouge/parish of east Baton Rouge ("city-parish") is a

Louisiana consolidated city-parish with powers and responsibilities of a municipal corporation,

incorporated under the laws of Louisiana, which is also its principal place of business, as well as

an administrative division of the state. It operates defendant Baton Rouge police department

("Brpd"), and was/is the employer of all BRPD defendants and some other public officials. Each

defendant, employed by the city of Baton Rouge/parish of east Baton Rouge at the time, relevant

to this complaint, is sued in its individual capacity. In addition to being sued in their individual

capacities, defendants Murphy Paul, Hillar Moore, and Richard Wells are also sued in their

official capacities. Defendants the city of Baton Rouge/parish of east Baton Rouge and Baton

Rouge police department have expressly consented to personal jurisdiction over them in this

action by the federal district court in Oregon. Due to their non-compliance with Rule

12(a)(1)(A)(i) and the requirement of timely and sufficient objection to venue in accordance with

1406(b) in response to Plaintiff's complaint, the defendants' venue objections had been also

waived.

9.    Defendant the Metropolitan Council of the city of Baton Rouge and the parish of east

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                          7

Baton Rouge ("metrocouncil") is a legislative branch of the city-parish and a governing authority

of its political subdivisions and agencies. At all times when assertions, allegations, and claims

for relief are brought against city-parish, they are also brought against metrocouncil even when it

is not explicitly stated.

10.       Defendant James Weber is/was a "BRPD" "detective" in violent crimes unit, major

assaults division, which was assigned to investigate the crimes of multiple second-degree

batteries, committed against Jane Doe by Poulicek, an employee of the Louisiana department of

justice ("Ladoj"). Weber has been instructed by those in charge of Brpd and Ladoj to falsify the

criminal investigation and shield Poulicek from any criminal and civil liability. Unsued co-

conspirator Charles Dotson was a sergeant in the same division and Weber's direct supervisor,

and defendant Stephen Murphy is/was a "lieutenant" in charge of the BRPD's "violent crimes

unit." Defendant Robert Hunt is/was a detective in a Brpd "digital forensic lab." Unsued co-

conspirator Brian Strong was/is a "detective" in Brpd. Weber, Murphy, and Hunt have expressly

consented to personal jurisdiction over of the Court in this legal action. Due to the defendants'

non-compliance with Rule 12(a)(1)(A)(i) and the requirement of timely and sufficient objection

to the venue in accordance with 1406(b), the defendants' venue objections should be considered

waived.

11.       Defendants Hillar Moore and Melanie Fields are the district attorney and assistant district

attorney for the nineteenth judicial district of the state of Louisiana ("19 JD") who have been the

key players of the conspiracy that they formed with BRPD and LADOJ to cover up Poulicek's

crime against Plaintiff and violate Plaintiff's constitutional rights. Fields also is/was a "president

of the board of directors" of defendant IRIS. Moore and Fields have expressly consented to

personal jurisdiction of the district court in Oregon in the above-entitled legal action. Due to the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                     8

defendants' non-compliance with Rule 12(a)(1)(A)(i) and the requirement of timely and sufficient objection to venue in accordance with 1406(b) in response to Plaintiff's complaint, their venue objections should be considered waived.

12.      Defendant Wilson Fields is a criminal and notorious scumbag, disguised as a "chief judge" of the criminal and corrupt establishment – the nineteenth judicial district court of Louisiana. The filthy scumbag, Fields, criminally and malisously and in distinct conspiratorial agreement with city-parish's scumbags, Louisiana "law enforcement," department of "justice," and other scumbags, sued herein, with a distinct intent to gravely injure Plaintiff and her Family, blocked Plaintiff access to court when she, while being attacked with chemical weapons, sought injunction to stop criminal activity and stop poisoning of her and her family. Although the law mandates the scumbag Fields to hold a hearing in 2 days and no later than in 10 days on the matter of the injunctive relief, the filthy criminal had been blocking Plaintiff's access to courts for months. Plaintiff provided the readings of the indoor air testing, showing that the air was dangerously polluted as Plaintiff and her Family were being bombarded by toxins and attacked with chemical weapons. Plaintiff provided a sworn affidavit that her health started to deteriorate, that she contacted numerous times the "law enforcement" and the foul negroes in charge of the ghetto where she was forced to live, but the attacks did not stop but only intensified. Numerous times, Plaintiff was coming to the "courthouse" with 5 subpoenaed witnesses, but the foul, filthy negro, Fields, was criminally and maliciously "rescheduling" it without any reason as the law does not allow to reschedule such a hearing except in case of the state declared emergency and for no longer than 5 days. After foul Fields and all other filthy scumbags, sued in this complaint, induced grave injuries on Plaintiff and her precious Family, the foul scumbags followed Plaintiff to Oregon making arrangements with various filthy "public officials" and private actors to block

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                    **9**

Plaintiff's and her Family's access to medical care, lie to Plaintiff about the state of her health

and the health of her precious Family, steal surgically removed organs and tissues to prevent

them from being studied histologically to reveal the truth and evidence that Plaintiff and her

Family were being brutally and criminally attacked, and that all three previously absolutely

healthy individuals sustained the injuries of the same etiology and severe systemic damage,

including to spleen, liver, and immune system.

13.    Defendant Dawn Sharp is an otolaryngologist that first examined Plaintiff's injuries – the

result of the attack by the psychopath Poulicek. Initially, Sharp diagnosed Plaintiff with

cartilaginous ear fractures but later manufactured false, fraudulent "records" in order not to be

"involved in any legal matter," per her own admission. Filthy, lying Sharp is "an active member

of the *Ethics* committee" in her "physician group."

14.    Defendant Shalimar Small is a psychopath and "ophthalmologist" that Plaintiff had a

tragedy to encounter. Small injected Plaintiff's eyelids with some corrosive-like substance

shortly after Plaintiff stated on December 4, 2018 to assistant district attorney Fields that she will

try to "publicize the details of the crime cover-up" and expose "the criminals that run Brpd and

Ladoj." As a result of the vicious attack by psychopath Small, Jane Doe's eyelids got eaten away

by the injected corrosives and got permanently deformed and scarred. Filthy Small severely

infected the Plaintiff's entire face whereas prior to the attack Plaintiff never had any infection of

any kind in her entire life. Small and its co-conspirators such as city-parish, LADOJ, BRPD, etc.

have been obstructing courts in Louisiana and Oregon, falsifying documents and records, and

fabricating fraudulent "investigations" in order to avoid any liability for its crimes.

15.    Defendant Louisiana state board of medical examiners is a criminal organization, wholly

controlled by the corrupt Louisiana "government." It corruptly covered up the vicious attack on

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES                                                                                    10**

Plaintiff by filthy Small and neither investigated nor held Small accountable for the horrific injuries and facial deformities it criminally inflicted on Plaintiff. In the event that board had any "immunity" it derives from state of Louisiana, that purported "immunity" has been waived by state of Louisiana and its department of "justice."

16.     Defendant Katie Craft ("Craft") is an FBI agent who has been assisting other defendants-co-conspirators with the crime cover-ups. Craft called Plaintiff and visited Plaintiff at her home but refused to provide her last name, claiming that she was not authorized to provide it. Her last name has been identified based on her photographs, published online. The New Orleans/Baton Rouge FBI office where Craft worked is umbilically and symbiotically connected to corrupt LADOJ and 19 JD. Craft has been ordered by her "superior officers" to engage in unlawful acts of aiding corrupt Louisiana law enforcement with crime cover-ups and persecution of Plaintiff. Craft continued being instrumental in conspiracy and in injuring of Plaintiff in Oregon and committing crimes against Plaintiff in Oregon. Among the Cons 1 through 500 inclusive, there is a large number of various Louisiana- and Oregon-based FBI co-conspirators. Craft is sued in her official and individual capacities.

17.     Defendant Brandon Fremin is a former US attorney for the middle district of Louisiana who held that office during the time the dirty Louisiana law enforcement started persecuting and injuring Plaintiff. Fremin umbilically and symbiotically connected with LADOJ and 19 JD where he spent the first couple of decades of his "career." While assisting to his "old [filthy] buddies" from these two criminal organizations in crime cover-ups. Fremin sent Craft under the guise of investigation to Plaintiff's home. Plaintiff provided evidence of record falsification, perjury, and crime cover-ups by BRPD. Ladoj, and 19 JD to Craft, and Craft claimed that she will pass all that information to Fremin for investigation. No investigation followed as

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 **11**

everything was just a criminal farce and Fremin was the one who sent Craft to Plaintiff to actually assist in crime cover ups and criminal dealings. Fremin is sued in his individual capacity.

18.    Defendant Jeffrey Landry is/was a Louisiana attorney general who was contacted with the request to bring its employee, Poulicek, to justice. Instead, together with BRPD and other co-conspirators, filthy Landry has been obstructing courts in Louisiana and Oregon and ensuring that Plaintiff has no access to justice. Landry has expressly waived any venue objections and other defenses while appearing in the previous action that has been unlawfully discarded.

19.    Defendant Patrick Magee was "in charge" of criminal investigations in LADOJ and was contacted with a request to review the case, involving Poulicek and bring the scumbag to justice but, being a co-conspirator of the other criminal, maliciously ignored the request. Defendant Kyle Poulicek is the malicious and dangerous psychopath that battered Plaintiff.  Poulicke has been employed by LADOJ which has been covering up its heinous crimes. Defendant Ronald Beaver, is/was Poulicek's supervisor. Magee and Beaver have expressly waived any objections to the venue whereas Poulicek has expressly consented to the district court's personal jurisdiction and has waived objections to the venue due to non-compliance with Rule 12(a)(1)(A)(i) and the requirement of timely and sufficient objection to venue in accordance with 1406(b).

20.    Defendant Caitlin Chugg was a private attorney, hired by Plaintiff to represent her as a crime victim and assist in "securing prosecution" of Jane Doe's batterer but, in conspiracy with BRPD and other law enforcement criminals and as instructed by those criminals and agencies, was intentionally duping Plaintiff, providing inaccurate, damaging "legal advice," stalling, misinforming Plaintiff, and otherwise actively working against its "client." Shortly after proving

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                  **12**

her commitment to corruption, fraud, and perjury, filthy lying Chugg was promoted and now

works for the state of Louisiana and its "attorney general" Landry. Defendant James Knipe

is/was a private attorney and Chugg's supervisor, similarly working in criminal conspiracy with

BRPD to assist it with the crime cover-up and injuring of Jane Doe.

21.    Defendant Lisa Woodruff-White is/was a judge of "the family court" of 19 JD that in

conspiracy with other defendants corruptly held a sham "protective order" hearing when Plaintiff

applied for a protective order against Poulicek. Filthy Woodruff-White, together with other co-

conspirators such as defendant Renetta Antee-Griffin, manufactured a fraudulent, altered

transcript of the "protective order" sham-proceeding and participated in many other corrupt,

atrocious dealings. Defendant William Morvant is/was a filthy "judge" of 19 JD that similarly

has been involved in criminal dealings such as tampering with and falsifying public records.

Woodruff-White, Morvant, and Antee-Griffin have expressly waived any objections to the

venue.

22.    Defendant Brad Cranmer is/was a private attorney that enthusiastically agreed to

represent Jane Doe as the crime victim and with the purpose of obtaining prosecution of Poulicek

but, after it learned from Chugg and other criminals-co-conspirators that everything what

happened was the official crime cover-up, filthy scumbag Cranmer "withdrew" its acceptance to

represent Plaintiff and joined in the persecution of Plaintiff, personally participating in criminal

activity.

23.    Defendant Christopher Nakamoto, an "anchor of WBRZ news" and a "chief investigator"

for that news outlet is a deceitful scumbag and co-conspirator that serves corruption under the

guise of "an anti-corruption activist" and assists public officials and other "politically connected"

filth in dirty dealings by stealing evidence while pretending to be interested in a "journalistic

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                    **13**

investigation" and by suppressing true stories and distracting the public by its meaningless hogwash. Nakamoto has expressly consented to the district court's of Oregon personal jurisdiction and has waived objections to the venue due to non-compliance with Rule 12(a)(1)(A)(i) and the requirement of timely and sufficient objection to venue in accordance with 1406(b).

24.     Defendant Shanard Carey is another BRPD criminal who was a BRPD "lieutenant," recently promoted to a "captain" and a "chief of detectives." Defendant Shona Stokes was a BRPD lieutenant during the events, described in the complaint, but has been promoted to a captain. Stokes is also on the board of directors of defendant The Capital Area Family Violence Intervention Center, Inc., known as IRIS domestic violence center. Defendant John Windham is yet another criminal who is/was a captain in charge of criminal investigations in BRPD. Defendant Murphy Paul is a filthy scumbag and criminal, and "chief" of BRPD. Carey, Stokes, Windham, and Murphy Paul are the citizens of Louisiana. Defendants Carey, Windham, and Murphy Paul have expressly consented to personal jurisdiction of the district court that sits in Oregon. Due to the defendants' non-compliance with Rule 12(a)(1)(A)(i) and the requirement of timely and sufficient objection to venue in accordance with 1406(b), their venue objections should be considered waived.

25.     Defendants Brenden Craig and Todd Tyson are/were private attorneys that represented Jane Doe's batterer in the staged "protective order" hearing prior to which those scumbags criminally eavesdropped on the Plaintiff's purportedly "confidential" conversation with defendant Ebony Cavalier. That crime happened with full cooperation of filthy Cavalier and "The capital area family violence intervention center, Inc.," known as "IRIS domestic violence center" ("IRIS"). Craig, Tyson, and Cavalier failed to comply with Rule 12(a)(1)(A)(i) and the

requirement of timely and sufficient objection to venue in accordance with 1406(b) and waived their personal jurisdiction and venue objections.

26.    Defendants Lisa Freeman, Kimbra Brooks, and Deelee Morris were "legal advisers" to BRPD and participated in the crime cover-ups, described in this complaint. Each one of these filthy criminals had been promoted since then. Unsued co-conspirator Chanita Vasquez was Freeman's, Brooks', and likely also Morris's assistant. Freeman, Brooks, and Morris have expressly consented to personal jurisdiction of the district court in the above-entitled legal action. Due to their non-compliance with Rule 12(a)(1)(A)(i) and the requirement of timely and sufficient objection to venue in accordance with 1406(b), their venue objections had been waived.

27.    Defendant Heather Anderson is/was a BRPD corporal who was sent to speak with Plaintiff three times in one day when Plaintiff was threatened with violence by some filthy and deranged negro. Anderson falsified the records by falsely misrepresenting that it only came once and not even mentioning the true reason for the call – that Plaintiff was being threatened with violence by the filthy negro. When Plaintiff was brutally attacked with a dangerous weapon by that same foul negro, and seriously injured, the dirty filthy cop-criminal, defendant Benjamin Sanders of BRPD, refused to even come but when eventually was compelled to respond to the call, in almost an hour after the brutal attack, the foul criminal Sanders came and falsified the public records per instruction of the criminals in charge of BRPD and Ladoj. Filthy criminal, Sanders, maliciously and criminally "designated" aggravated battery with a dangerous weapon as "miscellaneous." Defendant "Randy" Bonaventure was Sanders' supervisor who admitted to Plaintiff that Sanders falsified the record and promised that the negro who brutally attacked Plaintiff would be charged with the crime. Soon after Bonaventure made that statement, he was

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                15

brought up to the speed by the foul criminals – his supervisors in charge of BRPD. Bonaventure

then stated to Plaintiff that he was sorry but he was ordered not to correct the report and not to

charge the filthy negro with the crime, and that he cannot do anything about it because those who

ordered him to suppress evidence and cover up crime, "outrank" him.

28.      Defendant Ashton Holloway is a supervisor and/or owner of the "clinic" in which

Plaintiff was attacked by psychopath Small. After Plaintiff was attacked and injured, filthy

Holloway assaulted and threatened Jane Doe. Defendant Daniel Nelson, whom Plaintiff saw after

she was attacked and battered by Small, manufactured false, fraudulent "record" in order to

cover up the vicious ocular battery. Nelson and Holloway continued perjuring themselves,

manufacturing fraudulent records and "investigations," and obstructing courts to prevent Plaintiff

from receiving damages for the injuries that have been criminally inflicted on her. Just like all

filthy scumbags that conspired to injure Plaintiff, they have been protected by the law

enforcement scumbags, filthy "boards," and filthy "courts" that have been suppressing Plaintiff's

actions and/or complaints against them, manufacturing fraudulent records, and unlawfully

barricading Plaintiff's access to courts.

29.      Defendant Blake Booth, whom Plaintiff saw after she was viciously attacked by Small,

stole Plaintiff's scar tissues and wounds, inflicted on Plaintiff by rabid Small through the attack

by chemical weapon/injection of corrosives. The scumbag Booth, a full-blown co-conspirator,

followed the directives of other criminals, its co-conspirators, and in order to cover up the crime,

committed against Plaintiff, criminally stole and disposed of evidence of the vicious attack of

Plaintiff. Defendant Blake Williamson, whom Plaintiff also saw after the criminal ocular attack

by Small, manufactured false, fraudulent "records" in conspiracy with other defendants in order

to conceal their criminal conduct. Booth and Williamson failed to comply with Rule

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                  **16**

12(a)(1)(A)(i) and the requirement of timely and sufficient objection to the venue in accordance with 1406(b), and appeared in months after were served and in 40 days after request for entry of a default was filed, therefore their objections to personal jurisdiction and venue had been waived.

30.     Defendants Michael Simon is a criminal that was "appointed" by the criminals Small, Holloway, Booth, Nelson, Williamson, Palmintier and Degravelles, Halphen, and others to falsify, fabricate, and simulate a purported "investigation" into the vicious attack of Plaintiff by psychopath Small. The lying frauds, sued for battery, pretended to "investigate" for "medical malpractice." Defendants Maria Bernal; Maria Vives; and Jasmine Elison are filthy criminals and a purported "experts" that agreed to falsify and simulate an "investigation." The three filthy scumbags "found" that psychopath Small that viciously attacked and butchered Plaintiff, chemically burning and destroying her eyelids and severely infecting Plaintiff's entire face, did "not commit any medical malpractice." The filthy scumbags Small, Simon, Halphen, Palmintier and Degravelles, Booth, Nelson, and Williamson "searched" for those who would agree to criminally falsify an "investigation" for over 16 months whereas an "investigation" must be *completed* within 12 months. Their numerous "appointees" declined to falsify and "investigation" to such a criminal ghastly extent. Finally, filthy Bernal, Vives, and Elison were "found." Plaintiff was unable to obtain a copy of any single purported "document" that pertains to that purported "investigation" per the criminal conspiratorial agreement, and filthy Simon, together with other co-conspirators, continued lying to Plaintiff and no purported "documents" were ever provided.

31.     Dr. Laura Hetlzer is a facial plastic and reconstructive surgeon and otolaryngologist who examined Plaintiff and confirmed that Plaintiff sustained traumatic cartilaginous injuries after Plaintiff was attacked by the foul scumbag and psychopath, Poulicek. Dr. Hetzler spoke to

Weber and confirmed to it that Plaintiff has sustained traumatic injuries, however the foul

criminal Weber falsified Dr. Hetlzer's statements and the entire "investigation" which that foul

negro purported to be "conducting." Dr. Hetzler has been added as a defendant to this action

primarily for the purpose of conducting discovery.

32.    The Advocate newspaper and its phony "investigative journalists" Gordon Russell and

"Jim" Mustian are the unsued co-conspirators that have been informed about the crime cover-up

and the local law enforcement persecution of Jane Doe. After realizing that it was the official

crime cover up, authorized by the criminals in charge of "justice" in Louisiana, they joined other

co-conspirators by remaining silent. Unsued co-conspirator John Edwards is a criminal that

works as a "governor" of Louisiana who was contacted by Plaintiff regarding the official crime

cover-up but ignored the Plaintiff's communication. Unsued co-conspirator Tom Aswell is a

Louisiana "blogger" and a malicious fraud that controls the opposition and works for the dirty

Louisiana "government" under the guise of "opposing" or "exposing" it. Aswell was used to

pretend to collect some evidence of the crime cover-up and a copy of Weber's investigative

report from Plaintiff, likely for the purpose of later claiming that a newly manufactured report,

with corrected inconsistencies and obviously deceptive statements, was given to Aswell, and not

the actual, original report the copy of which Plaintiff shared with Aswell.

33.    Defendant Yuen Hann Kwok is/was an owner of the house where Plaintiff lived without

any issues or problems until she expressed her willingness to expose the filthy Louisiana "law

enforcement" corruption. Shortly thereafter, Plaintiff was no longer able to safely stay, work, or

reside undisturbed in that house that used to be a safe and welcoming place. Defendants Graeme

Morgan and Mark Burton are the two roommates who were used by the filthy Louisiana

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                    **18**

"government" defendants to persecute Plaintiff, immediately following Plaintiff's statement that

she will not accept the filthy Louisiana's corruption and will not remain silent about it.

34.     Defendant Our Lady of the Lake Physician Group, LLC is a Louisiana state-wide

criminal establishment, controlled by the filthy Louisiana governments that, after learning that

Plaintiff audio-recorded her medical appointments with its doctors and that the contents of such

recordings go against the official crime cover-ups, advanced by the Louisiana officials-criminals,

quietly and secretly, without notifying Plaintiff, "dismissed" Plaintiff as a patient by falsely and

fraudulently claiming that the reason for that was "improper behavior" (recording of the

appointments which if fully authorized by the federal and Louisiana law).

35.     Unsued co-conspirator Everett Baudean is/was a private attorney who was enrolled to

represent Poulicek in the Plaintiff's intentional tort action against Poulicek and took over Craig

who represented Poulicek at the time, in 1 hour after Plaintiff filed her first lawsuit on January

25, 2019 against the defendants, including Craig. Unquestionably, the criminals could not know

about it in 1 hour if they were not closely unlawfully monitoring Plaintiff and should they were

not be notified by the filthy middle district of Louisiana that criminally blocked Plaintiff's access

to courts and has been openly "advocating" and working for the defendants. The legal action was

suppressed and then unlawfully dismissed "with prejudice" by Dick but was reversed on appeal.

36.     Defendant Zantavia Bogan is a filthy criminal and a drug dealer, closely connected to the

Louisiana mafia of corrupt public officials who was a manager of ghetto-apartment complex

(further, "RaBS") where Plaintiff was forced to move in, and participated in brutal attack of

Plaintiff with a dangerous weapon by the deranged negro and consequent cover up of that crime,

and then directly and actively participated, in close conspiracy with the foul Louisiana "public

officials" in poisoning of Plaintiff and her Family.  Defendant Kendal Brookins is a filthy

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                              **19**

criminal and a drug dealer that was an assistant manager of RaBS and just like filthy Bogan, similarly participated in all crimes and atrocities. Defendant Cardinal Group Management, LLC was the employer of Bogan and Brookins and the manager of the disgusting ghetto-apartment. Defendant PPQBR, LLC, owned by the criminals, was an owner of the ghetto-apartment where Plaintiff and her two Family were being brutally attacked with a dangerous weapon and then with chemical weapons. Plaintiff and her Family sustained other grave injuries in that foul and disgusting ghetto, run and owned by the criminals. Defendant Gideon Carter is a filthy criminal and a bootlicker of Louisiana dirty governments that was a "lawyer" of Bogan, Brookins, and PPQBR, LLC that participated in active poisoning of Plaintiff and her precious Family.  PPQBR, LLC and Carter have consented to the venue and personal jurisdiction over them in this action.

37.    Unsued co-conspirator "court reporters of Louisiana, LLC" falsified and refused to properly transcribe a deposition of Wells because introduced evidence was favorable to Plaintiff and damaging to state of Louisiana, city-parish, and other criminals, sued herein. That criminal establishment verbally assaulted Plaintiff when she was trying to tell it that it is unlawful for it to transcribe the deposition selectively and inaccurately.

38.    Defendants Philip Morris USA, Inc.; Altria Group, Inc.; ITG Brands, LLC; Japan Tobacco International USA, Inc.; R. J. Reynolds Tobacco Company; Liggett Group, LLC are manufacturers of poisonous tobacco, marijuana, and other toxic products in the USA and the world.  Plaintiff and her Family were forced into a "residence," heavily contaminated with toxins, manufactured and sold by these defendants. In addition to other chemical weapons with which Plaintiff and her Family were being attacked by the criminals in order to induce serious systemic diseases and/or murder, they were also constantly bombarded and gravely injured by secondhand and thirdhand smoke and lethal toxins of the "products" these defendant

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                    **20**

manufacture. The defendants have been criminally falsifying and suppressing scientific evidence, bribing corrupt public officials that allowed them to legalize their poisonous products, and deceiving the public regarding the grave dangers of secondhand and thirdhand smoke tobacco, marijuana, and other toxins exposures. Those fraudulently legalized poisons were, among other things, used by the sued herein criminals to gravely injure Plaintiff and her Family.

39.    Defendants Louisiana supreme court and Louisiana court of appeals consists of notorious scumbags and criminals that fully and aggressively have been participating in the criminal enterprise, described in this complaint, including falsifying records, suppressing Plaintiff's appeals for over three years and then criminally lying that Plaintiff "abandoned" her appeal, perverting the law and procedure, deceiving the public, etc. Defendant Louisiana nineteenth judicial district court and defendant Baton rouge city court consists of notorious scumbags and criminals that fully and aggressively have been participating in the criminal enterprise, described in this complaint, including falsifying records, tampering with "court" records, simulating proceedings, perverting the law and facts, physically injuring Plaintiff, poisoning Plaintiff and her family, and willfully depriving Plaintiff of her constitutional rights. Defendant Christopher Hester is a filthy scumbag which personally participated in the crimes against Plaintiff and her Family. When Plaintiff was attacked by Poulicek and sought criminal justice, Hester was in charge of the prosecution of the crimes, reported to the "violent crime's unit" of BRPD. Thereafter, the scumbag became a "judge" of the city court and directly participated in forcing Plaintiff into the ghetto. Thereafter, filthy Hester was "elevated" to Louisiana court of appeals for the first circuit – the filthy scumbaggery criminal establishment inside out that has been actively involved in all crime cove ups.

40.    Unsued co-conspirator Kurt Peterson is an Oregon-based attorney for city-parish and its

many co-conspirators who attended a November 18, 2020 sham-"Spears hearing," simulated by

Wilder-Doomes. Although Plaintiff filed her legal action in district of Oregon on February 28,

2021, the defendants had recruited Peterson long before that.

41.    Defendant US district court for the middle district of Louisiana ("Lamd") has been

suppressing and mishandling the Plaintiff's legal actions and denying Plaintiff access to courts

since January 25, 2019. Defendants John Degravelles, Shelly Dick, Erin Wilder-Doomes, and

Scott Johnson are the judges of middle district of Louisiana who, while being intimately and

umbilically connected to the Louisiana defendants of this complaint, have been acting as their

advocates and unconstitutionally retaining "jurisdiction" over the Plaintiff's legal actions. As

members of the criminal enterprise, described in this complaint, they have been instrumental in

covering up crimes, assisting in persecution of the Plaintiff and using their "federal" employment

and access for furtherance of the multidistrict conspiracy. These filthy "judges" have been

shamefully perverting the law, lying, falsifying records, deceiving the public, simulating the

proceedings, and criminally depriving Plaintiff of her constitutional rights.

42.    Defendant US court of appeals for the Fifth circuit and defendants Patrick Higginbotham,

Stephen Higginson, and Kyle Duncan have been carefully assisting in crime cover ups and

working closely together with other co-conspirators and criminals, sued herein and the unsued

ones. When Plaintiff submitted a 55-page brief, detailing Degravelles', Wilder-doomes', Dick's

atrocities, perversions of the law and facts, lies, dirty and open assistance and advocacy for the

defendants and obstruction of justice, coupled with their malicious failure to disqualify

themselves, perversion of the procedure and violation of the Supreme Court's precedents in order

to injure Plaintiff and criminally block her access to the courts -- those judges hid the Plaintiff's

appellate filings from the public and manufactured a filthy and full of lies fabrication, falsely claiming that Plaintiff failed to present any "nonfrivolous" argument. Those malicious and corrupt defendants-co-conspirators criminally supported all atrocities that have been committed against Plaintiff and aided in crimes and obstruction of justice. They willfully deceived the public by falsely claiming that Plaintiff "failed" to present any arguments whereas Plaintiff meticulously briefed all applicable law and demonstrated that the middle district of Louisiana culprits lost their minds in their corrupt madness and perverted all the laws and all the US Supreme Court's relevant precedents.

43.    Defendant Peacehealth Oregon West Network and defendant Peacehealth Primary Care Clinic (both collectively referred to as "Peacehealth") are foul and corrupt "medical" establishments in Oregon and the dirty governments' bootlickers that have been readily complying with the criminal orders of the foul criminals, sued herein, who, after criminally and gravely injuring Plaintiff and her precious Family, started criminally destroying evidence of their crimes and covering up their ghastly crimes. Peacehealth is a full-blown co-conspirator as immediately after it was contacted by the filthy criminals and ordered to block Plaintiff's access to certain medical procedures and diagnostic tests that were specifically recommended by their "medical" personnel, criminally and maliciously, and secretly – without informing Plaintiff – cancelled them and continued lying to Plaintiff.

44.    Defendant Jill Chaplin is a filthy and corrupt dirty governments' bootlciker and a "physician" who specifically recommended certain tests and procedures to Plaintiff after speaking with Willamette cancer center, and then ordered such tests for Plaintiff. As the diagnostic procedures were capable to detect cancer on a cellular level and even detect pathological changes to DNA, caused by the criminal attacks of Plaintiff by chemical weapons,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                              **23**

the foul criminals-scumbags, sued herein, and their various unnamed unsued coconspirators that assist in the dirty criminal dealings behind the scenes and closely monitor Plaintiff, her life, all her communications, etc., immediately interfered and ordered filthy Chaplin and Peacehealth c cancel all the tests and block Plaintiff's access to medical procedures.

45.     Defendants James Sims and Celeste Sather are Chaplin's supervisor and the "clinic" manager. These filthy and corrupt bootlickers were contacted regarding Chaplin's abrupt and secret cancelling of the medical procedures that were previously specifically recommended by Chaplin and already ordered. The filthy co-conspirators, while working in full cooperation with all other criminals, sued herein, did not even respond to Plaintiff's correspondence and access to medical care continued being blocked to Plaintiff.

46.     Defendant Echo Hollow veterinary hospital and urgent care clinic is another filthy coconspirator and bootlicker of the dirty governments. Defendant Heather-Renee Srch-Thaden is a filthy, disgusting criminal and bootlicker of the dirty criminal governments that readily assists in crimes. Echo Hollow and Srch-Thaden were instructed to lie to Plaintiff regarding the disease of Rebecca, entirely induced on her by the foul, disgusting criminals, sued herein, through the malicious and criminal attacks with chemical weapons. The filthy and criminal coconspirators have fully complied and lied to Plaintiff, prevented and discouraged her from obtaining adequate tests for Rebecca, and falsified the record, twice – for the second time, in nearly a year after Plaintiff and Rebecca visited their foul "clinic" and when Plaintiff started voicing her assertion regarding the foul criminals poisoning Plaintiff and her Family and inducing grave injuries on all three. Then, the disgusting "law enforcement" criminals stole the fraudulent "records," scribbled by filthy Srch-Thaden, from Plaintiff's home, and Srch-Thaden refalsified them again to better comport with the deception and crimes that the criminals have been perpetuating. Filthy Srch-

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                      24

Thaden scribbled with its own handwriting the text of the refalsified record, and has been closely

involved with the crimes and continued participating in atrocities, therefore the involvement of

those foul, disgusting defendants has been a long-term criminal cooperation.

47.     Defendant Oregon Veterinary Referral Associates and defendants Curt Daly and Gina

Schluckebier are other corrupt and complicit bootlickers of the dirty governments. These corrupt

defendants-co-conspirators had been instructed to steal and destroy Forrest's spleen that was

scheduled to be examined histologically. The criminals did not allow Plaintiff to retrieve her

spleen. For the whole month they stalled and lied to Plaintiff and then claimed that they stole the

spleen because Plaintiff still owed them the portion of the quote. When Plaintiff specifically

requested that the spleen be released to her, they refused to do so. When Plaintiff inquired

whether they will release her spleen to her or examine it histologically after they receive the

remainder which they claimed Plaintiff still owes them, these thieves did "not know" but tried to

tell Plaintiff that it was "not necessary" to histologically examine her spleen in order to

determine the type of cancer, staging, and what toxins the filthy Louisiana criminals used to

induce those horrific injuries and damages and poison Plaintiff and her Family. These Oregon

co-conspirators, in the closely coordinated with the Louisiana defendants criminal racketeering

activity, simply stole the Plaintiff's spleen, destroyed and aided in destruction of evidence and

obstruction of justice, and falsified the records.

48.     Defendant Richard Wells, sued in its individual and official capacities, is another dirty

scumbag that, together with all other city-parish criminals and state of Louisiana criminals,

including those who work in the fire department ("BRFD"), have been fully aware that Plaintiff

was being poisoned and deliberately attacked with chemical weapons by the dirty filthy

scumbags, sued in this legal action. Filthy Wells was bribed by foul, despicable Carter, Bogan,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                      **25**

Brookins, Cardinal, and PPQBR to lie during its deposition. Plaintiff audio recorded Wells, who was a "captain" in BRFD and came to the foul ghetto to supposedly investigate toxic fumes with which Plaintiff and her Family were being attacked. Although the foul scumbags deliberately, per criminal design, did "not identify" any neurotoxins, bioagents, and carcinogens with which Plaintiff and her precious Family were being attacked, they commented on the extremely strong and disgusting fumes of illegal drugs that were being diverted into where Plaintiff and her Family stayed from all directions where foul negroes and drug addicts "lived." Although Plaintiff and her Family were also being unquestionably attacked by something else – extremely toxic and poisonous substances that induced splenic lymphoma, severe systemic diseases, and deterioration OF THE SAME ETIOLOGY IN ALL THREE PREVIOUSLY ABSOLUTELY HEALTHY VICTIMS – Plaintiff and her Family – the victims also had been attacked by extremely strong, dense, and continuous secondhand tobacco and various illegal drugs' toxic fumes which contains tens of thousands of toxic chemical, hundreds of which are known to be carcinogenic. Those attacks alone contributed and induced at least in part the damages which Plaintiff and her Family suffered. And Wells and his team clearly commented on the presence of those disgusting fumes that were being diverted from the negroes-addicts. They identified the illegal drugs they were smelling and stated that they were sorry Plaintiff was being forcefully exposed to that poison. Wells specifically stated that he was surprised that neither the ghetto filthy owners and managers had not done anything yet nor the BRPD. When Plaintiff asked Wells about it during his deposition, Wells lied that it never said it, witnessed it, smelled it, or observed it. When Plaintiff played the conversation with all those statements by Wells and his team, filthy Wells still lied and claimed it does not know how Plaintiff "doctored" that recording. Because Wells is sued in its official capacity as well, the entire fire department is also being sued. Unsued co-conspirator

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                          **26**

is a now retired BRFD "chief" – "Ed" Smith – the scumbag that was personally aware that Plaintiff was being attacked and poisoned by the filthy city-parish and personally aided in the crimes.

49.     Defendants Google, LLC; Reddit, Inc.; Advameg, Inc. and city-data.com are filthy and malicious bootlickers of the dirty governments that assist in crimes and suppress truthful narratives that expose the filthy scumbags and criminals under the guise of the "government" and the narratives of the events, described in this complaint. In violation of the Constitution, the scumbags in charge of these establishments silence the truthful, dissenting voices and deceive the public by suppressing free speech and press. Unsued co-conspirators Twitter, Inc., Meta Platforms, Inc. formerly known as facebook, Inc., and Linkedin/Microsoft are the filthy bootlickers of dirty governments, aiding in crime cover ups and unlawfully suppressing, in close cooperation with those dirty governments any truthful and critical speech about them are being mentioned because those scumbags, per request of the sued herein criminals, entirely block Plaintiff's access to their "platforms" even though Plaintiff had never violated any rules of those "companies" but simply the filthy cowardly criminals, sued herein, prevent Plaintiff from suing those "platforms" as a "prophylactic" measure to ensure that as few people as possible would learn about their crimes, committed against Plaintiff and her Family.

50.     Defendants Cons 1 through 500 inclusive are the co-conspirators, criminals, scumbags, and filthy malicious frauds that have been assisting in the crimes, crime cover-ups, record falsification, physical injuries to Plaintiff and her Family, destruction of evidence of the crimes, committed against Plaintiff and her Family, deception, tampering and falsifying documents to any extent or degree, malicious suppression and denial of medical treatments and procedures to Plaintiff, free speech suppression, obstruction of justice, etc. That would be various clerks,

secretaries, assistants, "doctors," administrators, agents, policemen, etc. that have been assisting in the crimes from behind the scenes. Cons 1 through 500 are based in Oregon, Louisiana, the US, and worldwide.

51.     Each defendant who is a natural person and whose name is listed in this complaint, is sued in its individual capacity, except Craft, Paul., Wells, and Moore who, in addition to being sued in their individual capacities, are also sued in their official capacities.

## STATEMENT OF THE CASE

52.     Plaintiff has been battered by the sick and filthy mentally disturbed psychopath Kyle Poulicek, a worker of Ladoj that just graduated from a Baton Rouge "police academy." The crimes of the repeated second-degree batteries, committed by Poulicek, left Jane Doe with multiple and numerous ear cartilage fractures and deformities and resulted in loss of the part of the Plaintiff's ear.

53.     Plaintiff saw an otolaryngologist Dawn Sharp for the injuries' evaluation. Plaintiff showed Sharp her injuries and Sharp immediately confirmed: "It's broken, damaged cartilage." Sharp asked whether it was a "child" who destroyed the Plaintiff's ear cartilage as either a senseless child or a rabid criminal with severe mental, intellectual, and emotional deficiency would be expected to do something as sick as what disgusting and despicable Poulicek has done.

54.     After Jane Doe reported the crimes of violence to BRPD in August 2017, Officer Brian Hunter promptly, within a few minutes, arrived to document the complaint. He wrote: "I met with a victim of a second-degree battery. She told me that her ex-boyfriend had damaged her ears from squashing and twisting them. The doctor's diagnosis: ear cartilage deformity, bilateral." "[Plaintiff] showed me lumps on her ears, damage she said was done by [Poulicek]."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 28

55.    The case was assigned to "detective" James Weber. From the very beginning, Weber
started plotting crime cover-up and implementing the easiest and least incriminating ways to
dispose of the case and shield Poulicek from any criminal and civil liability.

56.    Weber called Jane Doe on August 30, 2017 and conducted a preliminary interview by
speaking with Plaintiff for about 10 minutes as well as scheduled an in-person interview for the
next day, August 31, 2017 at 6:00 PM. Next day, Plaintiff sent a text message to Weber's cell
phone number in which she identified herself, provided a date/time the interview was scheduled
for, and asked to reschedule and let her know about a new date and time. Weber ignored the
Plaintiff's message. After waiting for a few days to no avail, Plaintiff called Weber on September
5, 2017 and repeated the same information and question that was in her text message. Weber said
it can meet tomorrow, September 6, 2017.  However, in its report it fraudulently wrote: "On
08/30/17 I attempted to contact the victim by phone using the number given in the report. I was
unable to reach the victim." As Weber erroneously assumed that Jane Doe was not interested in
coming down to the office for the interview, its false statement regarding "inability" to even
"locate" the victim was made with calculation to use the easiest way to "clear" the case and
cover up the crime.

57.    Weber also wrote a series of other nonsensical, misleading, and false statements such as:
"On 09/05/2017 I sent out a contact sheet in an effort to contact the victim" – Weber claims that
it mailed some sheet in attempt to locate Jane Doe in a week after the personal telephonic
interview that was conducted on August 30, 2017. It also wrote: "On 09/05/2017 I spoke with
[Plaintiff] via phone. [Plaintiff] advised she would come into the office for an interview on
09/06/2017." Weber was fraudulently methodically creating an appearance of "not being able" to
contact Plaintiff, apparently assuming that she would not come for the interview until Plaintiff

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                  **29**

did come to the office. Neither of its comments make sense as it did not go the way Weber hoped for and it could not quickly "clear" the case.

58.    The Plaintiff's interview on 09/06/2017 has been videotaped and Weber advised Plaintiff that it will be videotaped during the August 30th telephone interview. In the office, Weber announced when it was turning on and then turning off the cameras.

59.    Weber voiced a "disbelief" that Plaintiff has been injured by Poulicek on account that Plaintiff "dated" Poulicek "for two months only." Weber kept repeating that since Plaintiff was in a "relationship" with Poulicek for a short period of time, it could not be Poulicek who injured her. Weber stated that it conducted an "internet research" and did not find any "instructions" on the web how to inflict ear injuries. Weber "believed" that ear injuries could only happen during "wrestling" and "only wrestlers know how to do it [inflict ear injury]" and because Poulicek was "not a wrestler," he could not have inflicted the injuries. Unquestionably, all those fraudulent purported "assumptions" were attempts to brush the Plaintiff off.

60.    During the interview, Plaintiff showed her injured ears to Weber and, while looking, it exclaimed: "Now I see, you did get injured!" Weber confirmed that it could see deformities, bruises, and discolorations on the Plaintiff's ears.

61.    Over the course of the interview and after asking Plaintiff more questions, Weber stated that it thinks that Poulicek "was punishing" Plaintiff "for something."  The filthy birdbrain criminal apparently believed that Plaintiff "deserved" what has been done to her. At the conclusion of the "interview," the filthy bastard Weber told Plaintiff that it was her "fault" that she has been attacked by the sadistic psychopath Poulicek and that she was at fault "for getting into a relationship with that guy [Poulicek]."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **30**

62.    Weber wrote the following "investigative details": "[Plaintiff] was certain that Poulicek

has done this on purpose to cause the damage to her ears. [Plaintiff] had large deformities behind

her left and right ears." There is no mentioning of the signs of a recent trauma that Weber

observed and commented on such as bruises, discolorations, and contusions as well as no any

other pertinent details were included in that fraudulently manufactured "report."

63.    On September 11, 2017 Plaintiff emailed Weber, inquiring about an update on her case.

Next day, she received a message, left on her voicemail by Weber where it enthusiastically

greeted Poulicek and informed Poulicek that it was a "suspect" with whom Weber wanted to

speak. Plaintiff had to email the gormless "detective" and tell it that it left a message for the

batterer on the victim's voicemail.

64.    As there were no updates from Weber, on September 21, 2017 Plaintiff emailed Weber

and inquired what was going on with her case. On September 25, 2017, Weber responded that it

"was unable to gather enough probable cause to charge [Poulicek] with a crime."

65.    Plaintiff requested a meeting with Weber's supervisor and on September 26, 2017 met

with Charles Dotson. Dotson, another filthy criminal with a tremendous arrogance and ego,

proudly told Plaintiff that its "neighbor is a surgeon" and that it spoke with that "surgeon" who

"told" it that it "takes years to cause ear injury" and that's why Poulicek could not have done it

as Plaintiff had not known him "long enough." Plaintiff responded that it took Poulicek just

seconds to inflict more than 20 ear injuries. Dotson, rapidly losing its patience, said that its

neighbor knows better as it is a "surgeon" and Plaintiff isn't.

66.    As Plaintiff continued rejecting unintelligent and fraudulent claims that Dotson was

presenting to her, it then tried to convince Plaintiff that she has not been injured at all. With a

cretinous smile on its face, Dotson asked: "If he wanted to hurt you, why didn't he punch you in the nose?"

67.   Plaintiff asked Dotson to accept evidence such as photographs that show that before Plaintiff met Poulicek and even weeks after, her ears were still healthy, intact, and beautiful. The photograph of Jane Doe and Poulicek, taken prior to the batteries would alone destroy the fraudulent sloppy "theory" that Dotson and Weber manufactured as a purported "explanation" to why they, in violation of the law, refuse to file criminal charges against Poulicek. Dotson refused to accept photographs or any other evidence.

68.   Through laughter, Dotson also told Plaintiff that she "probably (engaged in rough) sex" with Poulicek and "that's how" ended up with her ear cartilage, fractured in over 20 places. It said that it was Plaintiff's "fault" and that she "should choose better with whom (she) socialize(s)."

69.   While Plaintiff still was trying to discuss her case with Dotson, it got up and ordered Plaintiff to follow it as Dotson decided to escort her out of the building. Plaintiff asked what was Dotson's name and who was in charge of the "violent crime unit." In the most arrogant way, Dotson slowly hissed: "I am" but refused to provide its name. Instead of providing the answer, it started repeating in a parrot-like manner, "Thank you for coming, good-bye." Plaintiff continued asking what was its name and who was in charge. There were numerous visitors in the lobby – people not affiliated with police – who started looking at Dotson. It then handed its "business card" to Plaintiff. The falsified "reports" have no mentioning that Plaintiff met with Dotson, Weber's supervisor, to discuss her case.

70.   After being tossed out by Dotson and still unable to get police to even accept evidence as it was going against their crime cover-up agenda, Plaintiff found out the name of an individual in

charge of the "violent crime unit" and contacted Stephen Murphy – another criminal in the "chain of command." In a written correspondence, Plaintiff pointed out that Weber and Dotson did not accept any evidence from Plaintiff but lied to her and made various fraudulent claims in purportedly support of their corrupt refusal to follow the law and charge Poulicek with the crime. Murphy failed to address any of the Plaintiff's concerns and repeatedly lied to Plaintiff and stalled for months, claiming that it will review the Plaintiff's case.

71.    On November 30, 2017 and May 15, 2018, Plaintiff saw Dr. Laura Hetlzer, a facial plastic and reconstructive surgeon and otolaryngologist who specializes in rebuilding, restoring, and "creating" ears, including in the cases where cartilage was lost or damaged due to trauma. Dr. Hetlzer made over a dozen of strong statements regarding Plaintiff's injuries such as: "I see the difference in your ears. I absolutely do. And I see the difference from that (a photograph of the pre-injured ears) and I see what's been done to you, but there is no easy way to put it back together." "We don't need an MRI to see that he changed your ears or that he hurt you more than just physically." "Walk away from it with your scars and with your changes […] despite this horrible person who did this to you." Dr. Hetlzer also asked Plaintiff, at least seven times, whether Plaintiff was still around that individual who damaged cartilage in her ears.

72.    After several months of stalling, on December 28, 2017 Murphy emailed Jane Doe, claiming that Weber purportedly finally inquired about the security tapes in the apartment complex which Plaintiff told them likely captured some of Poulicek's attacks on the Plaintiff. It claimed that the tapes were already "deleted" by the apartment complex. Murphy also fraudulently claimed that Plaintiff's injuries were "inconsistent with (Sharp's) examination and evaluation" and that Weber "closed the case due to insufficient probable cause and physical evidence."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                33

73.     Since Jane Doe was being prevented from seeing the falsified "investigative report" for many months, she did not know it at that time but learned later when unexpectedly acquired a copy of the report through the third party that, after speaking with Sharp, Weber wrote: "[Sharp] advised that if someone were to twist your ears in such a manor (sic) as to break the cartilage, the effects would be immediate and obvious." When Weber and Dotson introduced their fraudulent "theory" that "it takes years to cause ear injuries," Jane Doe emailed Weber several times – there are several separate emails, sent weeks and even months apart, where she repeatedly pointed out that the injuries were instantaneous, and visible right away, and it took Poulicek seconds to inflict them, and that the doctor should be able to confirm it. In each email, Jane Doe kept requesting that Weber speak with the physician. Weber continued ignoring Plaintiff for months but when finally "agreed" to interview Sharp, used precisely the Plaintiff's vocabulary and the way she repeatedly described it, to fraudulently present the exact Plaintiff's statement as being "inconsistent" with what Jane Doe said.

74.     Plaintiff responded to Murphy that she audio-recorded her medical appointments and it is clear from the recordings that Sharp immediately recognized the injuries as consistent with ear twisting and pinching. Jane Doe said that she also saw another doctor, a specialist in the ear reconstructive procedures, Dr. Hetzler, who also repeatedly confirmed the injures and inquired multiple times about Plaintiff's safety, being concerned that Plaintiff could still be around the abuser who will continue destroying cartilage in her ears. Jane Doe requested that Weber interviews Dr. Hetlzer and also requested a copy of the "investigative report."

75.     Murphy completely ignored everything that Plaintiff told it and only responded in more than a week that she must contact Lisa Freeman to get a copy of the report. Freeman, then "legal adviser to BRPD," emailed Plaintiff on January 8, 2018 and stated that Murphy "contacted (her)

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                34

office regarding" Jane Doe's public record request and said that Plaintiff must submit it directly

to her "office." Plaintiff responded that she had already faxed the request several days ago but as

Freeman claimed that she did not receive it, sent the request again via email. Freeman then

informed Jane Doe that they "will begin processing" it.

76.     As the defendants-co-conspirators were determined to keep Plaintiff from getting a copy of

their falsified and fraudulent "investigative report," Freeman was instructed by Murphy and

others in charge of BRPD to stall and not release the requested public record to Plaintiff.

77.     Plaintiff informed Murphy that it did not address any of her concerns that she thoroughly

described in her emails that show BRPD made inconsistent and nonsensical contradictory

statements. As, in violation of the law, Jane Doe was being denied access to public records and

"investigative reports," at that point she did not know yet that defendants-co-conspirators

manufactured the entirely false, misleading record to cover up the crime. Plaintiff also reminded

Murphy of its promise "to set up a conference in person upon completing (its) review," made on

October 25, 2017 via email. Murphy once again failed to address the substance of the Plaintiff's

correspondence, including the reminder about its empty promise, made in writing, and simply

told Jane Doe to make "any further requests through" Freeman.

78.     Not surprisingly, for many weeks there was no response from Freeman's "office" or her

assistant Vasquez regarding the status of the Plaintiff's public record request as the criminals

deliberately unlawfully blocked Plaintiff's access to public records. Plaintiff went to the district

attorney office of the 19 JD and asked to speak with a prosecutor or a prosecutor's assistant. She

was not allowed inside the office and someone came to the lobby, said that he was an

investigator and asked what she wanted. Jane Doe explained what happened to her and that her

case was dismissed improperly but she does not know the specifics as she is being prevented

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                    35

from seeing the "investigative reports." She asked the DA office to step in and investigate her case. The investigator told Plaintiff that they will not do anything but that she should go back and ask BRPD to reopen the case.

79.    On January 22, 2018, Plaintiff met with Caitlin Chugg who claimed to be "an attorney for domestic violence victims" as well as with Chugg's supervisor, Knipe. Chugg claimed that it will assist Plaintiff in "securing (of) prosecution of (the Plaintiff's) assailant." As it appeared that next criminal in the "chain of command" of BRPD was Windham, Plaintiff was trying at that time to set up the meeting with Windham. She asked Chugg if it could accompany her and "represent" her during the meeting with Windham. In response, Chugg claimed that "as an attorney," it "can go directly to the DA" and doesn't have to meet with BRPD. While taking all Plaintiff's savings, Knipe clearly stated that the "DA office will be contacted tomorrow" on Plaintiff's behalf, which would be January 23, 2018. Per Knipe's request, Plaintiff sent Chugg relevant photographs, files, and other documents.

80.    On January 26, 2018, Jane Doe received a letter from the law firm where Chugg and Knipe worked with a bogus "representation contract," which vaguely stated that the law firm will be representing Plaintiff as a "domestic abuse victim in Baton Rouge city court." Plaintiff immediately emailed Chugg and asked to confirm that, as agreed, Chugg will be assisting Jane Doe in securing prosecution of Poulicek. Jane Doe informed Chugg that she will not be signing the "contract" that was mailed to her as it is misleading and misstates the actual agreement. Chugg claimed that the office made a mistake, and that it will mail a correct contract. Contrary to Chugg's claims and promises, no other "contracts" were ever emailed or mailed to Plaintiff.

81.    After not hearing from Chugg for two weeks, Jane Doe emailed it, asking for an update as Chugg and Knipe promised to her that they contact the DA office on January 23, 2018. Chugg

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 **36**

responded that it was "still trying to communicate to BRPD" but refused to say anything else via email and told Plaintiff to call it. For over 30 minutes Chugg was attempting to brainwash Jane Doe by making more empty promises and lying that it must communicate first with BRPD as it would "enable" it to contact the DA. Plaintiff stated that during the in-person meeting that is exactly what Jane Doe asked for – to be represented at the meeting with Windham, an individual in charge of criminal investigations of BRPD with whom she was trying to set up the meeting as she thought it would be her next point of contact after Murphy wasted several months of her time, stalling and lying. Back then, Chugg said that "as an attorney, (it) can go directly to the DA office." Now, it was claiming just the opposite as it was consistent with its dirty agenda of assisting BRPD and other "law enforcement" with the crime cover-up. Every time Plaintiff was asking Chugg if she may attend those "meetings" with "law enforcement" that Chugg claimed it was "trying to schedule," it would categorically reject it, saying that Jane Doe may not be present. Of course, there were no meetings to be scheduled and filthy Chugg was just outrageously lying to Jane Doe and committing crimes against her.

82.     After two months of waiting and repeated fruitless inquiries regarding the status of production of the requested "public record files," on March 5, 2018 Plaintiff finally got a "response" regarding the "status" of her request. Vasquez finally responded to Jane Doe that Chugg "closed" Jane Doe's public record request. Plaintiff immediately contacted Chugg and asked what was going on and why it closed her public record request without consulting with her or even informing her about it. Shockingly, Chugg – a corrupt puppet of the dirty governments – claimed that it has done it to "keep the possibility of prosecution open," outrageously lying to Jane Doe that "if the record is obtained, (Poulicek) would never be convicted (because of that)."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    37

83.  As someone who could not even imagine such a degree of moral filthiness, Jane Doe believed Chugg and contacted Vasquez to tell it that since her "attorney" tells her so, she agrees to close her request. Jane Doe genuinely worried for several months that if someone would request the "public record" that pertains to her case, it will, as per Chugg's deceptive statements, automatically preclude Poulicek from ever being prosecuted.

84.    Chugg and Knipe, after abusing and defrauding Jane Doe for over three months during which they were actively working against their "client," committing crimes against Jane Doe, and aiding corrupt law enforcement criminals, were terminated by Plaintiff as her "attorney." Chugg, after proving its commitment to deceit and corruption, has been "promoted" and now works for Landry in a "child advocacy program" that purports to be "represent(ing) abused and neglected children who have been removed from their homes and/or families and are in the custody of the state." That raises concerns as vulnerable children should not be further mistreated by someone like Chugg. This complaint clearly demonstrated the pattern, characteristic for the filthy Louisiana – filthy and corrupt get "promoted" and individuals who have at least traces of integrity, resign or leave city-parish-state organizations, and the foul state itself.

85.    Jane Doe emailed Weber several times, telling it that it closed her case improperly, failed to accept evidence, and failed to investigate, such as failed to even interview Dr. Hetzler. Plaintiff patiently waited for couple of weeks before sending another email however Weber kept ignoring Jane Doe.

86.    Plaintiff sent a letter to the district attorney's office, addressed to Hillar Moore, and requested to review her case and bring her batterer to justice. After fruitlessly waiting for over a month for a response, she called the DA office but the receptionist refused to transfer her to anyone who reviews/replies to the correspondence. Plaintiff then went there in person and told

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**

the receptionist that she sent a letter but received no response. Just like in the past, she was not allowed inside nor allowed to speak with a prosecutor. Instead, somebody who "works with victims" stepped out to speak with Jane Doe and brush her off. The "victim worker" said that they did not receive Jane Doe's letter without even asking what was her name or when it was sent, and refused to check their records when Plaintiff specifically requested.

87.    Plaintiff then called the prosecutor's office in Baton Rouge city court and someone told her that they will connect her with Stokes, a "high-ranking BRPD officer who investigates domestic violence cases." Jane Doe was told that Stokes will get in touch with her. Plaintiff waited for over two weeks and then decided to call again the helpful individual who promised to contact Stokes. He was surprised that Stokes had not gotten in touch with Plaintiff yet, stating that Stokes "is usually very good with following up." He stated that he will email her again and remind to contact Plaintiff. Stokes called Jane Doe shortly after that, interviewed her, and told her that she will ask Weber to respond to her emails. Shortly thereafter, Weber emailed Plaintiff that it "will hear more evidence" and told Plaintiff to come to its office and bring all those recordings Plaintiff repeatedly was telling it in her emails for months, which it continued ignoring until Jane Doe spoke with Stokes and Stokes filed a supplemental report into that "investigative file." As access to public record was being consistently denied to Plaintiff for several months, Plaintiff did not know it then but found out later when finally got a copy of the reports through the third party.

88.    Weber scheduled the meeting two weeks in advance and told Plaintiff to come by on April 24, 2018. During the April 24 meeting with Weber and Murphy, Plaintiff played the portions of the audio recording of the appointment with Sharp, where after Plaintiff asks why the initial diagnosis, "bilateral ear cartilage deformity," was either removed or modified, Sharp tells Jane

Doe and repeats three times that it "can't get involved in any legal issue." Plaintiff also played a large portion of the recording of the appointment with Dr. Hetzler where the doctor makes over a dozen of strong statements regarding Plaintiff's injuries that alone would destroy the BRPD's fraudulent inconsistent claim and crime cover-up.

89.    Plaintiff asked Weber whether it remembers seeing and commenting on the Plaintiff's injuries. Weber said that yes, it remembers. As it just heard a very detailed Dr. Hetlzer's narrative regarding the Plaintiff's injuries, and also heard that Sharp did not want to provide a truthful testimony because it can't get involved in any legal issue, Plaintiff then asked why there are still no criminal charges against Poulicek. Weber said that there was no evidence. Murphy told Jane Doe that she "present(s) (herself) as a victim," but she actually is "not" a victim, and, since there was "no evidence," they "can't manufacture evidence." Continuing with their psychological abuse and manipulation of Plaintiff, the culprits implied that something was wrong with Plaintiff, and she simply imagined her injuries. Plaintiff responded that she is healthy mentally and psychologically and never loses connection with reality, and that she is willing to go to any psychiatrist for a full evaluation and have the results delivered to them. The Plaintiff's question/proposition was not responded to by the two criminals and she got was a blank stare.

90.    Although Weber and Murphy claimed that there was "no evidence," they also claimed that "to advance investigation," they needed to copy all the recordings "from the original device." It sounded nonsensical as they heard the contents of the recordings, and Weber stated it believed that the recordings were the actual medical appointments of Plaintiff, and at the same time both were claiming that there was "no evidence." Against her strong intuitive protest, Plaintiff nonetheless agreed to sign a "consent form" for Weber to copy the recordings. The filthy scumbag Murphy exhibited evil happiness on account of duping Plaintiff. Just like Plaintiff

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                40

intuitively felt at that time, she later learned that the culprits certainly wanted to copy the audio-recordings "from the original device" in order to falsely claim that the recordings were "altered" in a corrupt and criminal attempt to discredit the exceptionally strong evidence. While purporting to be "summarizing" the portion of the complaint that pertains to those events, corrupt Wilder-doomes wrote that Plaintiff was complaining that Weber and Murphy "failed to understand how the recordings were evidence," whereas the complaint asserts just the opposite and describes in detail how the culprits went an extra mile in order to copy those recordings.

91.     After Plaintiff, very reluctantly, signed the consent form, she was transported to a "forensic digital lab" where Hunt copied the recordings from her laptop, twice. Hunt did not seem to know how to copy certain files from the phone and only knew how to copy everything stored on the phone but Plaintiff consented only to the copying of the particular recordings. As Hunt was unable to copy them from the smartphone, it copied the files from the Plaintiff's laptop where Plaintiff previously transferred them. As Weber needed the recordings to be copied from the device by which the recordings were made, so that it can fraudulently claim that the *original* files were "altered", Plaintiff connected her smartphone to her laptop through wi-fi, and Hunt copied the recordings for the second time from the laptop, connected to the smartphone. All that took a considerable amount of time; somewhere in the middle of the process, Plaintiff asked if she may withdraw her consent for copying of the files, in accordance with the document that she was made to sign which stated that Plaintiff can abort the copying event at any time until finalized and withdraw her consent. Weber said that no, Jane Doe cannot withdraw her consent and must provide the recordings so that Weber "know(s) what questions to ask Dr. Hetzler." As Jane Doe was being denied access to public records, she did not learn about it right away but when acquired a copy of the reports through the third party on August 8, 2018, learnt that Hunt

manufactured a misleading report, insinuating that the recordings were either modified or not genuine.

92.     Although the recordings were copied, Weber still had "nothing to further the investigation with," and wanted to speak with Dr. Hetzler personally. Weber stated to Plaintiff that should Dr. Hetlzer confirm to it seeing any injuries on the Plaintiff's ears, it will charge Poulicek with the crime.

93.     Dr. Hetzler confirmed to Weber that Plaintiff has traumatic ear injuries. Weber's falsified report claims that Dr. Hetzler told it that "the injuries could not have happened in the manor (sic) [Jane Doe] stated." At the deposition, taken on July 31, 2019, Dr. Hetlzer stated that Weber asked her whether Plaintiff's injuries could have been inflicted by "gentle rubbing of the ears." The filthy fraud Weber asked Dr. Hetzler the only question that has no applicability to the Plaintiff's case so that it can further falsify its fraudulent "report." The record shows that at all times Plaintiff stated that her ears were pinched, squashed, and twisted. That has been documented by the original report, written by Officer Hunter, Plaintiff's email correspondence with filthy Brpd "detectives"and other law enforcement agencies, multiple videos, made by BRPD's body worn and other cameras, Weber's previous "reports," and other methods.

94.     After speaking with at least a dozen of individuals, familiar with law enforcement and legal procedures, Plaintiff learned that obtaining public records could not possibly preclude the possibility of prosecution of the criminal. Plaintiff then stopped believing the criminal lie that was fed to her by Chugg under the guise of a "legal advice" in conspiracy with corrupt BRPD and LADOJ, and resubmitted her public record request. Not surprisingly, it was ignored. Plaintiff repeatedly contacted the BRPD "legal division" regarding her request for a copy of the report, but it continued ignoring Plaintiff and unlawfully denying Jane Doe access to public record.

95.    Plaintiff contacted John Windham, an individual in charge of BRPD's "criminal investigations," and requested that it reviews her case. Windham ignored Jane Doe's written correspondence as well as made itself "unavailable" at all times when Jane Doe tried to reach it over the phone and never returned Plaintiff's calls. On June 12, 2018 Plaintiff contacted chief of police Murphy Paul with the request to review her case. No response was received from that criminal.

96.    Thereafter, Plaintiff contacted Jeffrey Landry, attorney general of Louisiana, and asked it to bring its employee who repeatedly battered her to justice. Jane Doe also contacted Patrick Magee, then a director of "criminal division" of LADOJ and Ronald Beaver, Poulicek's direct supervisor with the same request. No response of any kind was provided to Jane Doe's correspondence by those criminals.

97.    By then, it started becoming apparent that no one in either BRPD, DA office, or LADOJ will investigate or review her case or bring Poulicek to justice but that the criminals in charge of those inept, corrupt establishments shielded Poulicek from any criminal or civil liability. Plaintiff then decided to apply for a protective order, which she considered obtaining shortly after Poulicek battered her, and Officer Hunter suggested that she does so. Being utterly devastated and distraught because of what has been done to her and trying to come to the terms with that, she did not want to even think about being in the same room with Poulicek or having to look at the bastard who caused her so much harm ever again. Applying for the protective order would require to be at the same room with Poucliek during the hearing.

98.    At that time, it had been a year since Plaintiff has been battered by Poulicek, and Plaintiff by then felt stronger and thought she would be able to go through the process of obtaining a protective order. As there were still no criminal charges, Plaintiff believed that at least a

protective order might deter Poulicek from hurting her again. She applied for a protective order and the matter was set for a hearing. The papers that were handed to her by the "domestic violence" department of 19 JD had a "greeting" from IRIS domestic violence center, stapled to the front page, claiming the following: "On the day of your hearing there will be an advocate by your side to support you so you should not be afraid to face your abuser." That empty promise could not be farther from the truth as Jane Doe learned that IRIS is run and controlled by precisely the same corrupt public officials that run and control BRPD, LADOJ, DA office, etc. While operates under the guise of helping violence victims, it is actually front for the criminal dealings.

99.    When Plaintiff showed up in the 19 JD courthouse for the hearing on August 8, 2018, she was told by an IRIS assistant to go to the room where IRIS "interviews" domestic violence victims. The assistant pointed to a semi-open booth and said that an "attorney" will come to speak with her. While waiting, Jane Doe noticed that two men in suits situated themselves directly at the booth's opening. She thought it was odd and made her feel uncomfortable. Shortly after that Cavalier, an IRIS-employed "attorney," entered the booth and started "interviewing" Plaintiff. Cavalier was not listening to Jane Doe but instead was "having a conversation" with the two men in suits at the booth's opening, by frequently smirking and glancing at them with its empty, contemptuous eyes.  Plaintiff turned around and saw the two men leaning into the booth's opening and carefully listening to everything Jane Doe was saying. After Cavalier finished its phony "interview," it "declined representation" of Plaintiff. Jane Doe asked why they "represent 90% of domestic violence" cases – according to the supervisor of "domestic violence" department of the 19 JD – but decline to represent the victim whose injuries amounted to a maim. Plaintiff requested to speak with the supervisor.

100.    Plaintiff was told to take a seat and wait. While waiting, Plaintiff saw Weber dressed in a casual attire, walking into the room. Weber carried some letter size papers. Plaintiff then observed Weber, the two eavesdroppers on her conversation with Cavalier, the supervisor with whom Plaintiff was about to speak, and Cavalier chatting for about 10 minutes. Then, Weber handed the papers that it brought with it to the supervisor and started walking towards the room's exit. While passing Jane Doe, the filthy scumbag slowed down, looked Plaintiff's in the eye, and loudly clicked its tongue.

101.    Plaintiff was confused, in disbelief, and in shock since at that time she had not yet realized the extent of the corruptness of the "law enforcement" she dealt with, and did not know for a fact that Weber and other criminals have been actively protecting Poulicek and have been carrying out the official crime cover-up, not just doing some sloppy, negligent "investigation" due to laziness, lack of motivation, and lack of intelligence. The first year after the injuries' infliction was exhausting for Jane Doe and she tried so hard to "prove" her injuries to that "law enforcement" and endured so much of a psychological manipulation and abuse from those people. It just dawned on Jane Doe that Weber deliberately came to testify against her, and that everything what it did in the past and the way it presented itself to Plaintiff was a complete ruse.

102.    It looked like Weber came to the courthouse on its day off, brought its bogus report with it, and was willing to waste at least several hours, presenting its falsified report and testifying against Jane Doe. Plaintiff approached Cavalier who was just standing in the middle of the room and asked what Weber was doing there. Cavalier claimed that Poulicek "subpoenaed" Weber to come. Of course, there were no subpoenas issued and Weber came of its own free will.

103.    Finally, the director of legal services finished her friendly chats with dirty cops and dirty "lawyers" and was ready to speak with Plaintiff. Sarah Margaret Smith, while looking at the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                           **45**

papers that were just handed to her by Weber, said that "according to this" Jane Doe doesn't have any injuries. Jane Doe could not believe her eyes as it looked like Smith had on her desk the report that Plaintiff was trying to obtain for over eight months but the dirty law enforcement would not allow her to see public records. Jane Doe asked whether she may look at the report. Smith said that she will let her read the report. Plaintiff started reading and immediately started noticing fabrications, lies, misleading statements, and evidence omissions, and started commenting on the particular statements in the report, saying that she can prove that the report is a falsification in its entirety. Smith said that all that "doesn't matter" as the "judge" will not believe Plaintiff but "will believe the police officer."

104.    Plaintiff asked Smith for a copy of the report, explaining that she has been trying for many months to obtain it through public record requests but it has been refused to her. Smith said that she will make her a copy and stepped out of the room. Shortly, she came back and handed the copy of the entire report to Plaintiff. Jane Doe continued waiting to be called to the courtroom. While she was waiting, one of the eavesdroppers on Jane Doe's conversation with Cavalier approached her and introduced itself as Brenden Craig, "attorney for Poulicek." It asked if Plaintiff wanted to "discuss the case." Several minutes later, the second eavesdropper who also happened to be Poulicek's "attorney," Tyson, approached Jane Doe and told her that it was time to go to the courtroom.

105.    In the courtroom, "subpoenaed" Weber was nowhere to be found. Clearly, the corrupt coward left because Plaintiff got hold of the report and stated that Weber's "report" is a fabrication and that Jane Doe intends to question Weber regarding it during the hearing. At the hearing, responding to one of Woodruff-White's questions, Plaintiff once again stated that she just got a copy of the report, which is "full of lies," and intends to question Weber about it.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                                          **46**

106.    Craig and Tyson started mumbling incomprehensibly, unable to adequately explain why their "subpoenaed" witness was there but disappeared. Since IRIS "just turned down" Plaintiff, Woodruff-White decided to continue the hearing. Craig repeatedly objected and first claimed that Plaintiff "was told" by IRIS earlier, not after it "interviewed" Plaintiff so that Craig can eavesdrop on what was supposed to be a confidential "attorney-client" conversation, and then claimed that the hearing should not be continued since Plaintiff "had two hours" between when she was "turned down" and the hearing, to "find an attorney" to "represent" her.

107.    At the time of the first hearing on August 8, 2018, Woodruff-White was not yet approached by other defendants-criminals and ordered to "rule" corruptly in a pre-determined fashion. Defendants-co-conspirators were confident that it would not be needed and that they can handle it themselves, that's why dirty cop Weber came to "testify." As it did not go the way they planned, and Weber cowardly ran away, the next step was an arrangement with the corrupt judge.

108.    Not only Woodruff-White's actions during the first, original hearing seemed to be fair and impartial contrary to the second hearing but also Poulicek's appearance and behavior was a perfect telltale: a sadistic but cowardly creature was constantly pacing, looked like it had not eaten for a week – the malefactor realized that just maybe justice would occur and it will have to at least partially pay for what it has done. In striking contrast, at the second, 100% staged corrupt "hearing" the filthy scumbag Poulicek appeared looking like a guest of honor, with disgusting contemptuous grimace and over-confidence: it was told by BRPD and its LADOJ supervisors that everything has been taken care of for it and its crimes will continue to be covered up.

109.    In 40 minutes after the first hearing was rescheduled, Nakamoto, a purported "investigative reporter" that serves Louisiana corruption and assists public officials in criminal, underhanded dealings under the guise of an "anti-corruption activist" started calling and emailing

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                    47

Plaintiff and demanding that she comes to its office and brings "all evidence" that pertains to the crime cover-up.

110.    Plaintiff repeatedly contacted Nakamoto in the past but after collecting some information from her and reporting to corrupt public officials for whom it works that some Jane Doe is requesting an independent "journalistic investigation," stopped responding to Plaintiff. Plaintiff did not believe that Nakamoto had a genuine "journalistic interest" and told it to come to the hearing in two weeks, on August 22, 2018 and see everything for itself, since it suddenly was so interested to find out if it "could do a story about" the events that Plaintiff describes. As expected, Nakamoto did not come to the hearing nor sent any of its assistants.

111.    Shortly after the hearing was rescheduled, Plaintiff subpoenaed Weber, Hunt, Officer Hunter, and Dr. Hetlzer to come to the hearing and testify. Officer Hunter resigned and moved out of state. Other three witnesses were properly and timely served with the subpoenas. Not a single served witness appeared as ordered, at 8:00 a.m., or at any other later time. When the case was called, it was past noon.

112.    Plaintiff first moved for disqualification of Craig and Tyson, attesting to Woodruff-White that they were eavesdropping on what was supposed to be a "confidential attorney-client" conversation between her and Cavalier two weeks ago, on August 8, 2018.

113.    The eavesdroppers Tyson and Craig responded with anger and falsely claimed that they were not even in the room. Woodroof-White expressed its support for the sizzling with anger Tyson by saying: "I understand that you are frustrated, Mr. Tyson. I am frustrated too but I have to deal with disqualification." Then, it pretended to have dealt with the motion an quickly denied it. The heavily falsified transcript, manufactured by Antee-Griffin which it took it over thirty

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **48**

months to "produce," the corrupt Woodruff-White's claims of "frustration" and support of Tyson the eavesdropper have been fraudulently wiped out and altered to just "I have to deal with disqualification."

114.    Plaintiff informed Woodruff-White that she timely subpoenaed three witnesses and neither was there and that the law clearly states that if a material witness made itself unavailable – and in that case all three witnesses made themselves unavailable – continuance should be granted. Woodruff-White said that it "will render (its) judgement today."

115.    Plaintiff was ordered to get on a witness stand and start answering questions. Plaintiff firmly stated that she has the right to have her timely subpoenaed witnesses who are material to her case present. Woodruff-White turned on some horrible loud static noise that was playing on and off the entire day, likely so that sensitive recording devices will not pick up on any evil and corrupt behind-the-scenes comments, and appeared to be looking at the monitor of its computer. In a few minutes, it started mumbling something likely intentionally incoherent so that the deception of the comments will be lost among all unintelligible utterances. The message that could be discerned out of all that was the following: "only two were served." At other times during that very long sham-"hearing" with frequent breaks, Woodruff-White offered two more versions regarding the service of the witnesses: that "only one was served" and "no one was served."

116.    Plaintiff stated that she has proof of service, provided by the sheriff's department but Woodruff-White again mumbled something incoherent in a demeaning and patronizing manner and continued with its sham-"hearing."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **49**

117.    The room started to get filled up with many people who looked like the courthouse employees or some "lawyers" that came to watch the staged sham-"protective order hearing." Woodruff-White ordered Plaintiff to explain in detail how all over 20 ear injuries have been inflicted. The eavesdroppers Craig and Tyson, like two parrots, robotically objected to everything Plaintiff was saying and all but one invalid objections were "sustained." Poulicek was not asked a single question of which it already knew as it was told that everything was taken care of for it and that some judge, after putting on a show, will dismiss the action at no cost to it. Poulicek was proudly sitting there, with the disgustingly contentious grimace of the criminal who is part of the gang that "took care" of it and made everything to "go away" for it.

118.    As Plaintiff continued repeating that the law is being violated and that she subpoenaed her witnesses but they were not there, Woodruff-White continued presenting Plaintiff to the spectators as some rebellious individual who does not even understand what is going on. To "help the situation," Cavalier was asked to approach and "provide legal advice" which was falsely presented to the public as if Plaintiff was given help some extra consideration and "help." Plaintiff rejected filthy Cavalier's "legal advice" and repeated that she was not asking for any advice or any assistance but clearly stated that the law was being violated because she was not allowed to have the testimony of her subpoenaed witnesses.

119.    Next, a bailiff was used to present Plaintiff in bad light. The bailiff started straightening out Plaintiff and trying to shame her for "not respecting authority," and threatening with violence in whatever purported "lawful" form it is used to silence or remove an unwanted witnesses. Since none of those deceitful and intimidating tactics worked and Plaintiff continued insisting that she was not afforded a prescribed by law right to have a fair hearing, Woodruff-White decided to "show" Plaintiff that she "is having a fair hearing."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                **50**

120.    Woodruff-White stated that the two subpoenaed "detectives" will be phoned and asked whether they can come to the courthouse. After that announcement was made, Weber and Hunt appeared in the courtroom in a remarkably fast fashion. Co-conspirators Wilder-Doomes and Degravelles, while purporting to be describing the event, claimed that Weber and Hunt appeared "on the judge's order," misrepresenting and concealing the facts such as that they were subpoenaed by Plaintiff to appear at 8:00 AM but ignored the subpoenas and only after abuse of Plaintiff by the criminals of 19 JD and repeated Plaintiff's requests that the "hearing" be conducted in accordance with the law, "appeared" at around 1:00 PM.

121.    Plaintiff was allowed to ask Weber and Hunt only a limited number of questions. When they did not want to answer, they just sat there in silence and Plaintiff was ordered to ask next question. When Weber and Hunt lied and provided inconsistent and nonsensical answers or when, confronted by the audio-recordings of themselves would entirely change their previous answer (no audio recording were allowed to be played or submitted as evidence), the corrupt co-conspirator Woodruff-White would entirely disregard and dismiss all inconsistencies as if it were too demented to even notice what was going on it its "courtroom." Craig and Tyson continued making abusive, baseless, and invalid "objections" to everything and all "objections" during witness questioning were "sustained."

122.    Weber perjured itself while answering questions "under oath" countless times. When asked if "large deformities" were the only signs of trauma Weber observed, it said "yes." When Plaintiff asked Woodruff-White if she may play an audio-recording of Weber commenting that it observed bruises, discolorations, and contusions on the Plaintiff's ears, Woodruff-White said in a whining, high-pitched voice that it does "not want to listen to (any) recordings" and Weber "corrected" its answer and said that it did see the early signs of injury. When Plaintiff asked why

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                              51

it was not documented in the bogus "investigative report" it manufactured, Weber sat in silence

with a proud, contemptuous grimace on its face. Woodruff-White whined: "But he is not a

doctor," insinuating that police do not have an obligation to truthfully document its observations

of traumas.

123.    Plaintiff asked Weber why it gave Poulicek a copy of its phony "investigative report" on

the same day it was served with a temporary restraining order papers which may be ascertained

by the date, stamped on those reports – July 27, 2018 – but had been denying Plaintiff access to

those reports for over eight months. Weber, with a disgusting grimace on its face, sat in silence.

The criminal bastard Woodruff-White, assisting its co-conspirator, said that Jane Doe can ask

Weber about it some other time and ordered Plaintiff to ask next question.

124.    Plaintiff asked Weber if it heard that on the recordings of the appointments with Dr.

Hetzler, the doctor was concerned about Plaintiff's safety and asked repeatedly – at least 7 times

– whether Plaintiff was still around the individual who broke cartilage in her ears and whether

she felt safe and was in a safe place. Weber lied by saying that no, it did not hear that but only

heard that Plaintiff said that she was an "abuse victim" and then was asked if she "was okay."

125.    When asked what it heard on the recordings of the medical appointments and if heard that

the doctor confirmed the injuries, Weber ignored the question but said that it "couldn't use the

recordings because they were altered." Weber refused to say how they were purportedly "altered"

and Woodruff-White prevented Plaintiff from insisting on the answer and asking uncomfortable,

incriminating questions that interfere with the official crime cover-up.

126.    Hunt, the second subpoenaed "detective" who copied the recordings from the Plaintiff's

laptop manufactured an ambiguous, full of misleading statements "report." It claimed that the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                          **52**

dates of the recordings' creation were "inconsistent with the stated dates." Plaintiff showed Hunt

the portions of the medical records with the dates of the appointments that match the dates it

"determined" by "metadata." Plaintiff stated that because the dates clearly match, Hunt's

commentary in the report is misleading, and asked if Hunts sees that to which Hunt, with anger

and grimace of disgust, responded with a "no." Woodruff-White said that it was Plaintiff's

"fault" as she "stated inaccurate dates" to Hunt. Hunt said that it was Weber who stated the dates

to Hunt. Woodruff-White "allowed" Plaintiff to ask "two more questions" and after that said that

Hunt and Weber were free to go.

127.    As yet another break was announced, as soon as Weber got down from the witness stand,

it approached Poulicek, Craig, and Tyson and, openly displaying closeness and intimacy of their

relationship, with the distinct warmth in its eyes, enthusiastically shook their hands and then

chatted.

128.    Woodruff-White denied a protective order to Plaintiff, claiming that evidence of abuse

was "insufficient" and "ordered" Plaintiff to compensate the criminal that maimed her for its

"legal expenses" and pay $2000.00 to the eavesdroppers Craig and Tyson. It also ordered

Plaintiff to pay nearly the same amount of purported court "fees" most of which originated from

the requested subpoenas to which neither subpoenaed witness responded.

129.    Plaintiff attempted to appeal but Woodruff-White denied her application to proceed

without prepaying of costs, and demanded that Plaintiff first pays to the eavesdroppers for the

batterer's "legal expenses," plus all other purported costs. Plaintiff filed an application for a

supervisory writ with the Louisiana court of appeal as she was being prevented maliciously

prevented by the scumbag Woodruff-White from having her matter appealed. The co-conspirator

Louisiana court of appeal which is the integral part of the Louisiana well-oiled criminal,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                     53

racketeering, and bogus "legal" system machine and consists of the atrociously corrupt scumbags

suppressed the writ and was not taking any action on it for over sixteen months whereas

Woodruff-White was trying to dismiss Plaintiff's appeal as "abandoned."

130.    Plaintiff learned that Carey was Weber's and Murphy's supervisor and emailed Carey,

requesting proof for Weber's fraudulent statement, given under oath, that the recordings of the

Plaintiff's medical appointments were "modified." As there was no response from Carey for over

three weeks, Plaintiff contacted Stokes who provided Carey's email address to her that she is

unable to get in touch with Carey. Stokes asked why Plaintiff needed to contact Carey. Plaintiff

explained that Weber, with authorization of its supervisors, falsified the investigation of the

second-degree batteries, committed against Plaintiff, and lied under oath. And now Plaintiff

requests the documentary proof for those deceitful statements, made by Weber. Stokes said that

she needs to hang up but will "call (Plaintiff) right back." Jane Doe still awaits to receive that

call back from Stokes.

131.    That false, perjurious, and malicious Weber's statement that the recordings of the

Plaintiff's medical appointments were "modified" or not genuine, resulted in yet another serious

emotional injury, inflicted on Plaintiff by filthy Weber and other city-parish-state criminals. As at

that time all information that Plaintiff had was Weber's fabricated report that made false and

misleading claims regarding Plaintiff's injuries and Dr. Hetlzer's purported statements, and the

audio-recorded evidence was also fraudulently labeled by the criminals as "altered," Plaintiff was

devastated as she did not know how else she can prove the truthfulness of her claims. Plaintiff

contacted several entities that advertised independent forensic studies of the audio materials.

Plaintiff was determined to purchase that expensive service to confirm the authenticity of her

recordings.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                54

132.    The professionals she spoke with asked her whether the recordings were of the very poor

quality and Plaintiff needed to "restore" the sound, and Plaintiff would tell them that the

recordings were of the superb quality where each and every word as well as emotion could be

heard and understood. They could not understand that Plaintiff was merely trying to "prove" that

the recordings were not modified in any way because the Louisiana "law enforcement"

scumbags were lying and discrediting her evidence. Plaintiff decided not do the study after all

not only because it was very expensive but also would be entirely pointless – Plaintiff already

had the evidence that was being discredited by the "law enforcement" criminals. Obtaining that

verification of the authenticity of her evidence will not help as the very same barbarians who do

not follow the law will find another way to discredit the evidence and falsify the record.

133.    After the original August 8, 2018 protective order hearing was continued, Plaintiff noticed

for the first time that her computer and online accounts were being remotely accessed. Plaintiff

filled out some report form on the FBI website, explaining that she believed that BRPD and

LADOJ could be tampering with her electronic devices and accounts. In approximately a week

after she filled out the form, Jane Doe got a phone call from an individual who introduced herself

as "agent Katie" of Baton Rouge/New Orleans office of the FBI but refused to provide her last

name. As the last name was never provided to Plaintiff per her request, Plaintiff determined that

it is very likely that the "agent Katie's" last name is Craft based on the photographs, located

online.

134.    Craft said that she wanted to come to the Plaintiff's apartment and speak with Plaintiff.

Plaintiff initially declined as from the telephone conversation it was unclear what was the

purpose of that visit and why she was contacted even though she did fill out some short form on

the FBI's website. Craft told Plaintiff to call her supervisor who would confirm that Craft was a

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                      55

"real agent" from the FBI office. After thinking about it for a few days, Plaintiff agreed to meet with Craft. Craft arrived with a 50-something white male, purportedly another "agent." Plaintiff asked what was Craft's full name but she refused to provide it, saying that they "usually do not (share their) last names."

135.    Plaintiff told them that BRPD have been falsifying evidence and denying access to public records for over eight months until she stopped seeking a copy as was able to obtain one through the third party. Plaintiff explained that she contacted LADOJ and the DA of 19 JD regarding the crime cover-up but has been ignored and never received any response to her written correspondence. The "agents" purported to be taking detailed notes of everything what Plaintiff was telling them. Craft said that they will take all evidence that Plaintiff wants them to have and will "speak with the US attorney" – Fremin, who prior to its "federal" career spent a couple of decades working for LADOJ and DA of 19 JD. They were especially interested in getting a copy of the bogus BRPD "investigative report." Plaintiff said she doesn't mind giving them a copy but thought that they can easily obtain one from BRPD, if wanted to. The male "agent" told Jane Doe that she "will be surprised" how long it will take them to get that copy directly from BRPD, "longer than (it took Plaintiff)."

136.    On August 27, 2018, Plaintiff met with Cranmer, another "advocate for abuse victims who has experience prosecuting domestic abuse" cases in Baton Rouge city court. Cranmer looked at Weber's "investigative report" and said, "yes, they definitely did not do a good job." Plaintiff told Cranmer that it is not that they "didn't do a good job," it was an official crime cover-up and that's why the report is full of misleading, nonsensical statements. Cranmer insisted that Jane Doe shows it her disfigured ears, and Plaintiff moved her hair that was covering her ears and showed the injuries. Cranmer commented: "It is so swollen. I can even see it right here."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                56

Then, it found Poulicek's facebook profile and looked at its photograph, commenting, "There are just people like this, sociopaths, that do horrible things." Cranmer said that "Hillar can make them (BRPD)" charge Poulicek and that Cranmer will be willing to write a letter to Hillar Moore, provided that Plaintiff pays a $2500.00 retainer. Jane Doe asked since the only service Cranmer was willing to provide is writing a letter, can the retainer be lower. Cranmer said no but told Jane Doe that if she is able to provide the quoted amount, it will represent her in making contact with the DA and requesting that the malefactor be charged. Cranmer, claiming that it does not believe that there was the official crime cover-up said that it will "make some calls" and talk to Chugg and "maybe someone else."

137.    After speaking with Chugg and likely with other defendants or their co-conspirators, Cranmer learnt that what was going on was the official crime cover-up. It then called Plaintiff to tell her that "unfortunately (it) will not be able to take (her) case." As Plaintiff picked up the phone, Cranmer hung up as was trying to cowardly leave a message. It later called again, but Jane Doe again answered the phone and Cranmer hung up. Later, Cranmer managed to leave a message when Plaintiff was unable to answer the phone and the call went to the voicemail. Cranmer not only joined the criminal conspiracy to cover-up the crime but later participated in persecution of Plaintiff.

138.    On November 19, 2018, Plaintiff met with another purported "anti-corruption activist," "Tom" Aswell whose blog Plaintiff accidently discovered on the internet. It appeared that Aswell was writing about local government, sometimes making some assumptions and teasing certain characters. For example, it seemed to be obsessed with Landry, extensively reflecting on its pre-attorney general "legal career" and telling amusing stories about its inadequacy and impotence in handling even the simplest legal matters. Aswell purports to come across as an independent and

concerned senior citizen who "reports" on some local "politics." Almost certainly, Aswell is a controlled opposition that serves corrupt Louisiana governments.

139.    Responding to Jane Doe's email, Aswell wrote: "The attorney general's office is inept, inefficient and in some cases, outright corrupt, beginning at the top and working downward, so your plight doesn't come as a surprise to me. I have been taking critical shots at Jeff Landry for two years now. Could we meet someplace public to discuss your situation?"

140.    When Jane Doe personally met Aswell, it immediately did not feel right. It was obvious that the purpose of its meeting with Plaintiff was not what Aswell presented to her. Aswell was exhibiting that evil sick excitement from duping Plaintiff that she saw in Murphy – in fact, nearly identical. Aswell took a copy of Weber's report and later wrote to Plaintiff that he read everything but did not see Poulicek's name anywhere and asked what was the name of that individual who hurt Plaintiff. As Poulicek's name is repeated in the "investigative reports" numerous times, Aswell's question did not make any sense. Plaintiff suspected it before but after receiving that email, it seemed even more likely that Aswell's "purpose" for meeting Jane Doe was to collect the report and then be used by the defendants-co-conspirators in any possible legal action as a "witness" that would claim that a new, once again fabricated "investigative report," re-manufactured after Plaintiff pointed out most inconsistencies by analyzing it and submitting over 30 exhibits to the Louisiana court of appeal was the report that Plaintiff purportedly gave him at the personal meeting.

141.    When at a later time the criminals disguised as Louisiana "law enforcement" were intimidating and physically harming Plaintiff and she contacted Aswell who presents itself to the public as such a concerned citizen who would never tolerate even a minor civil rights violation and would immediately speak about it to create public awareness, and who personally told

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                      58

Plaintiff that she may call him any time, ignored Plaintiff's attempts to contact him. It is most likely that Aswell, just like Nakamoto, actually works for the dirty Louisiana governments, to create an illusion of "controlled" free speech and opposition and dupes the public by presenting itself as an anti-corruption activist.

142.    Because filthy criminals were lying to Plaintiff and telling her that Dr. Hetzler purportedly provided the testimony that contradicts Dr. Hetzler's actual findings and statements, in November, 2018, Plaintiff mailed Dr. Hetlzer a CD with the recordings of the medical appointments and asked her to confirm that certain statements regarding Plaintiff's ear injuries have been made. After Plaintiff mailed the recordings to Dr. Hetzler, she was soon "discharged" as a patient across all "our lady of the lake physician group." Defendant "our lady of the lake physician group" "discharged" Jane Doe "secretly," without any notification to Plaintiff, required by law. To justify the fraudulent dismissal, the criminal establishment – the bootlicker of the dirty law enforcement – falsely claimed that Plaintiff was "discharged" for "improper behavior." All Plaintiff's appointments with that physician group were related to physical attacks on the Plaintiff by the Louisiana criminals.

143.    In November, 2018, Plaintiff wrote another letter to DA of 19 JD, detailing the crime cover-up, evidence fabrication and falsification, Weber's lying under oath and repeatedly perjuring itself, and other despicable dealings, done in order to shield Poulicek, a low-ranking member of "law enforcement" from any criminal and civil liability. Jane Doe demanded that the DA's office investigates the matter and brings Poulicek to justice. This time the letter was sent with a tracking number and signature confirmation. In about two weeks after it was received, Melanie Fields contacted Plaintiff over the phone and told her that she wants to "chat" with Plaintiff. Being exhausted by dealing with continuous lies of corrupt frauds in charge of

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                              **59**

"justice," Plaintiff said that she is not interested in "chatting" and that her letter contains a detailed description of all the events, references to evidence, and a demand that Fields performs the duties she was hired to perform.

144. In response, filthy Fields continued lying to Jane Doe and gaslighting her. Fields claimed that she has no authority to charge or prosecute anyone unless the police told her to do so. Fields stated that she "do(es) not doubt for a second" that Plaintiff was a true "victim" but since "conviction is not going to happen," she "recommends therapy." Fields also claimed that she looked at BRPD's report and thinks that "they did a good job" whereas the reports immediately come across as misleading and fraudulent, even without knowing all the facts.

145. On December 4, 2018, shortly after the phone conversation with Fields and after thinking more about her lies and manipulation tactics, Plaintiff wrote an email to Fields telling her that if she, after being advised that there is evidence of the crime and crime cover-up, will still "join the criminals that run Baton Rouge police department and Louisiana department of justice" and refuse to perform her duties and prosecute Poulicek, Jane Doe "will publicize all the details of the crime cover-up" including Fields' and Moore's involvement in it.

146. Fields did not respond but her secretary started calling and emailing Plaintiff and telling her that she must see "Mr. Hillar Moore." Plaintiff asked what would be the nature of that meeting and if criminal charges have been filed against Poulicek. No response was received that confirmed that Plaintiff had already realized after speaking with Fields: the DA office was an integral part of the conspiracy to cover the crimes and was trying to brainwash Plaintiff and "convince" her that there was no any "conspiracy."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**

147.    Next day, Plaintiff realized that her social media accounts where she shared some details about her interactions with BRPD, DA of 19 JD, LADOJ, and other co-conspirators were deactivated. All information documented in the Plaintiff's blog that pertained to the criminal conduct of BRPD was removed. In the next few days, Jane Doe attempted to contact over a dozen of investigative journalists known on a national level. For the purpose of contacting them, Plaintiff created a separate protonmail account. Criminals under the guise of "law enforcement" momentarily took control over it, enabled password reset, changed the password, and enabled daily notifications of all emails to their email address. Beginning approximately August 2018 and through the date of the filing of this amended complaint, BRPD, LADOJ, FBI, and other "law enforcement" criminals have been fully controlling, accessing, spying on, deactivating, and modifying Plaintiff's digital accounts, data storage, and everything that involves electronic devices and online access.

148.    In just a few days after Plaintiff stated to Fields via email on December 4, 2018 that she will attempt to expose the Louisiana "law enforcement" corruption, the criminals attacked Plaintiff with a chemical weapon. On December 11, 2018 in the purported ophthalmological office Plaintiff's upper and lower eyelids of the right eye were injected by a corrosive-like substance under the guise of a "medical service." The vicious attack caused immediate chemical burns, skin deterioration, eyelid deformities, and loss of the normal eyelid structures. Prior to the attack Plaintiff had absolutely healthy eyes and eyelids and never visited any ophthalmologist in nearly a decade of living in Louisiana.

149.    When an eye cream got into the Plaintiff's eye, it caused a blockage of a tiny duct of an oil gland which was akin to a grain of sand under -- 1 mm in diameter on the lower eyelid and absolutely undetectable visually, and around 2 mm in diameter on the upper eyelid and virtually

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    61

undetectable by the naked eye. There was no inflammation and no intervention of any kind was needed. Plaintiff was attacked by the psychopath Small that claimed that Plaintiff needed an "injection of Kenalog." Small claimed that the injection that it was entirely safe and does not have any side effects.

150.    Filthy psychopath Small never washed its hands before nor wore any gloves while touching Plaintiff's eyelids. It slipped out of the room and came back with an already filled syringe. Plaintiff did not see what was put into that syringe, when, or by whom. Small, still with unwashed and ungloved hands, injected some toxic chemical weapon into the eyelids of the Plaintiff's right eye.

151.    Immediately after the attack, Plaintiff felt strong sharp pain and cried out in pain. Small touched Plaintiff's eyelids with its filthy bare hands claiming that it was "spreading the medicine." Plaintiff looked at the mirror and saw horrible various deformities on her lower eyelid whose healthy and beautiful structures have been permanently lost the second the filthy scumbag Small injected its chemical weapon into Plaintiff. The chemically burned lower eyelid became in approximately 30-40 times bigger than its normal healthy state as it was right before the attack. The wounds, inflicted on the lower eyelid were bleeding and the upper eyelid was also swollen and purple due to a large hematoma.

152.    As a result of the vicious attack, Plaintiff's severely traumatized eyelids got covered with scars, wounds, and other formations that appear exclusively in response to severe ocular assault. The chemically burned tissues remained raw and swollen for over three years. The injected chemical weapon dissolved the portions of the Plaintiff's eyelids and caused disfigurement, asymmetry, chronic pain, and impaired functionality.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                             **62**

153.    Shortly after Plaintiff got home injured, her beloved dog Forrest's seemingly intact skin started breaking open and sprinkling blood everywhere. Forrest was absolutely healthy, was not injured in any way to the Plaintiff's knowledge, and was closely supervised at nearly all times. Plaintiff took Forrest to several veterinarians and explained that everything was fine but then as it appears someone hurt her Dog by likely injecting something toxic under his skin and it started rupturing suddenly while he just stands still. Plaintiff said that if some toxins were injected that cause the seemingly healthy skin to break open from the inside, there might be a tumor forming. One veterinarian said that it could not be a tumor and that Plaintiff did not go to a "vet school for many years" to possibly know but agreed to run some tests. After the test has been done, the veterinarian, with a concern and disbelief on their face came back into the exam room, carrying some kind of encyclopedia and wanting to show Jane Doe what kind of cancerous cells were observed under the microscope. The affected area on the Forrest's skin was immediately surgically incised.

154.    After being unable to sleep, feeling strong pain at the attacked site, having difficulty to open the battered eye as the eyeball was being prevented from rolling smoothly by the wounds and excessive swelling caused by the injected chemical weapon, and experiencing problems with her vision, Plaintiff went back to the purported clinic on December 13, 2018 and requested that whatever was injected in her will be removed. Plaintiff requested that because she learnt that "Kenalog" – which the filthy scumbag Small claimed it injected into Plaintiff – could be removed once injected. At that time, shock, caused by pain and the entire situation of the vicious battery, prevented Plaintiff from yet realizing that what was injected into her could not be removed and that it disfigured and burned her tissues at the very second she was attacked with that chemical weapon.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                    63

155.    When Plaintiff got to the filthy purported clinic, she was told Holloway, a "clinic owner"

will see her. The filthy scumbag Holloway assaulted Plaintiff and attempted to grab Plaintiff's

already severely traumatized eyelids with its unwashed and ungloved hands. In addition to severe

traumas, Plaintiff also felt pressure and pain in her eyeball and, being advised that once that

happens as a result of the ocular battery, the vision could be permanently lost if not addressed

immediately. Plaintiff said that she was seriously injured in Holloway's clinic and will not leave

until gets some help and her injuries be addressed. Holloway said that it will call Baton Rouge

police department and they will come and throw her out.

156.    Due to the severe injuries, inflicted by the chemical weapon attack, Plaintiff had to seek

help elsewhere. She contacted a large ophthalmologic clinic and was scheduled to see Nelson.

Seeing how badly Plaintiff was injured by the injection, the scumbag Nelson refused to diagnose

Plaintiff and quickly "referred" Plaintiff to someone else in its clinic. The wait time for that next

appointment was approximately three weeks. A couple of days prior to the appointment someone

called from the clinic saying that they "need to reschedule." Next time, same thing happened

again and just a couple of days prior to the appointment, a call was received with the message

that Plaintiff's appointment was canceled because her "insurance would not cover" the visit.

Plaintiff called the insurance and found out that it was not true and that it was yet another

criminal lie of the scumbag Nelson and its associates. Later Plaintiff learned that the filthy

criminals-co-conspirators fraudulently "documented" that Jane Doe was "4 times no-show."

157.    Plaintiff went to see Smith from "Williamson eye center." In addition to attacking

Plaintiff with chemical weapon that dissolved the Plaintiff's tissues, filthy Small also severely

infected the entire right side of the Plaintiff's face. Smith "prescribed" antibiotics and referred

Plaintiff to Booth, a purported "eyelid specialist." An unidentified infection/virus that Small

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                                    **64**

infected Plaintiff with did not respond to any "antibiotics" although Plaintiff was taking

antibiotics for the first time in her life, and prior to the attack by Small, never used any kind of

antibiotics. That means that Plaintiff could not have any "resistance" to antibiotics as she never

taken them before. Nevertheless, whichever bastard Small infected Plaintiff with was not

responding to any "antibiotics."

158.    Booth told Plaintiff that her eyelids were covered with granulomas – wounds that form in

response to severe ocular assault, and that she has a large scar tissue that formed due to the

chemical weapon battery. Booth said it will surgically remove those traumatic wounds and

growths. Plaintiff stated that she wants all those wounds, growths, and other removed contents to

be sent to the third-party laboratory for histologic examination. Booth injected Plaintiff's eyelid

with an anesthetic and then announced that "the instruments were not ready." It appeared that

Booth was making calls to find out whether it is allowed by the dirty "government"-co-

conspirator to send evidence of traumatic injuries by the chemical weapon to the laboratory. It

appears that it injected Plaintiff's eyelid with the anesthetic so that she will not walk out of the

clinic and go someplace else where they might send the evidence of the attack to the laboratory.

Booth came back in 15 minutes after the anesthetic nearly wore off and started cutting out the

scars and wounds, inflicted on her by filthy Small. Filthy bastard Booth manufactured fraudulent,

misleading, incomplete, and inaccurate "record" to cover up the ocular battery by the chemical

weapon.

159.    Because Plaintiff's disfigured, raw, partially inverted, and covered with wounds and scars

eyelids looked terrible and the eyelashes were scratching and abrading the eyeball due to the

inflicted eyelid deformity, Plaintiff felt compelled to try to consult someone else. As there were

no other providers available, Plaintiff went to see Williamson in the same "Williamson eye

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                    **65**

center." Williamson "referred" Plaintiff to Booth and when she declined, referred her to his other friend and manufactured a fraudulent, deceitful "record," covering up the vicious attack by Small. When Plaintiff requested a referral to a provider outside of the fraudulent circle who also was incomparably better qualified and was willing to see Plaintiff, Williamson refused to provide a referral and its assistant kept saying that Plaintiff "must see" Williamson's friend. When Plaintiff contacted Williamson's "friend," she was told that her eyelid would be cut on the outside and that she will have a large scar. Plaintiff was shocked as she did not need that surgery that Williamson was pushing on her.

160.     The filthy scumbag, together with other foul criminals, had been deliberately pushing improper procedure on Plaintiff to cause her more deformities and scars in order to cover up the vicious attack by foul Small. When it attacked Plaintiff, Plaintiff had absolutely healthy and exceptionally beautiful eyes and eyelids. Causing more deformities under the guise of the "needed" surgical procedure would have assisted the foul scumbags in obscuring and covering up the original vicious attack and its magnitude – from entirely healthy and virgin-beautiful to damaged and deformed.

161.     Booth and Williamson refused to release to Plaintiff the purported "records" they manufactured despite being repeatedly served with the authorization form for months, and only released them after the complaint against them was filed.

162.     Because there were no other providers available, Plaintiff decided to see Nelson to request a referral. Already knowing that Nelson is a useless fraud, Plaintiff thought that maybe it at least would provide a referral. Because the filthy bastard Nelson manufactured a fraudulent "record" that did not contain any information regarding the Plaintiff's injuries, its "referral" was

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    66

rejected. When Plaintiff asked Nelson's assistant why the records were falsified, she said that Nelson would "never write anything that would damage another physician's career."

163.    When Plaintiff attempted to commence a battery and fraud action in the state court against Small, Holloway, Nelson, Booth, and Williamson, it was unlawfully suppressed and hidden by filthy and corrupt "judge" Morvant and other defendants and/or co-conspirators. Plaintiff waited for around six weeks but no action was taken on the Plaintiff's suit, no summons were issued, and the filings remained unavailable to public scrutiny and were being displayed as a blank page. Plaintiff filed a writ with the higher Louisiana court and once Morvant received the notice of the filing, it immediately started displaying the Plaintiff's filings in the proper manner and signed the documents, fraudulently backdating them to six weeks ago.

164.    Booth and Williamson failed to appear and Plaintiff filed the motion for preliminary default which was fraudulently removed from the record by corrupt Morvant and corrupt clerks of 19 JD. When Booth and Williamson finally appeared in over three months after they were served, the Plaintiff's motion – whereas the document itself was already removed the docket – was "ruled on" in approximately five months after it was filed – by the way of a fraudulent minute entry that claimed that it was denied because Booth and Williamson purportedly made an appearance on "2/18/2020." The record clearly shows that Booth and Williamson did not file anything until May 5, 2020 although were served by the sheriff on January 27, 2020.

165.    Thereafter, the action was fraudulently and in violation of the law dismissed under the guise of a "prematurely filed medical malpractice suit" although there was no such cause of action in the complaint and the defendants were sued for battery and fraud. Unlawful machinations continued with the "medical review panel" with Small, Holloway, Nelson, Booth, and Williamson organizing fraudulent purported "investigations" into their misconduct.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                      67

166.     It appears that it took them sixteen months or so to recruit the frauds who would sign

corrupt and fraudulent affidavits and make corrupt and fraudulent purported "findings" for them.

Finally, they located the four criminals – Bernal, Vives, Elison, and Simon who purportedly

"determined" that the filthy bastard Small did not do anything wrong when it attacked,

permanently disfigured, and severely infected Plaintiff – the person who was absolutely healthy

in all respects and had no prior conditions or even infections of any kind. The filthy frauds

manufactured their purported "findings" based on purportedly reading the Plaintiff's description

of her injuries, inflicted by the scumbag Small.

167.     During the time when Plaintiff was dealing with the injuries, inflicted by the criminals of

Louisiana "law enforcement" through its co-conspirator Small, they have been terrorizing her by

openly accessing, spying on, controlling various Plaintiff's accounts, electronic devices, such as

her laptop and smartphone, her electronic and regular mail. During the first several weeks,

starting December 4, the criminals were especially belligerent, obdurately and barbarically

removing, blocking, deactivating everything they wanted.

168.     At that time, someone started tampering with the Plaintiff's internet access just before

Plaintiff had to be online for work, by temporarily changing the network password or blocking

her devices whereas the message "your device has been blocked at the router access" would

appear, preventing her from accessing the network. Because of those unlawful interreferences,

Plaintiff's employment contract was nearly terminated, she got penalized, and received a

warning that another absence would be final. Although Plaintiff used the router that she herself

purchased, she was unable to reset it because someone disabled that feature.

169.     When Plaintiff got another router to use separately, it worked for a while and then

something was done to it and it stopped working. Plaintiff attempted to seek help from an

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                                          68

individual who was setting up and maintaining computer networks for a living, but it appeared that there was no easy way to solve the issue even for a professional. Plaintiff tried calling the provider of the internet service which was unable to help. There was only one provider of the high-speed internet in the area and Plaintiff was not permitted to use any mobile networks for work per her employment contract. Because Plaintiff was unable to work from the house where she lived and paid rent for, and because she could not afford to lose her employment, Plaintiff did not live in that house in January and February, 2019. Every time she was trying to go back to the place for which she was paying rent and where she wanted to stay, something would be done to prevent her from working and make her leave.

170.    In the beginning, Plaintiff did not know who exactly was doing those unlawful things and interfering with her livelihood and employment as some machinations appeared to be done physically, such as tampering with the hardware directly. Prior to when Plaintiff protested corruption and discrimination and made the statement to Fields that she will try to expose the Louisiana filthy "law enforcement" criminals, the house where she lived was an entirely safe place, no one was persecuting or even bothering her in any way. That is why Plaintiff was not suspecting that Morgan and Burton, the two roommates with whom Plaintiff had friendly relationships, could be doing any of those things. Unquestionably, Morgan and Burton had been enlisted by the dirty law enforcement criminals for the cause as they started persecuting Plaintiff at the time when the "law enforcement" started openly persecuting and injuring Plaintiff.

171.    Plaintiff worked in Louisiana state university as a tutor for student-athletes from approximately June, 2018 and was getting positive feedback from the students as well as from the supervisors. Not even once Plaintiff received any kind of dissatisfaction, warning, or negative evaluation about her performance. In just a few days after Plaintiff made the statement that she

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                        **69**

will try to challenge and expose the Louisiana law enforcement criminals' corruption, she was secretly and quietly discharged on or about December 15, 2018. Unquestionably, that had been done within the agenda of persecution of Plaintiff by the filthy Louisiana public officials.

172.    Plaintiff was afraid that the bastards will continue hurting her in even more serious ways. Without any expectations and maintaining a skeptical approach based on what she already knew and observed, Plaintiff called Baton Rouge FBI office and, after being connected to some clown, explained to it that she has been persecuted by Baton Rouge police department that removes truthful incriminating things she publishes about it, describing her personal interactions with it, controls her online activities, prevents her from contacting possibly genuine investigative journalists, among other things. Jane Doe was asked all the details about who she was, what was her address, phone number, and it appeared that the clown was also typing all the information she was giving to it. The call lasted for around 10 minutes and there was no doubt that the call taker understood her well and followed her line of thought. Suddenly, in a robotic voice, the FBI clown blurted out: "For all further inquiries regarding this, contact Baton Rouge police department," and quickly hung up.

173.    Plaintiff dialed again and asked to speak with "agent Katie." She was told that "agent Katie" was not available and asked what was the reason for her call. In a couple of days "agent Katie" called Plaintiff and asked when she can come by and return the copy of Weber's falsified "report" that Jane Doe gave Katie nearly three months ago. Plaintiff asked Katie why she wanted to return the copy of the report now, and she responded that she decided to "return" the report because Plaintiff recently "called the office."

174.    Jane Doe said that when she called the Baton Rouge FBI office, she made the purpose of her call abundantly clear and it had nothing to do with the report. Plaintiff again clarified that she

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                              **70**

called because she was being persecuted by the dirty Louisiana "law enforcement." Katie

ignored what Plaintiff was saying but continued insisting that she wants to return the report.

When Plaintiff gave the copy to that agent, she explained that it was not her only copy and that

she does not need it to be returned. Plaintiff again repeated to Katie that she does not need that

copy. Assuming that Katie wanted to bring a re-written copy, once again re-manufactured by

BRPD after Plaintiff pointed out most inconsistencies and provided some evidence of the

report's inadequacy, she told Craft not to bring any reports, stating that she will not accept any

reports from her because she has the copy of the original report that was brought to the

courthouse by Weber and given to Plaintiff by the IRIS's director of legal services, Smith, in

August 2018.

175.     As criminals, clothed as law enforcement continued barbarically accessing Plaintiff's

electronic devices, tampering with her digital accounts, intimidating Plaintiff and harming her,

Plaintiff started drafting a complaint, intending to file it in a federal court and hoping that it at

least might deter the defendants from further harming her. Plaintiff was drafting her complaint by

hand to minimize criminal eavesdropping by the defendants which indubitably were closely

monitoring everything Plaintiff was doing on her personal computer, smartphone, etc. It took

some time to draft the complaint by hand. On January 25, 2019, Plaintiff went to the federal

courthouse of the middle district of Louisiana. She was told that "the court's deputy happened to

be" in the clerk's office, and that deputy needs to read the complaint first. Plaintiff waited for

about an hour while someone, as she was told, read her complaint. Thereafter, "the deputy" came

out of the room and told Plaintiff that her complaint must be filed "under seal." Plaintiff

objected, stating that she did not request it to be sealed. Thereafter, her complaint was finally

filed.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                                    **71**

176.    Corrupt judge Shelly Dick of middle district of Louisiana suppressed the Plaintiff's

action as no ruling on the Plaintiff's in forma pauperis application was ever issued. Plaintiff

waited for over seven weeks and after realized that access to courts had been denied to her, filed

a "motion to dismiss without prejudice." Dick momentarily "granted" the motion and unlawfully

dismissed it with prejudice. Plaintiff filed a notice of appeal and the Fifth Circuit reversed Dick

on November 19, 2019, ordering Dick to enter an order, dismissing Plaintiff's complaint without

prejudice. Between January 25, 2019 and November 19, 2019, Plaintiff could not prosecute or

even refile her complaint.

177.    In less than an hour after the complaint was filed on January 25, 2019 in LAMD, Plaintiff

received an email from Craig who was representing Poulicek in a state tort action with the

motion to "enroll counsel," attached to it. Craig immediately stopped representing Poulicek and

all further communication went through another individual, not associated directly with the

crime cover-up. That is how fast the communication between the co-conspirators works. The law

enforcement criminals have been controlling not only all Plaintiff's online and all other wire

activities but always knew where Plaintiff goes and where she is at any given moment.  Although

the law enforcement co-conspirators have been unlawfully monitoring Plaintiff's activities in a

ghost-like manner, they also have been "sharing" the Plaintiff's passwords with other involved

criminals. For instance, Craig accessed the Plaintiff's email account and deleted an email it sent

to Plaintiff. Plaintiff was actually looking at the page at the moment. Immediately, a notification

of an unauthorized and suspicious activity has been delivered to Plaintiff, advising her that

someone just accessed her account from a "Tor" browser.

178.    Because Burton and Morgan, in conspiracy with the dirty "law enforcement" started

persecuting Plaintiff immediately after Plaintiff made the statement to "law enforcement" that its

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                              72

corruption and discrimination of Plaintiff is not accepted and will not be tolerated, Plaintiff was unable to work normally and stay in the house where she lived in January and February 2019. In addition to tampering with the router, changing passwords right before Plaintiff had to be online for work, disconnecting the internet, Morgan and Burton also started disabling the cooling system, turning on the heater on maximum when Plaintiff was sleeping and leaving the house, and disabling the water heater when they were not home or using hot water themselves. Because during the entire January and February Plaintiff was unable to live in the house although timely paid rent, Plaintiff withheld rent in March.

179.    The owner of the house Kwok who lived in China did not get involved in the rental process, in collecting rent, or in monitoring whether it is paid timely. Morgan, responsible for communicating and sending payments to Kwok repeatedly stated that he deposits payments sometimes weeks or months late, and it was "okay if rent is paid late." Plaintiff herself saw that the checks that she was giving timely to Morgan in the beginning of each month did not get deposited until the middle of the month or even later. That time, however, Kwok who ordinarily would not even know whether payment was made and would not concern himself with what was going on, contacted Plaintiff immediately with a "notice to vacate." The eviction suit followed.

180.    After being served with an eviction summons, Plaintiff decided – against her intuitive protest – to contact some "legal services," provided by city-parish. Although that "legal service" claims that for urgent matters such as evictions it gets back to the requestor within a day, it continued ignoring Plaintiff and brush her off with empty promises to call back for about 5 business days until there was only a day left. Since Plaintiff kept calling, it finally, on the very last day prior to an "eviction" hearing agreed to see her. Some filthy city-parish criminal that introduced itself as "Gray" falsely claimed that it was calling and writing to Plaintiff for the last

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    73

week but was unable to reach Plaintiff. Gray told Plaintiff that it does not matter that someone was disconnecting her internet, preventing her from working and living in the house where she was a renter and paid rent, and was disconnecting her cooling system. Gray claimed that Plaintiff still should have paid rent and that the "judge" will "not even listen" to Plaintiff. Gray said that it will copy all Plaintiff's papers whereas Plaintiff said that she does not consent to it copying any of her documents. In response, Gray that was four times bigger than Plaintiff simply forcefully grabbed the documents and left the room to purportedly make the copies.

181.    At the eviction hearing, Kwok was represented by Jeansonne who "practiced eviction law for nearly ten years," according to several articles, published on wafb.com where Jeansonne provided its "expert" tips, related to evictions in Louisiana. Jane Doe represented herself. The unlawful eviction was denied because Judge Judy Moore Vendetto agreed with Plaintiff that she was being prevented from living in the house and working there although was timely paying rent. Jeansonne admitted that it did not have any information or proof that Plaintiff was ever late with the rental payments in the past or that she ever committed any violation of the rental agreement.

182.    At the time, Jeansonne was the only attorney in the area, advertising itself as an "eviction attorney" and the only name that was coming up in the search for eviction attorney in Baton Rouge in 2018 and 2019. It appeared that Kwok found Jeansonne on www.kickemoutquick.com and it was the only Louisiana lawyer, presented as a "member" or provider on that website.

183.    After the unlawful eviction was denied, Morgan and Burton immediately resorted to their "self-help eviction." Kwok attempted to make Plaintiff sign a lease termination and release all possible claims against him and all others involved in exchange for a conditional "relocation stipend" of $200.00. Plaintiff declined and Kwok started demanding payment in full, ignoring the fact that Plaintiff physically could not stay in the house without fault or intent of her own in

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    74

January and February, however timely paid rent. When Plaintiff signed the lease in October, 2018, she put a random lease expiration based on Morgan's advice. Kwok, however, contacted plaintiff and told her that the minimal length of the lease is 12 months, and if she would need to leave before the expiration of that period, she must find a replacement.

184.    However, immediately after the unlawful eviction was denied in April, 2019, he forgot about the minimum 12-month requirement that he was enforcing and started enforcing told Plaintiff to vacate at the random date on the lease that he said prior was invalid. Kwok then filed for another eviction. When Plaintiff came to Baton Rouge city court for the second eviction hearing, she realized that there was no other general public and practically an empty room. That was in stark contrast with the first hearing when the room was so full of people that it was difficult to find a seat. The bailiff gave Plaintiff a dirty look and, without even asking her name that is ordinarily always asked, shoved the papers with Plaintiff's name on it at Plaintiff.

185.    As soon as Plaintiff took a seat, she noticed that a figure, exhibiting arrogance and concealed aggression, was moving towards her. It stopped probably 12 feet away and said: "Come here. I want to discuss your case." Plaintiff did not respond to the "order." When the hearing started, she realized that the arrogant figure that attempted to order her around was Cranmer whom she met a couple of months ago and who agreed to communicate with the DA of 19 JD on her behalf to ensure that criminal charges will be filed against Poulicek but withdrew its acceptance to represent Plaintiff immediately after spoke with Chugg and likely other co-conspirators. Not only that but Cranmer joined those who have been persecuting Plaintiff.

186.    The second "eviction" hearing, staged by dirty city-parish was "handled" by Hester who just became a judge but was a prosecutor and "section chief" of the "violent crimes unit" of 19 JD when the "official investigation" and crime cover-up of the Jane Doe's case took place.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                     75

Recently, Hester was "elected" to Louisiana court of appeal that is an integral part of the Louisiana criminal "judicial" system and more broadly, its criminal enterprise. Morgan came to "testify" at the staged sham-hearing. Unquestionably, Cranmer who did not handle evictions, did not advertise as a "lawyer" for evictions, and used to work in that corrupt city court was not found by co-conspirators Morgan, Burton, and Kwok independently. Rather, it and the staged sham-hearing has been arranged by the dirty criminals, sued herein.

187.    After being unlawfully "evicted" with the help of Cranmer and other city-parish-state defendants and their co-conspirators, Plaintiff was unable to find a decent or safe place and had to move in into the horrific ghetto, owned, managed and occupied by the drug dealers and drug-addicts. The "law enforcement" criminals, sued in this complaint, profit from that filthy drug cartel. The criminals physically attacked Plaintiff on the territory of the drug-ghetto and were intentionally poisoning Plaintiff and her majestic canine family by releasing toxic chemicals, neurotoxins, chemicals of mutagenic toxicity, and extraordinarily high and constant amounts of secondhand tobacco and marijuana smoke. In addition to assault by chemical weapons, it is likely that other types, such as bio-weapons, had been used by the dirty criminals.

188.    Plaintiff filled out the form, indicating that she was a non-smoker and only agreed to live near non-smokers. Plaintiff also informed the ghetto-management that she has two large Dogs – in fact, that was the first information that Plaintiff provided about herself as if the Dogs were not allowed, she would not apply there. Filthy Bogan, Brookins, Cardinal, PPQBR placed Plaintiff with a black deranged woman which they did not inform that Plaintiff has two Dogs. For over a year, it lived by itself while paying only the fraction of the price. It did not want to share the apartment with anyone else and did not want to live with Dogs. The disgusting criminal, it immediately started doing everything in order to get the entire apartment back to itself.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                          76

189.    It would turn its music extremely loudly, direct its speakers/subwoofers at Plaintiff, and leave the apartment. The sound was at dangerous decibel levels, causing pain in the inner ear and threatening hearing loss. Plaintiff complained to management but filthy Bogan simply ignored the complaints. On one occasion, the deranged came to the apartment at around 11 p.m., intoxicated and under influence of some drugs. It turned on its TV in the common area extremely loudly. Plaintiff sent a text to the deranged asking it to turn it down to no avail. The sound was dangerously loud and was causing acoustic trauma so that Plaintiff had to cover her ears. After waiting for around 40 minutes during which the sound was consistently extremely loud and was not turned down, Plaintiff called BRPD to report disturbance. Plaintiff waited for over 40 minutes but no one from BRPD came. Plaintiff then heard that the deranged turned down the sound. It was still very loud, especially for a midnight but was no longer at the dangerous level. Plaintiff called BRPD and told them that the sound was turned down and that she wants to cancel her request.

190.    Regardless that Plaintiff informed BRPD the sound was turned down and she no longer needed their "assistance," in about 30 minutes BRPD still showed up. They spent several minutes trying to wake up the filthy drunk or otherwise intoxicated on the couch. After that, it spent several minutes telling the cops how "pissed" it was that Plaintiff called the police. When Plaintiff later obtained "the report," a dirty BRPD cop fraudulently wrote in it that the sound was not very loud. There was no mentioning that it came in over an hour and that Plaintiff already called to advise regarding the change in the situation and canceled but it still showed up.

191.    Next morning, the deranged roommate turned off the air-conditioner, in June in Louisiana when the temperatures were around 90-100 F. Plaintiff came out of her room to turn it back on. The deranged threatened to turn it off again as soon as Plaintiff goes back to her room.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                    77

As it did turn it back off, Plaintiff waited for a while and when it started becoming hot, stepped out of the room and turned the cooling system back on. The deranged started moving toward Plaintiff, apparently to turn the AC back off. Plaintiff continued standing next to the thermostat. The deranged moved like a tank at Plaintiff, and moved Plaintiff by its body. Then, it turned the system back off.

192.     Plaintiff immediately locked her bedroom and went to the "leasing office" and told them everything what just happened. Brookins said that it will "move" Plaintiff. No information about when or where to was provided. Plaintiff left the "office" and started walking to her apartment. She saw a BRPD cop outside, asking her name. The deranged called the police and lied to them that Plaintiff did something to her. Plaintiff was shocked as although she by that time has already met countless bastards, as described in this complaint – she had never met yet such a filthy lowlife that would accuse someone of precisely what it did. While Plaintiff was standing next to the cop and Brookins, Brookins told the cop that the deranged did not want a roommate and was the one causing problems.

193.     Plaintiff was not told what exactly the deranged claimed Plaintiff "did" to it, and when she asked the cop about it, he refused to tell Plaintiff. The only thing that he told Plaintiff that Bogan and Brookins, two filthy scumbags, told him that Plaintiff "lied" to them and did not disclose that she had two Dogs. While the cop was still on the territory of the ghetto-apartments, Plaintiff observed Brookins whispering something into that cop's ears, and when Plaintiff was trying to approach, both the BRPD cop and Brookins started gesticulating, "signaling" to Plaintiff not to approach. After that, filthy Brookins continued whispering directly into the cop's ear. After the cop left, Bogan and Brookins still did not move Plaintiff.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                              78

194.    The deranged filthy roommate continued blasting its music at the dangerously loud

levels of decibels that were causing acoustic trauma, continued stealing Plaintiff's food, and

damaging her possessions. Plaintiff complained to the "management" but nothing changed.

Filthy Bogan was not moving Plaintiff, just making empty promises that it was "willing" to

reassign Plaintiff to a different apartment. When Plaintiff would ask when and where to, it would

not answer. The filthy deranged roommate brought and started housing the nasty 450-pound

black male that was lying around in the common areas. When Plaintiff went on a short trip with

her beloved Dogs, she returned to find her portion of the apartment wrecked, her personal

possessions damaged to the point that they had to be thrown out, and her groceries stolen and

damaged. Plaintiff called Bogan which said that was not its problem. Plaintiff then called BRPD.

A female responder Anderson arrived and, upon looking around and talking to Plaintiff told

Plaintiff to get out of there immediately, voicing a concern that the deranged could hurt her Dogs

by "throwing something in the room." Plaintiff responded that she was being also afraid of that

and was always locking her bedroom door and was never leaving the Dogs for longer than a few

minutes even in a locked room.

195.    Shortly after Anderson left, the deranged came back to the apartment and turned off the

air-conditioner whereas the outside temperature was around 90-100 F. Plaintiff turned the

cooling system back on and the deranged and its male guest that it was unlawfully housing in the

common areas of the apartment started threatening Plaintiff with violence if she ever touches the

thermostat again. Plaintiff called BRPD and when the same female cop, Anderson, arrived, told

her that she was being threatened with violence. The threats did not stop and Plaintiff had to call

later on that day again, and again same Anderson arrived. When Plaintiff later obtained "public

record," prepared and released by Morris and other city-parish criminals, it only contained a

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                      **79**

fraudulent falsification that the "roommates argued" about the "temperature of AC" whereas Plaintiff repeatedly explained that she never spoke to that roommate after Plaintiff moved in, except by sending a few polite texts, which she showed to BRPD, let alone "argued" with it. The only reason Plaintiff knew that roommate's phone number is because it was listed on a "roommate assignment" sheet. Although Plaintiff repeatedly clearly stated that she called because she was being threatened with violence, none of it was in those fraudulent BRPD "reports" as well as the fact that Anderson came three times on that day was also not documented but was fraudulently presented that Anderson responded just once.

196.    On June 19, 2019 – in 5 days after that roommate threatened Plaintiff with violence which Plaintiff repeatedly reported to the ghetto-management and Anderson, it approached Plaintiff from the back and violently hit Plaintiff with a solid wooden block. The vicious attack shattered and permanently deformed the Plaintiff's shoulder blade. Plaintiff immediately went to her room and called the ghetto-management telling them that she was just battered by the deranged scumbag they put her up with. Thereafter, Plaintiff quickly hung up and dialed 911, reporting the crime and requesting assistance. Prior to when the call was finalized, filthy Bogan and Brookins already appeared at the front door. Plaintiff showed her injured shoulder with a distinct red mark, resembling the wooden block on it to Bogan that demonstratively turned its head away and was not looking. Plaintiff turned around and went to her room to finish the call with the police so that it can dispatch a responder.

197.    Plaintiff waited for over 40 minutes but no one came. Plaintiff then dialed the police number again and asked whether they will respond to her call. The dispatcher said that "an officer" came but was sent away by Bogan that claimed that no assistance was needed. Plaintiff responded that she asked for an assistance and is waiting. The dispatcher promised to "talk to"

the responder. Shortly thereafter, a disgusting dirty BRPD cop Sanders appeared at the Plaintiff door, chaperoned by the two scumbags, Bogan and Brookins. All three black faces stared at Plaintiff with marked hatred and contempt. Plaintiff said to Bogan: "Please do not cancel my 911 calls" in response to which Bogan made a disgusting grimace.

198.    Sanders did not want to look at the injuries and refused to accept the video and photographs that Plaintiff made immediately after the attack. While Plaintiff was speaking with Sanders, filthy Bogan and Brookins were seating in the living room and whispering into the deranged roommate's ears. The dirty BRPD cop, Sanders, gave Plaintiff a "card" with reference to an incident that it "designated" as "miscellaneous." After that, Plaintiff tried to reach Sanders for months, leaving messages for it and its supervisors with requests to accept evidence, document everything properly, and charge the bastard that viciously attacked Plaintiff with the crime but the criminals ignored all messages and written correspondence.

199.    After Plaintiff has been attacked by the violent roommate, Bogan immediately "found" a unit where to move Plaintiff. It claimed that it was about to call the "headquarters" to confirm whether it can move Plaintiff. Bogan said that once it confirms it, the only thing to be done prior to when Plaintiff can move in, is the carpet cleaning. Plaintiff expressly and firmly stated that she requests that no "carpet cleaning" be done in there because they use harsh, harmful for environment, animals, and people cleaners and deodorizers, which she avoids for her own safety, her beloved Dogs' safety, and for the sake of the environment that is damaged by toxic "cleaning" chemicals. Plaintiff stated that if it has to be done, she will clean the carpets herself, with safe and non-toxic cleaning solutions. Filthy Bogan said that it was not a problem, and that, per Plaintiff's request, the carpets will not be cleaned, especially because whoever "lived there before already cleaned (the carpets) professionally."

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                      **81**

200.    In a little over an hour after that conversation with Bogan, and just after Sanders left,

Plaintiff asked to see the unit she was being moved to. Brookins said it will walk Plaintiff there.

When Plaintiff approached the building, she saw a commercial cleaning van, parked there, and

the cleaner just finished cleaning the carpets in the unit Plaintiff was brought to. Plaintiff asked

why the carpets were cleaned after her explicit request not to clean them. Filthy Brookins said

that Plaintiff asked about it "too late" and the cleaner already "started" cleaning. However, when

Plaintiff made her request, per filthy Bogan – it was not even confirmed yet to which unit

Plaintiff will be moved. It takes less than 15 minutes to clean those carpets and Plaintiff clearly

stated no to any "cleaning" well over an hour prior. When Brookins opened the door, it was

impossible to enter as the air was completely filled with disgusting strong synthetic deodorizer.

201.    Plaintiff was hesitant to walk in because she could not breath even standing next to an

open door. She asked filthy Brookins whether it was the only available unit and it said yes.

Plaintiff did not have anywhere else to go to. On a normal day, Plaintiff would still walk away

from it but she was just viciously attacked and battered with a wooden block by the deranged

violent negro, and just dealt with an abusive dirty BRPD cop, Sanders. To Plaintiff's personal

tragedy and the deepest regret, she crossed the doorstep of that deadly contaminated place where

for the next 12 months she and her family, Forrest and Rebecca, were being purposely attacked

by the Louisiana "law enforcement" criminals by the constant release of various mutagens,

neurotoxins, and other toxic chemicals.

202.    Because the unit where the criminals placed Plaintiff and her family was dangerously

contaminated with secondhand and thirdhand tobacco and marijuana smoke and other toxins, the

criminals soaked the filthy carpets in a harsh deodorizing solution in order to disguise that unit

was contaminated. To conceal that they were placing Plaintiff into the deadly reservoir of cancer-

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                    **82**

causing compounds, the criminals soaked those carpets in a deodorizer so badly that they were making noise while being walked on. In only 72 hours the carpets started drying out. All that time and thereafter, Plaintiff and her family, Forrest and Rebecca, were being subjected to the cocktail of toxic chemicals, off-gassing from those carpets into the air. When, in days, the harsh deodorizing synthetic stench started to slowly dissipate, Plaintiff realized that the unit reeks with a very strong tobacco, marijuana, and other noxious toxic smells. Plaintiff also realized that not only the filthy unit was soaked in toxins but that there was an active daily indoor tobacco, marijuana, and other substances' smoking in all adjacent apartments. In addition to the drugs, the Louisiana "law enforcement" criminals were releasing other toxic chemicals into that apartment in order to induce deadly disease in Plaintiff.

203.    Filthy Bogan and Brookins maliciously and in conspiracy with Louisiana "law enforcement" criminals placed Plaintiff in that disgusting contaminated unit, surrounded by drug addicts and drug dealers. That is why the criminals heavily deodorized the unit, against Plaintiff's explicit warning not to do so. Because they placed Plaintiff next to the addicts and drug manufacturers that were constantly poisoning Plaintiff through their daily illegal activities, the "law enforcement" criminals could disguise their release of toxic chemical weapons directly into that apartment in all the nasty fumes, produced by the indoor smokers and drug-users from the adjacent apartments.

204.    Plaintiff immediately contacted the ghetto-management to report that there was indoor smoking and that Plaintiff was being subjected to its harms. Filthy Bogan was making empty promises to "speak" to the drug users and smokers which lived in the adjacent to Plaintiff's units. Despite the fact that "smoking (was) strictly prohibited" on the territory of the ghetto, according to the "lease agreement" that Plaintiff signed with it, Plaintiff continued fruitlessly reporting the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                              83

violations by calling and emailing Bogan, Brookins, and other ghetto-management for the next several months.

205.    In just a few days after Plaintiff was moved into that filthy unit full of booby-traps both inside and outside, Plaintiff's beloved Dog, Forrest, got seriously injured in the "pet area" just in front of the apartment. The "pet area" was covered with numerous holes of various diameter and depth. The holes and defects were concealed by grass and did not appear dangerous. Forrest's leg got trapped into one of the holes and he sustained a complete tear of his cranial crucial ligament (CCL). The orthopedic veterinary surgeon stated that he has rarely seen such laxity in his patients' injured legs, commenting that Forrest did not have any pre-existing conditions such as arthritis, erosion, inflammation, or any signs of a progressive degenerative failure of the ligament which are present in most of his patients with a CCL tear. Not being held by any erosion or inflammation, typical for progressive degenerative failure of the ligament, Forrest's femur and tibia completely came apart. The injury was 100% due to Forrest's leg getting captured by the hole on the defective property of ghetto apartment complex.

206.    That injury was incredibly hard and devastating to Plaintiff, Forrest, and Rebecca. Otherwise exceptionally healthy prior to injury, Forrest was unable to walk at all after getting injured, and was in extreme pain at the time of the injury and for many months after the surgical repair of the torn ligament has been done. To repair Forrest's torn ligament, his healthy bones were sawed, repositioned, and reattached by multiple metal screws as there is no other way to repair the CCL tear in a large canine. The trauma, the surgery, and the several months of rehabilitation were extremely difficult and brought a great deal of emotional distress to Plaintiff and her family. Plaintiff had to watch her beloved Dog being seriously injured, suffering, and had to nurse him back to new "normal" and rehabilitate him. After the complex and highly invasive

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                              **84**

surgical repair, Forrest's leg and surrounding soft tissues and muscles started to have different appearance and the leg was not being fully or in the same way used as prior to the trauma. All that suffering and difficulties, inflicted on Plaintiff by the filthy apartment complex, was greatly amplified by continuous toxic exposure that was slowly murdering Plaintiff, Rebecca, and Forrest.

207.    Bogan and Brookins assigned to Plaintiff a "roommate" with a criminal record, pertaining to illegal drugs, and the mug shot was the first thing that was coming up in search. The "roommate's" name was unique and undoubtedly the information about criminal record pertained to it and not to someone else. The filthy criminals – Bogan, Brookins, PPQBR and Cardinal – did not disclose to that assigned roommate that Plaintiff has two Dogs. When Plaintiff, already knowing that those crooks and criminals deceive the potential tenants by purposely and maliciously not disclosing the animal situation to the assigned roommates in order to lock people into their "lease contracts" and then shamelessly blame the tenant with animals and accuse her of dishonesty, contacted that assigned roommate and let it know that she has two large Dogs. The assigned roommate did not like the news and the assignment was canceled.

208.    Plaintiff and her family continued being battered by dense, overwhelming secondhand tobacco and marijuana smoke, and continued being exposed to various toxins and carcinogens, including the chemical weapons purposely released by the Louisiana "law enforcement" criminals. Even when the junkies in the adjacent units were not smoking, Plaintiff and her canine family were being continuously exposed to the grave dangers of the thirdhand smoke. Plaintiff's physical, mental, and emotional health started rapidly deteriorating. Plaintiff continued contacting filthy Bogan and Brookins regarding deterioration of her health and dense secondhand smoke in her apartment, but lowlife bastards continued ignoring Plaintiff. Plaintiff started

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                          85

contacting BRPD as, in addition to secondhand tobacco smoke, marijuana and other illegal

drugs' secondhand smoke and odors were also entering Plaintiff's unit. The "law enforcement"

criminals, in accordance with its malicious and corrupt plan of persecuting and poisoning

Plaintiff, were ignoring Plaintiff. Instead, secondhand smoke and toxic odors became even more

prominent.

209.    Plaintiff purchased an indoor air quality detector that was calibrated to specifically detect

and measure levels of common indoor pollutants, including all types of secondhand smoke. The

readings were showing what Plaintiff already knew – that the air inside of the Plaintiff's

apartment was dangerously polluted. The testing results showed in several thousand times

elevated levels of pollution compared to what is considered clean or fresh air. Every time

Plaintiff did the testing of the indoor air, the device started beeping, advising to move to fresh air

immediately.

210.    In October, 2019, as a result of toxic exposure and chemical weapons assault, Plaintiff

started experiencing sharp abdominal pain that was so intense that Plaintiff was nearly fainting.

Plaintiff moved out of her bedroom where the secondhand smoke and other toxic pollution were

the worst as the most of horrific, disgusting secondhand smoke was entering through the vents in

Plaintiff's bedroom and bathroom. Plaintiff opened the "patio" door and made the bed for herself

right by the opened door. This measure was still inadequate and Plaintiff's abdominal pain

continued intensifying until it became unbearable. On October 8, 2019 Plaintiff started

screaming in pain. Prior to that episode, Plaintiff never experienced any such excruciating pain

that could not be tolerated. For the first time in her life, Plaintiff called and requested an

ambulance. When the city-parish ambulance arrived, Plaintiff explained to those responders that

she was being continuously battered by extraordinarily dense secondhand marijuana and tobacco

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                                          **86**

smoke, as well as by other substances and toxins that were being pushed into her unit that she cannot identify. The "responders" offered to take Plaintiff to a hospital. Plaintiff, knowing definitively that what was going on with her was 100% related to and induced by severe exposure to toxins, and that going to the hospital will not help her, decided not to go to the hospital.

211.    When Plaintiff was screaming in pain, her roommate, Ashley, recommended that Plaintiff opens the second door, in addition to an already opened patio door, to create an air circulation. Ashley was also bothered by the exposure to toxins and mentioned to Plaintiff numerous times that she was rearranging her work schedule, such as leaving earlier and then going to work a few hours earlier in the morning with one goal – to get to the bastards if the "leasing office" during its business hours as Ashley believed that talking personally to Bogan and Brookins will be more helpful then over the phone or email. Plaintiff, having dealt with the filthy criminals Bogan and Brookins, assured Ashley that her sacrifices were for nothing, and she was only wasting time on those filthy bastards as there is no difference how she contacts them, the result will be precisely the same – that is, no change at all. Plaintiff was hesitant to open the front door, as Ashley suggested, as all those drug addicts were walking by and looking inside the apartment. Hoping to reduce the damage and exposure to toxins, Plaintiff did open the front door as well. For the remainder of the Plaintiff's stay in the filthy ghetto apartment complex, Plaintiff was unable to close the doors due to the constant chemical weapon assault and had to keep the doors open at all times while she was in the apartment.

212.    Plaintiff continued contacting filthy Bogan and Brookins and the BRPD criminals whose responsibility was to deal with illegal drug usage and production – all to no avail. The situation with indoor smoking of tobacco, marijuana, and other drugs and toxins started becoming worse

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                     **87**

and Plaintiff could not go anywhere near the bedroom and bathroom unless her mouth and nose were covered with a folded thick bath towel. Plaintiff took out the majority of her possessions out of the bedroom and stopped using the apartment's bathroom. In addition to the mixture of continuous secondhand tobacco and marijuana smoke and other chemical weapons/toxins some of which had pharmaceutical stench, there was also absolutely horrific persistent "human" stench that could be described as intolerably aggressive and nasty bodily odors, coming from vomit, urine, feces, and other bodily liquids of the filthy inhabitants of the adjacent apartments, pumped with all kinds of nasty drugs and alcohol. In the horrible ghetto apartments with "paper" walls and non-existent ventilation with direct air-exchange between adjacent apartments, Plaintiff and her precious canine family were being continuously assaulted by those horrific stenches as well.

213.    Plaintiff stopped using the cooling equipment as it was bringing inside even more of the secondhand smoke odors and particles. While doing everything she could do reduce her family's exposure to toxins, Plaintiff continued contacting filthy Bogan, Brookins, and BRPD. Plaintiff was not being moved to a safe unit and the indoor smoking in the adjacent apartments was not being stopped. Plaintiff purchased a tent and attempted to sleep, together with her canine family, outside in the tent. The entire ghetto apartment complex reeked with nasty drugs and smoking, and the drugs were also being made on the property – even outside at that time and during at least a few months the quality of the air was low, especially during certain hours.

214.    Plaintiff could barely walk because of the abdominal and back pain caused by the constant assault by chemical weapons and other toxins. The chemical weapons that the "law enforcement" criminals were poisoning her with, were causing, among other things, neurological damage. On October 14, 2019, Plaintiff filed a petition in Baton Rouge city court for injunctive relief to stop toxic assault. The city-parish criminals suppressed the legal action and although the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                            **88**

law requires that any injunctive relief petition be heard within 24 hours after filed, the filthy criminals were not taking any action and were not scheduling any hearing for two months. When Plaintiff called, the disgusting criminals kept telling her that it was "before the judge."

215.    Plaintiff continued trying to minimize her family's toxic exposure, as well as continued contacting the ghetto management and BRPD, reporting overwhelming amounts of secondhand smoke, including of illegal drugs however the bastards continued ignoring the reports. Plaintiff kept contacting ghetto complex's maintenance as well, requesting that it improves ventilation and blocks the air flow from the adjacent apartments. Con 1, the maintenance manager the ghetto complex that goes by "Mike" finally responded. Plaintiff provided it with the materials such as several types of plastic sheets, including insulated material. As Plaintiff was not going anywhere near the bedroom and bathroom, she let "Mike" Con 1 to go there on its own. Plaintiff does not know what Con was actually doing in there, but when it left, Plaintiff started noticing strong stench of a synthetic cleaning substance and deodorizing substance being added to the already deadly, nauseating mixture of odors.

216.    It is likely that "Mike" Con 1, coached and instructed by Bogan, Brookins, PPQBR, and Cardinal, installed some slow-release, heavy duty synthetic deodorizers in the vents in the Plaintiff's apartment in order to disguise the toxic fumes of drugs, tobacco, and other chemicals. That horrible cleaning solution/deodorizer that those criminals installed without Plaintiff's consent and authorization in attempt to conceal their crimes against Plaintiff and her Dogs whom they continued knowingly subjecting to the deadly toxic exposure, added to the already dangerously polluted air more volatile organic compounds.

217.    Plaintiff continued greatly suffering from the harms of secondhand and thirdhand smoke and other toxins, entering her unit. Plaintiff continued contacting the ghetto management

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                89

with reports about constant indoor smoking and drug manufacturing in adjacent units,

demanding that the criminals stop those illegal activities. Similarly, Plaintiff continued reporting

illegal drug usage and manufacturing on the ghetto property to BRPD. During one of those

countless attempts to make the criminals to do their jobs, on November 6, 2019 when Plaintiff

called BRPD to report continuous marijuana and other drugs secondhand smoke toxic matter

entering her unit and poisoning her and her Dogs, she was told to contact the fire department. As

instructed, Plaintiff called the fire department that sent the four responders, including defendant

Wells who was the captain of that team. As always, Plaintiff had all windows and doors open in

her apartment. Plaintiff stated that she was exhausted by continuous battery by secondhand

smoke of tobacco, marijuana, and something else that she cannot identify, and that the toxic

fumes are so strong that it feels like there is an "army" of drug addicts smoking and

manufacturing drugs in all those adjacent units.

218.    Immediately upon arrival, the responders claimed they could not smell anything. Then,

as dense disgusting marijuana secondhand smoke started coming through the vent, they

immediately commented on it and identified it as marijuana. Wells stated that he was surprised

that the ghetto management has not done anything about it. He told Plaintiff to call the police

regarding that. Plaintiff explained that she contacted BRPD many times but they continued

ignoring her. Plaintiff also explained that she called BRFD only because was told by BRPD to do

so. Another member of Wells' team said that it might be awful and exhausting to have constantly

smell that, and that he felt sorry for Plaintiff. Wells said that he will call "hazmat" team so that

they can test the air inside the apartment. Wells said that to do that, it will be necessary to close

all doors and windows. Plaintiff said that she cannot be in that apartment at all unless there is at

least some air circulation, created by opened windows and especially doors that provided a much

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                    **90**

better airflow. Plaintiff went outside with her Dogs, and Wells and his team closed all windows and doors. Then, Wells came out and informed that everything was closed and now Plaintiff only needed to wait for "hazmat" and talk to them.

219.   The hazmat responders said the same as Wells – that the ghetto management should have resolved that and suggested that Plaintiff continues insisting to be transferred to another unit, noting that, even if transferred, she "might run at exactly the same problem." The hazmat "tested" the air and told Plaintiff that her air was "okay." As Plaintiff's indoor air was densely polluted by secondhand tobacco, marijuana, and other unidentified by Plaintiff toxins – chemical weapons that the "law enforcement" criminals were attacking her with – she called BRFD to clarify why they claimed that such dangerously polluted air was "okay." Plaintiff was immediately transferred, although she did not ask for any specific individual, to the BRFD chief "Ed" Smith who, for about an hour, pitched to her a claim that their testing devices are very expensive and accurate, that they calibrate them daily, and that Plaintiff should trust them. Plaintiff wanted to hung up and tried to do so many times, but Smith continued lecturing Plaintiff.

220.   Smith asked what kind of device Plaintiff used to test her air and requested that Plaintiff tells him the exact brand, model, and where it was purchased. It appeared that Smith wanted to find out what was the capabilities of the device Plaintiff was using and what it is able to detect and what is not. Because BRFD devices were much more expensive, Smith continued pitching the fallacy that Plaintiff should trust their results of the air "testing." Shortly thereafter, Plaintiff find out and got confirmation from BRFD that their expensive hazmat devices are not calibrated to detect toxins of secondhand and thirdhand smoke of tobacco, marijuana, or any other toxic chemical. Instead, it was calibrated to only detect flammable and other such substances that pose

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                              91

a risk of explosion or other emergency situations. Plaintiff's device, however, was created to specifically measure the indoor pollutants and toxins such as those found in secondhand tobacco and marijuana smoke.

221.    On November 21, 2019 Plaintiff learned that on November 19, the U.S. Court of Appeals for the Fifth Circuit reversed LAMD that, after unlawfully suppressing for months Plaintiff's legal action, dismissed it "with prejudice." After LAMD was reversed, Plaintiff got back the absolute legal right to sue the defendants that co-conspirator LAMD unlawfully took from her. Plaintiff wanted to refile her action as soon as possible, knowing that with the defendants-vultures it is in her best interest to refile the suit soon. However, being battered and poisoned by neurotoxins and other chemical weapons, entering her apartment, Plaintiff could not focus or concentrate to the extent, needed for drafting of a voluminous, factually-detailed complaint. Plaintiff's physical, mental, and emotional health was greatly impaired and she was practically surviving.

222.    Plaintiff's damaged shoulder continued hurting, and Plaintiff was fruitlessly trying to get in touch with Sanders, its supervisors, and other BRPD frauds, demanding that they properly document the attack on Plaintiff and charge Plaintiff's batterer with the crime. In November 2019, Plaintiff went to the BRPD station and requested to speak with Sander's supervisor. Bonaventure, a sergeant who was supervising Sanders, looked at the photographs and video of the Plaintiff's injuries that she made immediately after has been battered with the wooden block by the deranged filthy "roommate," stated that Sanders "made a mistake" and should have done everything correctly in the first place. Disgusting dirty cop Sanders wrote in its fraudulent "report" that there were no injuries whereas Plaintiff's shoulder blade has been permanently

damaged by the black violent bastard. Bonaventure said that he will order Sanders to correct report, find that roommate, and issue it a citation to appear in court.

223.    However, Bonaventure was ordered by a higher ranking BRPD dirty cop, Con 2, to drop the matter entirely and not to change the falsified report. Bonaventure said to Plaintiff that he was sorry but that "they told (him) not to do anything" and that he could not do anything because "they (Bonaventure's supervisor(s) who ordered Bonaventure to cover up the crime) outrank" him.

224.    Plaintiff, Rebecca, and Forrest continued being slowly murdered by the chemical weapons that were being released by the filthy Louisiana "law enforcement" criminals as well as by dense tobacco and marijuana secondhand and thirdhand smoke that was drifting and seeping inside their apartment. Plaintiff continued to be assaulted by horrific "human junkie" stenches that were entering her unit as well as by volatile organic compounds of a synthetic deodorizer that the ghetto-management installed in the vents of her unit, in attempt to maliciously "mask" the poisonous fumes that were being pushed into her apartment. Plaintiff was holding her breath and covering her nose and mouth with thick cloth/material, often with folded towel, if she had to go to the portion of the apartment that was away from an open patio door. The bedroom and bathroom doors were always closed and Plaintiff avoided going anywhere near them, let alone enter. Plaintiff was not using the apartment's bathroom and was not using the cooling/heating system as running an air conditioner brought in even more of the dense disgusting chemical toxins, secondhand smoke, particulate matter, drug-addicts' stomach-wrenching bodily odors, and synthetic deodorizers that the ghetto installed in the vents of the apartment.

225.    As city-parish criminals unlawfully suppressed Plaintiff's petition for injunctive relief and instead of addressing it within 24 hours as required by law, suppressed it and continued lying

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                93

to Plaintiff for two months while continue poisoning and harming her, Plaintiff decided to file an injunctive relief petition in 19 JD. Plaintiff mailed her petition, accompanied by the sworn notarized affidavit and it was filed into the record on December 26, 2019. In her petition, Plaintiff explained, in detail, how she was being affected and tortured by continuous assault by chemical toxins and secondhand tobacco and marijuana smoke. Plaintiff attached the results of the air quality testing in her apartment, showing that it was dangerously polluted. For comparison, Plaintiff provided the results of the testing of air quality outside, which was in hundred and often thousand times cleaner than the indoor air. Plaintiff explained that she was being battered by pollutants to such an extent that she had to keep all doors and windows open in the apartment at nearly all times, and had been risking her life.

226.     Plaintiff requested injunctive relief, forbidding indoor smoking of tobacco, marijuana, and other substances in all adjacent apartments, in accordance with the "lease agreement," signed between Plaintiff and the ghetto apartment – Cardinal, PPQBR, Bogan, and Brookins – that explicitly stated that "smoking (was) strictly prohibited" on the property in the common areas and anywhere indoors. Plaintiff attached a copy of the lease agreement to her petition and her sworn notarized affidavit declared that she was suffering an irreparable injury. In the body of the complaint, Plaintiff provided references to the U.S. Surgeon General's reports that unequivocally stated that there was no safe amount of secondhand smoke and provided statistics of deaths, directly linked to secondhand smoke exposure. Plaintiff also cited most reputable sources such as research projects of the dangers of secondhand and thirdhand tobacco and marijuana smoke, sponsored and initiated by the US government and various scholarly findings about the same.

227.     The petition was assigned to the filthy scumbag, Wilson Fields. It scheduled the hearing in 10 days after the action was filed. Plaintiff subpoenaed Bogan, Brookins, Con 1, Wells, and

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                        94

Ashley – Plaintiff's former roommate – to appear on the day of the scheduled hearing. Plaintiff intended to question filthy Bogan, Brookins, and Con 1 regarding countless complaints and reports concerning continuous exposure to chemical toxins and secondhand and thirdhand smoke in their filthy ghetto. Wells was also subpoenaed because he witnessed that the secondhand smoke of illegal narcotics was entering Plaintiff's unit, commented regarding how unacceptable it was on the part of the ghetto management, and observed that Plaintiff kept the doors and windows open in order to be able to breath and in attempt to minimize the exposure to chemical toxins. Wells also saw that Plaintiff was "living" in the "dining area" and that two bedrooms and two bathrooms in her apartment were empty and locked, and he and his team went there by themselves because Plaintiff stated she could not even go anywhere near the bedroom and bathroom due to high amounts of chemical toxins entering through the vents in those rooms.

228.    Plaintiff attempted to serve PPQBR through its listed registered agent but it was impossible to do so. The sheriff's deputy informed Plaintiff that as long as he remembers, it was impossible to serve that individual as it never responded nor contacted them when the information regarding service was left. Plaintiff then attempted to serve PPQBR through its place of business but filthy Bogan was not accepting service – just like it happened in the above-entitled action. The scumbags refused service and then Bogan, Brookins, Con 1 appeared as subpoenaed witnesses, represented by Carter that "moved" for continuance on behalf of the three witnesses without enrolling as an "attorney" for PPQBR that was the named defendant. Contrary to the 24-hour requirement for the injunctive relief petitions, scumbag Fields started "continuing" hearings and scheduling them 3-4 weeks apart. After each "continuance," Plaintiff had to again subpoena 5 witnesses, diligently prepare for the hearing, take a taxi to the courthouse – only to observe the scumbag Fields continuing with its criminal conduct.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                              **95**

229.     When Plaintiff raised her objections regarding baseless unlawful "continuances" of the injunctive relief hearings, and requested an explanation why she was not allowed to have meaningful access to courts and not allowed to obtain, she did not receive any explanation. Because Wells had to repeatedly come to the courthouse under subpoena, he was getting annoyed and angry – at Plaintiff and not at scumbag Fields or city-parish and other co-conspirators that ordered the persecution of Plaintiff. Unquestionably, the scumbag Fields was criminally violating the law so that the filthy scumbags-co-conspirators can continue attacking Plaintiff with chemical toxic weapons.

230.     After yet another sham "continuance," Plaintiff saw Wells in the hall of the courthouse where it was chatting with Bogan, Brookins, Carter, and Con 1. When Plaintiff greeted Wells, it looked at her angrily and told Plaintiff that it does "not know what (it) was doing" there because it "did not smell anything except dog pee." After that Wells' statement, filthy scumbag Bogan said to Wells: "Thank you very much." Plaintiff realized that scumbag Wells, bribed by the filthy ghetto and ordered by its co-conspirators will lie about its actual observations and comments, made in its official capacity while it was performing its duties and "investigating" toxic fumes.

231.     After Plaintiff realized that Wells will only lie and provide false, fraudulent testimony, and doubting that clown Fields will allow her to properly question Wells, she decided to depose Wells. The deposition was scheduled to take place at the office of Louisiana court reporters, LLC. That corrupt establishment attempted to cancel the deposition twice, once just a day before it was scheduled, after confirming it repeatedly. The deposition was attended by Plaintiff, Wells, Carter, and Bogan.

232.     Plaintiff started questioning Wells and asked if it had been to the Plaintiff's apartment on November 6, 2019 while performing its official duties and investigating toxic fumes in that

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                    96

apartment. Wells said that it remembers being in the Plaintiff's apartment because Plaintiff called

BRFD and reported toxic poisonous fumes that were making her sick. Plaintiff asked whether

Wells commented that it found that marijuana fumes were entering Plaintiff's apartment through

the vents in the wall from the adjacent apartments. Wells denied that. Instead, the scumbag

claimed that the only odor it smelled was "dog poo" – apparently trying to make its false

testimony more vivid than the one it gave in the hall of the courthouse. After Wells made that

comment, the corrupt court reporter started laughing. Further, Wells denied seeing that all doors

and windows were open in the Plaintiff's apartment and denied that Plaintiff stated to it and its

team that she almost never closes the doors and windows due to continuous assault by the

chemical toxins and secondhand smokes.

233.    The scumbag also denied that it personally closed all doors and windows, and denied

that Plaintiff stated to it that she was unable to go anywhere near the closed empty bedrooms and

bathrooms and denied that it and its team went there on their own. Wells also denied that it

expressed its shock and disapproval of the filthy ghetto managers and owners that failed to stop

indoor smoking and refused to do anything about it.

234.    Plaintiff then introduced an audio recording of the conversation of her with Wells and its

team on November 6, 2019. At first, the corrupt court reporter started documenting it, but

immediately stopped when realized that Wells, Carter, and Bogan dislike the evidence that is

100% favorable to Plaintiff and demonstrates that scumbag Wells just perjured itself numerous

times as well as demonstrates that everything that Plaintiff stated was true and accurate. When

Plaintiff asked Wells whether it recognizes itself speaking on the recording, it would not answer

but continued "objecting to the recording" and saying that it "did not know (it) was being

recorded." Plaintiff reminded it that the recording was made in compliance with the Louisiana

law, that Plaintiff did not have to inform Wells or ask its permission in order to record the

conversation she participated in, and whether it objects or not, it still must answer the question.

The scumbag then said that it sounded like its voice and it speaking but it does "not know how

(Plaintiff) doctored that recording."

235.    When Plaintiff asked the corrupt court reporter why the exhibit in the form of an audio

recording was not being documented and if it will be made part of the transcript later. It angrily

said that no, it will not transcribe it. Plaintiff explained that the recording is the part of the record

as it was being discussed thoroughly and directly referenced during the deposition. The corrupt

court reporter continued talking to Plaintiff angrily and demonstrating its contempt. It then

brought to the room its "manager" that, with the face, twisted in contempt, said that they do not

allow "illegal recordings" to be transcribed. When the "deposition" was over, Plaintiff observed

the two filthy scumbags, Carter and Wells discussing the transfer of the bribe funds to Wells for

providing false testimony.

236.    Every time Plaintiff appeared in the "courtroom" of Fields-the-scumbag, it invariably

asked her to show her ID. Its bailiff than approach Plaintiff, studied her ID, and then reported to

Fields who Plaintiff was. Not a single time Fields requested an ID of Carter, Bogan, Brookins,

Con 1, Wells, or Ashley. When Plaintiff appeared again to participate in yet another "hearing"

that was about to be continued by the scumbag and criminal Fields, she saw Antee-Griffin, the

court reporter of filthy Woodruff-White, sitting next to Fields and staring at Plaintiff with evil

hatred. Filthy Antee-Griffin came to "serve" Plaintiff with some papers that pertained to the

protective order hearing that was at that time being suppressed by the criminals of Louisiana

court of appeal and supreme court. Unquestionably, should there be no constant criminal

conniving, conspiracy, and coordinating regarding the persecution of Plaintiff between the filthy

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                          98

criminals, sued in this legal action, AnteeGriffin could have never been able "track" Plaintiff. As soon as the filthy AnteeGriffin "served" Plaintiff, the scumbag Fields once again "continued" the preliminary injunction hearing for four weeks.

237.    When Plaintiff was unable to come to yet another sham-hearing on the string of numerous "continued" by the scumbag Fields, she requested continuance and even advised the scumbag Carter about her circumstances. Witnesses were not subpoenaed for that day due to Fields' providing wrong date of the hearing in open court which resulted in necessity to recall the subpoenas prior to when they were issued and there was no time to request the issuance of other subpoenas for the correct date. The filthy scumbag denied the Plaintiff's request for continuance and "dismissed" the Plaintiff's action. Without any doubt, should Plaintiff appear, the filthy criminal Fields would have unlawfully "continued" its criminal conduct and ensured that Plaintiff is continued to be poisoned and attacked with the chemical weapons by it and its co-conspirators.

238.    While filthy scumbag Woodruff-White was threatening to "arrest" Plaintiff for not paying Poulicek's legal expenses, it also falsely and fraudulently claimed that Plaintiff "abandoned" her appeal. The scumbags and criminal on Louisiana court of appeals and supreme court were unlawfully suppressing the appeal, falsifying documents, the records, and doing other criminal acts in order to cover up the crimes of the Louisiana criminal "law enforcement." It took two years and several writs to supreme court to have the scumbags to lodge the purported appeal record which the court of appeal would not allow Plaintiff to inspect although Plaintiff purchased it twice. When another writ to supreme court was filed, the scumbags finally released the record. As it was heavily falsified with important document deleted and fraudulently manufactured and falsified transcript, Plaintiff filed a writ with supreme court demanding that the exhibits be

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                    **99**

properly added and the recording of the hearing realesed so that an independent court reporter

could be hired to transcribe it. The scumbags responded with a usual bogus one-word "ruling:"

"denied." After 40 months since notice of appeal was filed and briefing was completed and

"pended" for years purportedly awaiting the disposition/ruling, the scumbags fraudulently

"dismissed" Plaintiff's appeal as "abandoned."

239.    On or about April 18, 2020, Plaintiff purchased a laptop on amazon.com. It was

delivered on April 20, 2020. The product was purchased as "new" but its software and hardware

components were most certainly tampered with. Notably, all packages, against Plaintiff's explicit

protest and demand not to accept any packages on her behalf as they were supposed to be

delivered directly to Plaintiff, were being dumped in Bogan's filthy office. That time, it was

delivered to the doorstep and whoever dropped it quickly left and Plaintiff does not know who

"delivered" it to her door. Because the laptop was tampered with, Plaintiff immediately sent it

back.

240.    On April 22, 2020, Plaintiff attempted to purchase a laptop at Costco in Baton Rouge.

She talked to the electronics department consultant who answered her questions about the model

she was interested in and told her that she can take a picture of the model number, show it at the

checkout, and they will bring one from the storage. When she requested it in about 40 minutes at

the checkout, the store manager went to bring it, came back, and said they don't have it and the

only one left is on the display which they can sell to her with a discount. Plaintiff said that she

definitively knows that they have dozens of laptops of that new model in stock and that she

requests one in a sealed box. The manager said it is not possible but that they can get the one on

the display "ready" for her in 20 minutes. Plaintiff asked why would it take so long and was told

that they need to "reboot" it. Plaintiff said that it takes a few seconds to "reboot" a new computer

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                      **100**

The manager and an assistant manager who joined him, told Plaintiff that they will have to "reboot for (her) safety" and it will take them 20 minutes. Unquestionably, that incident was one the countless episodes of continuing abuse and persecution by the filthy "law enforcement" criminals, sued in this complaint.

241.    Plaintiff requested the records concerning city-parish's ambulance dispatch and visit of the responders to the Plaintiff's call for assistance on October 8, 2019 when she was experiencing an excruciating abdominal pain due to continuous assault by the chemical toxic weapons and secondhand tobacco and marijuana smoke. The filthy lying criminals, sued in this legal action, that were maliciously intentionally poisoning Plaintiff responded that "no such records exist." That was one of the numerous, countless instances of the city-parish-state scumbags, destroying evidence and covering up their atrocities.

242.    After poisoning Plaintiff and her precious Family for a year and attacking them with the chemical weapons, the filthy criminals, sued in this legal action manufactured a purported "eviction" claiming that the scumbags were "evicting" Plaintiff for "smoking" and "unauthorized vehicles." Plaintiff spent a year fighting against poisoning, abuse, chemical toxic exposure, indoor smoking by the filthy ghetto residents, manufacturing illegal drugs on the property, and unauthorized vehicles on the property selling illegal drugs. Plaintiff submitted dozens of reports to the ghetto management, to city-parish, and to filthy Louisiana "courts." After unlawfully and criminally poisoning Plaintiff with the help if its atrociously corrupt "law enforcement" and "courts" system, those filthy criminals sued in this complaint, accused Plaintiff of their crimes of which she relentlessly complained and against which fought.

243.    Because the Fifth Circuit reversed the unlawful discarding of the Plaintiff's complaint by corrupt judge Dick of Lamd, Plaintiff was able to refile her action. Another corrupt judge of that

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                              **101**

court, Degravelles, together with the corrupt magistrate Wilder-Doomes continued blocking

Plaintiff's access to courts per their conspiratorial plan with other defendants-co-conspirators.

They unlawfully "screened" Plaintiff's complaint under the prisoner in forma pauperis statute

and then, while further perverting the law and procedure, manufactured fraudulent "reports" and

"opinions" in which misapprehended the facts, misapplied the law to the facts, and corruptly

"reached" false conclusions while diligently working as advocates for the defendants – their

friends, business partners, and co-conspirators. They perverted each and every fact of the Jane

Doe's complaint. For instance, they lied to the public that Plaintiff "agreed" to close her public

record request and left out that Plaintiff was actually tricked and lied to by the filthy criminal,

Chugg, which worked for the defendants under the guise of representing Plaintiff's interests.

Further, they claimed that maybe Jane Doe "incorrectly resubmitted her request thereafter," as

her complaint purportedly does not tell how exactly and to whom she resubmitted her request.

While perverting the facts and fabricating imaginary "facts" – contrary to the US Supreme

Court's precedents – the filthy co-conspirators simulated the proceedings while working as a

"counsel" for the defendants. In order to unlawfully discard the Plaintiff's meritorious legal

action, Degravelles refused to accept the filing fee from Plaintiff and instructed its corrupt clerk

to continue returning Plaintiff's cashier checks and continue deceiving Plaintiff regarding the

amount of the fee.

244.    After Plaintiff left filthy Louisiana and relocated to Oregon on July 1, 2020, the filthy

defendants-criminals, personally and through their Oregon-based co-conspirators, continued

persecuting Plaintiff, destroying evidence, and committing other atrocities. The bastards, by

continuously accessing and controlling Plaintiff's electronic devices, all digital accounts,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**

networks, and likely using other unlawful methods of spying and surveilling, have been carefully controlling and risk-managing everything that Plaintiff was doing or trying to do.

245.    When as a direct result of the poisoning and attacks with chemical toxic weapons by the criminal bastards, sued herein, Plaintiff's precious Rebecca started showing neurological damage, rapidly losing all the muscles including those around the spine causing her spine protrude for at least 7 cm, and gradually losing the use of her rear legs and becoming more and more fatigued, Plaintiff started to look for a veterinarian.

246.    Plaintiff called the nearby veterinary clinics, telling them that she wanted to bring her Dog, Rebecca, for an ultrasound and other tests as soon as possible. Some clinics did not have openings and some stated they do not do ultrasounds at all or unless their own veterinarian determines it necessary and makes a referral which is a process that will take at least several weeks. When Plaintiff called Echo Hollow veterinary hospital in Eugene, she was told that they had availability and that they readily do ultrasounds. Plaintiff and Rebecca went to Echo Hollow on November 2, 2020.

247.    In Echo Hollow, Rebecca was "seen" by Srch-Thaden. Plaintiff told Srch-Thaden that she and her two Dogs were being bombarded by chemical toxins and secondhand tobacco and marijuana smoke, and now Rebecca had been rapidly changing from the healthy, thriving Dog to a very sick and fatigued Dog who was barely standing on her rear legs and rapidly losing the normal usage of her legs. Srch-Thaden asked Plaintiff what tests she wanted them to do on Rebecca. Plaintiff repeated what she already stated over the phone – that they need an abdominal ultrasound, x-ray, and heartworm blood test. Srch-Thaden also tried to sell Plaintiff other tests that Plaintiff rightly assumed were useless for any diagnostics. Srch-Thaden continued insisting and claiming that basic urine test and "blood work" were necessary for diagnosing Rebecca.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                      103

Plaintiff gave in and agreed that those tests be also performed in addition to the ones she requested. The charlatan took Rebecca and told Plaintiff to wait outside.

248.    When Srch-Thaden "did some tests," it came out to speak with Plaintiff. It said that that they did almost all the tests and that Rebecca is a very healthy Dog. Plaintiff asked why Rebecca who used to move with elegance and be extremely agile, athletic, and with superb coordination now suddenly moves awkwardly, barely stands, and lost all her muscles.

249.    Filthy Srch-Thaden claimed that it was because Rebecca was "old." As for the catastrophic loss of the muscles, the scumbag Srch-Thaden claimed that it "could be anything," even "old age." It claimed that to lose so much of the muscle tissue, there would be something advanced and therefore readily apparent and easily diagnosed. Because it purportedly could not find anything in Rebecca, it claimed that it just "something" Plaintiff should not worry about.

250.    Srch-Thaden claimed that they did not do an ultrasound because it was not available. It further claimed that it advises against doing an ultrasound because it did "not know what (they are) looking for," and that "(they) will not find anything there." Plaintiff asked if Rebecca has any definite life expectancy or whether there was a possibility that Rebecca had just "6 months or so to live, for example." Srch-Thaden rolled its eyes and started shaking its head while saying, "No-o-o, n-o-o!" Thereafter, Srch-Thaden again told Plaintiff that Rebecca was a "very healthy dog."

251.    When Plaintiff got home, she started thinking and researching what disease it could be that had been induced and inflicted on Rebecca. Since, according to filthy Srch-Thaden it was not cancer or something that really needs to be addressed quickly or at all – as the Echo Hollow scumbag tried to convince Plaintiff that there was no disease of any kind, but just "old" age of

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **104**

the still young Rebecca. As it was alarming that Rebecca could barely stand on her rear legs but Srch-Thaden claimed there was nothing wrong with her, she emailed the Echo Hollow, clarifying that Rebecca was losing ability to walk and asking them to look again over Rebecca's x-rays. The bastards told Plaintiff to call the clinic to "speak with the doctor." When Plaintiff called, she was told that several "doctors" looked at Rebecca and her x-rays when she was in that clinic, and all of them – several quacks – "determined" that she was just fine. The receptionist claimed that some "doctor" will call her and discuss that. However, no one ever called or otherwise contacted Plaintiff.

252.    Plaintiff audio-recorded some of her conversations with Echo Hollow. Plaintiff soon discovered that the filthy "law enforcement" criminals, sued in this complaint – deleted those recordings. Plaintiff definitively knew that no one else would be able – without access and technologies of the dirty governments – to access the device, either physically or remotely, on which the recordings were stored. There was no doubt that the filthy "law enforcement" criminals did that however at that time Plaintiff did not know why the criminal bastards needed to steal the recordings that pertain to communication with Echo Hollow. Plaintiff also called the clinic on the next day after the visit to tell them not to deposit the check she gave them but process her payment over the phone via credit card. They took the payment over the phone but still deposited the check and then sent a bill as if Plaintiff never paid via credit card. At that time Plaintiff thought that maybe it was some clerical error but later understood that it likely has been done on purpose.

253.    Plaintiff believed what the Echo Hollow bastards told her and concluded that, according to what they said, there was nothing that currently can be diagnosed or detected in Rebecca that might require any treatment, and there was no danger to her life and was safe to wait and

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                 **105**

monitor. Since the Echo Hollow scumbags said it could not be cancer, Plaintiff thought that

maybe it was some kind of slowly progressing neurological disorder. After the visit with Srch-

Thaden that lied to Plaintiff and convinced Plaintiff that Rebecca was not in need of any

diagnostics or treatment, and convinced Plaintiff not to do an abdominal ultrasound for Rebecca,

Rebecca lived for only 90 days.

254.     After Rebecca's passing, Plaintiff wept hysterically for several weeks, blaming herself

that she trusted the Echo Hollow charlatans and allowed those charlatans to misinform Plaintiff

and convince her not to dig deeper or investigate more thoroughly into Rebecca's disease.

Plaintiff then looked at the "notes" that pertained to the visit that Echo Hollow gave her and saw

all the diagnostic tests that Plaintiff said she wanted for Rebecca, written down by Srch-Thaden.

Next to abdominal ultrasound Srch-Thaden scribbled "decl." That bastard Srch-Thaden

specifically told Plaintiff not to get ultrasound, claiming that it will not show anything as there

was nothing to look for. The accurate comment would be to say that the client was advised

against getting an ultrasound for her dog because, as filthy Srch-Thaden claimed, it was useless

and inappropriate procedure that will "show nothing."

255.     Within just a couple of weeks after Plaintiff lost Rebecca, she started noticing that

Forrest was also rapidly losing muscles along his spine, in his legs, and everywhere else in his

body. He started walking awkwardly, became fatigued, started having problems with his skin

such as blisters and ulcers whereas he never had any problems with his skin such as any

allergies, rashes, or blisters to any degree before. Plaintiff immediately knew that she has to act

fast. Plaintiff could see that the same disease has been inflicted on both her Dogs as they have

had the same symptoms, their beautiful bodies got deformed and incapacitated in the same way,

and they have had the same neurological and other changes. Plaintiff started calling the clinics,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                    106

trying to find a suitable one. Plaintiff knew that this time if someone would try to prevent her from getting an ultrasound for her Dog, she would immediately walk away and seek help elsewhere.

256.    Forrest got an ultrasound which showed that he had lesions in his spleen. It was impossible to say what exactly it was without doing a biopsy which is risky when done in the spleen and could also be inconclusive. Plaintiff was told that it "might be nothing serious or cancer." However, Plaintiff already knew that it was not "nothing serious" – her Dogs, poisoned by the filthy "law enforcement" criminals, sued in this complaint, got the same injuries and Plaintiff already knew – thanks to precious Rebecca – that it was very serious and that she must act fast. Plaintiff learned that dogs could live very well without spleen, so the course of action was to remove the spleen.

257.    Plaintiff was referred to Oregon Veterinary Referral Associates. She was contacted by Daly, the surgeon, who was trying to convince Plaintiff that she should not do that because she "does not know" what is it exactly in the Forrest's spleen, and to perform splenectomy "just to get a diagnosis" was not advisable. Plaintiff explained to Daly that she would not do that if that were optional, but because she already lost one Dog with exactly the same sudden onset of the symptoms after Plaintiff and her family were being poisoned by the chemical toxins, she does not have a choice. Daly then tried to convince Plaintiff that toxic exposure does "not always" cause cancer or other sickness and tried to instill in Plaintiff other unscientific unfounded "beliefs." Daly told Plaintiff that when the spleen is removed, some dogs start suffering from a terrible arrythmia, and also told Plaintiff that sometimes the removal of the spleen will only prolong the life for one month or so which apparently could be true for hemangiosarcoma whereas Plaintiff's Dogs were showing clinically entirely different symptoms.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                107

258.     With great fear and uncertainty, largely due to Daly's attempts to convince Plaintiff not

to have that surgery, Plaintiff decided to have the splenectomy as Forrest's spleen was failing and

systemic disease with fatigue and other symptoms was nearing the pre-terminal stage. Daly

called Plaintiff after the surgery and told her that now the most important part would be the

histological examination. Plaintiff stated that by observing both her Dogs who fell ill after the

assault by toxic chemicals, she believes that what had been induced on them is lymphoma in the

spleen. Daly said that the histological examination will confirm that, noting that splenectomy is

completely curative for the canine lymphoma in the spleen.

259.     After waiting for a certain period of time, Plaintiff contacted the clinic, requesting a copy

of the results of the histological examination of the Forrest's spleen. The clinic was not

responding. Finally, the clinic left a message, saying that they were calling regarding "Forrest's

labs." When Plaintiff called back, she was told that a manager will call her. Schluckebier called

Plaintiff and said that she needs the remainder of the Plaintiff's payment. Plaintiff asked when

she would be able to receive a copy of Forrest's histological examination. Schluckebier did not

respond but only kept saying that she needs the remainder of the Plaintiff's payment. Plaintiff

said that for the whole month they did not contact her at all – including regarding the purported

payment – and when finally responded, left a message claiming that they want to talk regarding

"Forrest's labs." Therefore, she wants to know what did they do to the Forrest's spleen.

260.     Schluckebier said that the spleen was not studied, purportedly because Plaintiff still

owes them the portion of the quote for splenectomy and histological examination. Plaintiff asked

why Schluckebier did not contact her sooner to tell her that they would not histologically

examine the Forrest's spleen. Schluckebier did not respond. Plaintiff then asked Schluckebier

whether the spleen will be examined after they receive the remainder of the payment. Filthy

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                    **108**

Schluckebier said, "Possibly. Or, we can just ask Dr. Daly. He removed hundreds of spleens, he will know, we don't even need to test it."

261.    Unquestionably, the filthy criminal bastards that had attacked Plaintiff and her family with the chemical toxic weapons, ordered the filthy unscrupulous puppets in that veterinary practice not to examine the Forrest's spleen to conceal their crimes and destroy evidence. That is why the filthy bastards similarly ordered the scumbags in Echo Hollow to lie to Plaintiff and misinform her, and prevent her from finding out that Rebecca was dying from lymphoma in the spleen, induced by the filthy "law enforcement" criminals, and needed to have the spleen removed. When the three absolutely healthy prior to the attack by chemical toxins individuals – Plaintiff, Rebecca, and Forrest – diagnosed with the same, induced and inflicted by the attack disease, it clearly implicates the filthy Louisiana criminals.

262.    That is why the scumbags, once again, stole the Plaintiff's property – the spleen of her Dog, Forrest, and ordered the filthy puppets of dirty governments – Daly, Schluckebier, and Oregon Veterinary Referral Associates – to deceive Plaintiff, steal/destroy/throw out the Forrest's spleen. Ordinarily, such a crime would be inconceivable as no medical business in its right mind would do that and subject themselves to an enormous liability. In this case, the filthy criminals that obstruct and control the corrupt courts – the part of the criminal "system" – guaranteed the puppets like Daly, Schluckebier, Srch-Thaden that they will be "immune" and free from any liability for following their criminal orders.

263.    In January, 2021 Plaintiff started experiencing pain in her spleen. She stated that in her complaint and the declarations that she filed. The filthy "law enforcement" criminals and perverts that carefully monitor all Plaintiff's activities and carefully "study" things like the records, manufactured by any physician that Plaintiff sees, have been religiously following the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**

progress of her splenic disease that those scumbags inflicted on her. Plaintiff was seeing Chaplin

exclusively because she started experiencing pain in her spleen. Plaintiff explained to Chaplin

that she had been subjected to toxic exposure. Chaplin started ordering some basic diagnostic

tests. Plaintiff told Chaplin that those tests will not be conclusive because even when her Dogs

were already nearing death as a result of the same exposure, their basic "bloodwork" was still

normal. It is not uncommon for humans who have stage III-IV of lymphoma to have their

"bloodwork" within normal limits. Plaintiff explained to Chaplin that all studies show that

canines have a very short latency period, at least 5-7 times shorter than humans. Therefore, she

unlikely would have anything found by those conventional, very basic tests which fail to

diagnose even late-stage lymphoma.

264.    Plaintiff explained to Chaplin that she has been having pain in her spleen and later also

in her liver which she never experienced before. And that, after seeing what has been induced on

her Dogs who were perfectly healthy prior to the toxic attacks, she will not discount the strong

possibility that she is also very sick, just at the very early stage that is rarely diagnosed and never

by basic, general tests. Chaplin then told Plaintiff that she contacted the oncologists in

Willamette Valley Cancer Research center, and they told her to order flow cytometry test for

Plaintiff, stating that it would show whether Plaintiff "has cancer at any point," even when yet

undetectable by any general and more conventional diagnostics. Chaplin wrote all that in the

Plaintiff's "records" and told Plaintiff to research about flow cytometry, saying that if Plaintiff

"wants it," Chaplin "will order it" for Plaintiff.

265.    Plaintiff learned that flow cytometry is a unique test that detects even damage to DNA

and finds cancer even before there is an actual cancer present and that it is specifically used to

diagnose lymphoma which otherwise is difficult to diagnose. Plaintiff told Chaplin that she

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                 **110**

would like to have the test done by sending a message through the patient portal. Chaplin

responded: "I will order it for you." Prior to that moment, Chaplin always kept her word and

everything that she "promised" was being done immediately, on the same day. However, that is

when the filthy criminal "law enforcement" bastards and perverts that have been carefully

studying the Plaintiff's records and progress, intervened and ordered Chaplin not to order the

flow cytometry test for Plaintiff. Because Plaintiff did not know that, and because there was no

reason to doubt Chaplin's word prior to that moment, Plaintiff simply waited until she receives

the instructions regarding scheduling for flow cytometry.

266.    After waiting for a significantly longer time than it usually takes to schedule, Plaintiff

reached Chaplin's office and inquired about the scheduling. However, Chaplin was not

responding definitively; instead, the filthy government puppet was lying and stalling. Prior to

conspiring with the dirty governments, Chaplin usually responded in the patient portal within 1

business day. While following the corrupt "governments" criminal order to suppress and

withhold the Plaintiff's diagnostic tests, Chaplin stopped responding at all. Instead, various

purportedly "assistants" or "nurses" which did not work with Chaplin were "responding" and

saying that Chaplin was out of the office for weeks at the time and when Chaplin "gets back,"

Plaintiff needs to schedule an appointment with it and discuss in person.

267.    Some appointments were being cancelled by purportedly some "assistants" which

names Plaintiff was not recognizing as they did not work with Chaplin. Finally, the appointment

was scheduled and attended by Chaplin. Chaplin started talking to Plaintiff as it never received

any messages with the specific questions. When Plaintiff stated that she clearly explained the

reason for her appointment – that she has been waiting for six months after Chaplin suggested to

Plaintiff the flow cytometry test and then promised, twice, that it will order the test for her, but

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                                    **111**

the test apparently still was not ordered and Plaintiff was unable to get any clarification regarding it.

268.    Chaplin then said that it "changed (its) mind" and will not order it. Plaintiff reminded Chaplin that Chaplin itself actually suggested it, explaining to Plaintiff that an oncologist specifically recommended it as the only appropriate diagnostic test for the Plaintiff's situation. Plaintiff reminded Chaplin that Chaplin was the one who specifically told Plaintiff that flow cytometry is the test Plaintiff should get, and then promised to Plaintiff and confirmed that the test was ordered

269.    Deceitful dirty "government" puppet Chaplin claimed that it cannot order it without help of an oncologist who, although previously specifically recommended it, now was purportedly advising against it. Then, Chaplin further lied to Plaintiff that it cannot order it because it would not know how to interpret the results. Instead, Chaplin started pushing some inapplicable useless "tests" that were not recommended by the specialist and a whole list of "vaccines."

270.    Plaintiff did not know yet that the filthy puppet of the corrupt governments, Chaplin, was simply following its owners' criminal "orders." Plaintiff wrote to Chaplin that she was confused because it did not make sense that Chaplin specifically recommended the test which Plaintiff researched and learned that it is exactly what she might need – and there is a reason why the oncologist suggested that when Chaplin reached out to them telling them that Plaintiff has splenic pain and suspects that lymphoma has been inflicted on her through the toxic exposure. Chaplin then claimed that the insurance will not pay for it. Plaintiff provided Chaplin with information that the flow cytometry cost could be as little as $3.00, and that PeaceHealth charges

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                  **112**

just around $100.00 for an out-of-pocket flow cytometry, stating to Chaplin that if the insurance will not pay for it, she will pay for the test herself.

271.    Filthy Chaplin then run out of the excuses and wrote to Plaintiff: "I will not order this test." Plaintiff then went to find the messages where Chaplin was recommending flow cytometry and specifically promising and confirming that the test will be ordered. To the Plaintiff's shock, she learned that all messages that pertained to flow cytometry have been wiped out by the filthy criminals. Plaintiff also found that all messages where she was reporting on progression of her symptoms have been also wiped out. It was evident that the filthy perverts carefully checked each and every message with their criminal agenda in their minds, and deleted everything that would go against that criminal and corrupt agenda.

272.    Plaintiff then asked Chaplin why it did not document any of her symptoms and the progression of the disease that she was reporting orally during the appointments and via patient portal. Plaintiff again repeated her symptoms that are specific for the splenic lymphoma and demanded that they be added to those purported "medical records." Plaintiff also told Chaplin to remove falsities that it recently added, such as that Plaintiff was "overdue" for the whole nomenclature of purported "vaccines." Plaintiff clearly stated to Chaplin that she does not authorize it to write falsities in purportedly her "medical records." Plaintiff also said that she would like to contact Chaplin's supervisor. Chaplin said on February 18, 2022 that it will ask the "clinic manager" Sather and the "section chief" Sims to contact her.

273.    No one contacted Plaintiff and on March 1, 2022 she sent an official letter to Chaplin, again stating her symptoms that were all reported as they were appearing and progressing and documented in the patient portal that the filthy criminals of the joint racketeering enterprise wiped out. Plaintiff demanded that all the symptoms that she had been reporting be added to her

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                113

"records" but the falsities, manufactured by Chaplin be removed. Plaintiff also sent an official letter to Sims and Sather adding the copy of the letter addressed to Chaplin and stating that they have been criminally and maliciously withholding necessary diagnostics, lying to her for over 6 months during which she was patiently waiting, unbeknownst that the filthy flunkies were actually assisting the "law enforcement" criminals with crime cover-ups. Plaintiff demanded that the test that their clinic stated to her was appropriate and specifically recommended it and regarding which they had been lying to Plaintiff for over 6 months be ordered immediately. Plaintiff requested a written response.

274.    Over the next two weeks Plaintiff waited for the purported response from Sims and Sather. Those filthy criminals were not going to respond however Chaplin was lying to Plaintiff that they "will respond," they were "out of the office," will be "out of the office for several weeks," that the clinic purportedly does not know the Plaintiff's number and that's why no one "called" Plaintiff. Plaintiff again asked Chaplin why her symptoms and their progression as Plaintiff was reporting it was not on that phony Chaplin's "record." Chaplin completely went off its rocker and turned into a zombie. It was not responding but instead "referred" Plaintiff to an ENT which sent her a letter and called to advise that it cannot wait to see Plaintiff. Plaintiff wrote to Chaplin asking it why it "referred" Plaintiff to an ENT whereas at all times when Plaintiff saw Chaplin, she complained about the newly developed splenic pain and then at a later time also about pain in her liver, following the assault by toxic chemicals. Chaplin, the puppet of the dirty "governments," was not responding.

275.    On March 8, 2022 Plaintiff contacted Willamette Valley Cancer Research center that told Chaplin that the proper test for diagnosing, monitoring, and staging the splenic lymphoma would be flow cytometry and recommended that Chaplin orders it for Plaintiff. She was told to

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                    114

write a letter and fax it to the specific department. Plaintiff sent a letter, detailing her symptoms and stating that Chaplin wrote in her records that an oncologist of Willamette Valley Cancer center recommended that an appropriate test for Plaintiff is flow cytometry and that Chaplin will order it. Plaintiff explained that despite that, she had been waiting for over 6 month and lied to, and now she does not have any more time to waste because, although she is in the process of transferring to another medical practice, it will take months to get established as new patient and wait for them to refer Plaintiff or order the appropriate diagnostics for her. Plaintiff stated that, as Willamette Valley cancer center's website says, referrals are not mandatory in order to get an appointment, and therefore she asks that an appointment be scheduled for her.

276.    On the same day, Plaintiff received a response, requesting to provide a copy of the record where Chaplin wrote that it was instructed by an oncologist of Willamette Valley cancer center to order flow cytometry for Plaintiff. Plaintiff provided the requested documentation. In a few days, she received a voice message left by the filthy flunkies of the dirty "governmental" criminals, sued in this complaint. The bizarre message claimed that Willamette Valley cancer center does "not diagnose" cancer and also it does "not order flow cytometry."

277.    Despite Plaintiff's requests that filthy Chaplin documents her symptoms, removes falsities from her "records," and provides response when Sims and Sather would respond to Plaintiff's letter, sent on March 1, Chaplin was not responding and was not correcting records. Plaintiff noticed that filthy Chaplin and the entire criminal "PeaceHealth" system that serves the criminal "governments" unlawfully removed not only patient portal messages but also Plaintiff's certain records. For instance, Plaintiff saw Ms. Skeiner to whom Chaplin referred Plaintiff and who documented Plaintiff's assault by toxic exposure and made important findings that pertain to Plaintiff's excruciating abdominal pain that she experienced when was being chemically

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                115

attacked by the filthy "law enforcement" criminals and had to call the ambulance the record of which the Louisiana scumbags, sued herein, destroyed/concealed.

278.  As soon as Plaintiff realized that that record has been also maliciously stolen from her records/history by the criminals, she messaged dirty Chaplin, instructing it to immediately release the stolen record to Plaintiff. The scumbag was not responding and the stolen record and Ms. Skeiner's notes were not released to Plaintiff. Plaintiff received a notification that she purportedly had a message in the "patient portal." When Plaintiff tried to log in on March 14, 2022, she saw the red alert: "This account is inactive." The filthy "PeaceHealth" scumbags, covering up their crimes and serving dirty "governments," deactivated the Plaintiff's patient portal account that contained important messages (the ones that the filthy criminals had not yet deleted at that time) and other information, documenting some chronology of the events that had not been yet falsified/erased by the criminals.

279.    The dirty Louisiana criminals, sued in this complaint, have inflicted grave harm and injuries on Plaintiff and her Family. To cover up their atrocities, they have been enlisting various filthy bootlickers of corrupt governments that have been falsifying "medical records," stealing Plaintiff's property, destroying Plaintiff's property and evidence, withholding proper diagnostic procedures and treatment in order to cover up their crimes and prevent Plaintiff from obtaining timely medical help.

280.    When Plaintiff initiated the instant legal action on February 28, 2021 and mailed the filing fee to the clerk's office in Eugene in order to have this legal action properly commenced and in order to be able to prosecute this action, the criminals sued herein on March 2, 2021 intercepted and stole the envelope with the filing fee while it was on the USPS vehicle and out

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                 **116**

for delivery. That criminal act has been done to obstruct Plaintiff's access to the courts and prevent this legal action from moving forward.

281.    When Plaintiff was improperly removed from the house where she lived through the purported "no fault eviction" on October 15, 2021, Plaintiff petitioned Oregon Court of Appeals which, acting on the Plaintiff's emergency motion, reversed the lower court on the same day the emergency motion was filed. However, Plaintiff was unable to return to the property. Plaintiff called Eugene police that improperly tossed her out of the house and told them that now she has the appellate court's order that reversed the trial court, but still is unable to return. The clowns told her that it was a "civil matter" and they do not get involved. Plaintiff said that when they tossed her out, it was also a "civil matter" which had not stopped them. As always, the clowns did not have any sensical explanation. Plaintiff then had to again petition Oregon Court of Appeals and wait for a few more days while being unhoused together with Forrest. The court of appeals issued another order, specifically ordering that Plaintiff be allowed to return to the property.

282.    When Plaintiff returned, she learned that certain documents were stolen while she was locked out and unable to come back. Namely, Rebecca's "records," manufactured by Echo Hollow were stolen. The documents were in the house at the time she was removed from the house and Plaintiff was specifically carefully holding on to those papers. When Plaintiff requested a copy of the "records" from Echo Hollow, she received a falsified copy where filthy Srch-Thaden scribbled with the same handwriting that it purportedly told Plaintiff to get abdominal ultrasound for Rebecca. The filthy criminals stole the records and had the filthy criminals – their puppets and co-conspirators which, unknown to Plaintiff at that time had been serving the criminals, misinforming Plaintiff, and preventing Plaintiff from obtaining help for

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 **117**

Rebecca and accurate diagnosis that would reveal that all three exceptionally healthy individuals – Plaintiff, Rebecca, and Forrest – have been maliciously poisoned and slowly murdered by the foul scumbags, sued herein – to falsify the "records."

283.    The foul scumbags similarly have been preventing Plaintiff from obtaining medical care and accurate diagnosis, stealing records, stealing and falsifying Forrest's spleen and records.

284.    The dirty criminals sued herein have been violating the Plaintiff's clearly established constitutional rights of free speech and the free press, unlawfully taking down her writings and publications, hiding from the public and making her writings and publications unsearchable by the general public. Among various unlawful forms of censorship, the criminals have been utilizing the help of the criminals of google.com to make all Plaintiff's publications entirely invisible and unsearchable, including any "community" features such as leaving reviews and feedback.

285.    On February 4, 2022, Plaintiff's window was shot at four times by the "airsoft gun or BB gun," according to the police report. The shooting caused two circular holes in the window. The police responder classified it as "reckless endangering – criminal mischief 2." Plaintiff is unaware of anyone who – outside of the foul criminals, sued in this complaint and their coconspirators – would want to shoot at the Plaintiff's windows. When the attack was happening, approximately one minute between each shot, Plaintiff looked everywhere and there was no one outside. The shooting was not accidental and the perpetrator knew how to completely disguise itself.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 **118**

## CLAIMS FOR RELIEF

### First Claim for Relief

### 18 USC § 1962(b), § 1962(c) and § 1962(d)

### 18 U.S. Code § 1503 – Obstruction of Justice

286.    Plaintiff incorporates by reference all the facts and assertions set forth above.

287.    This cause of action is brought against all defendants.

288.    18 USC § 1962 provides:

(b) It shall be unlawful for any person through a pattern of racketeering activity…to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

289.    18 USC Section 1503 provides: "Whoever corruptly...influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice shall be punished" and shall be held liable for damages in accordance with 18 U.S.C. § 1964(c). As used in § 1503, "corruptly" means that the act must be done with the purpose of obstructing justice. *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981).

290.    Defendants have formed a multidistrict racketeering enterprise and have been engaged in the racketeering activity of obstructing justice. "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                119

pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Unquestionably, all factors are present in the instant case.

291.    The instances of racketeering activity of obstruction of justice are truly countless – obstructing courts and working in tandem with the criminals of which courts, be it state or federal, consist; stealing documents including audio, video, photo, and texts; falsifying documents, including "medical records" and public records; stealing and tampering with the US mail; stealing Plaintiff's and her Family's bodily tissues and criminally preventing them from being studied histologically in order to cover up the crimes, committed by those rabid criminals against Plaintiff and her Family and cover up the extent of inflicted harm; maliciously preventing Plaintiff and her Family from obtaining medical care for the purpose to further harm and cover up their atrocities; stealing electronically transmitted information, etc.

292.    The defendants' racketeering activity have been affecting interstate and foreign commerce which "includes, among other things: travel, trade, transportation, and communication." *Annotation 28, Art. I* to the U.S. Constitution provides: "'Commerce' in the constitutional sense, and hence 'interstate commerce,' covers every species of movement of persons and things, whether for profit or not, across state lines, every species of communication, every species of transmission of intelligence, whether for commercial purposes or otherwise, see *United States v. Simpson*, 252 U.S. 465 (1920); *Caminetti v. United States*, 242 U.S. 470 (1917), every species of commercial negotiation which will involve sooner or later an act of transportation of… things, or the flow of services or power, across state lines." "Not only…may transactions be commerce though non-commercial; they may be commerce though illegal and sporadic, and though they do not utilize common carriers or concern the flow of anything more

tangible than electrons and information." *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 549 -550 (1944).

293.     "It is not necessary…to show that the defendant actually intended or anticipated an effect on interstate or foreign commerce or that commerce was actually affected. All that is necessary is that the natural and probable consequences of the defendant's action would be to affect interstate or foreign commerce, no matter how minimal." *U.S. v. Aramony*, 88 F.3d 1369, 1385 (4th Cir. 1996); *United States v. Jackson*, 935 F.2d 832 (7th Cir. 1991) (check drawn on bank implicates interstate commerce); *United States v. Gallo*, 927 F.2d 815 (5th Cir. 1991) (drug money implicates interstate commerce).

294.     Unquestionably, countless described in the complaint illegal acts, transactions, and communications fall within the constitutional definition of interstate commerce. That defendants' racketeering activity has been performed to obstruct justice. "Concealing and attempting to conceal certain ledgers and notebooks after receiving a grand jury subpoena duces tecum requesting production of…documents" resulted in the conviction on the "obstruction of justice…charge." *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir. 1981). Here, defendants have done much worse – they have been stealing Plaintiff's property, barbarically destroying evidence that they stole, concealing, falsifying, tampering with the public record documents to a truly shocking extent, ordering third parties – their puppets – to follow their criminal agenda of obstruction of justice. The criminals-barbarians have been robbing Plaintiff of her life, liberty, freedom, and happiness – destroying and damaging Plaintiff's health and health and lives of her precious Family. The filthy criminals have been consistently engaged in crime cover-ups, multiplying their crimes in attempt to protect themselves from liability for their criminal dealings.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                                121

295.    The following acts and omissions have resulted in criminal conviction under section 1503. These are similar to the acts and omissions that defendants have been advancing in the instant case, however the defendants' crimes have risen to a much greater extent:

a.    Endeavoring to influence a witness not to testify or to make himself/herself unavailable to testify. *United States v. Washington Water Power Co.*, 793 F.2d 1079 (9th Cir. 1986).

b.    Giving false denials of knowledge and memory, or evasive answers. *United States v. Langella*, 776 F.2d 1078 (2d Cir. 1985), *cert. denied*, 475 U.S. 1019 (1986); *United States v. Perkins*, 748 F.2d 1519 (11th Cir. 1984); *United States v. Griffin*, 589 F.2d 200 (5th Cir.), *cert. denied*, 444 U.S. 825 (1979); *United States v. Spalliero*, 602 F. Supp. 417 (C.D. Cal. 1984); *United States v. Cohn*, 452 F.2d 881 (2d Cir. 1971), *cert. denied*, 405 U.S. 975 (1972).

c.    Destroying, altering, or concealing subpoenaed documents. *United States v. Ruggiero*, 934 F.2d 440, 446 (2d Cir. 1991); *United States v. McKnight*, 779 F.2d 443 (8th Cir. 1986); *United States v. Brimberry*, 744 F.2d 580 (7th Cir. 1984); *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), *cert. denied, sub. nom. Phillips v. United States*, 454 U.S. 1157 (1982); *United States v. Faudman*, 640 F.2d 20 (6th Cir. 1981); *United States v. Simmons*, 591 F.2d 206 (3d Cir. 1979); *United States v. Walasek*, 527 F.2d 676 (3d Cir. 1975); *United States v. Weiss*, 491 F.2d 460 (2d Cir.), *cert. denied*, 419 U.S. 833 (1974).

296.    Unquestionably, in this civil proceeding, the defendants should be held accountable for their wrongs. Here, the defendants have been committing the wrongs that are much worse than what has been done in the examples above which all resulted in *criminal conviction*. Therefore,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                122

Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law and an attorney should be appointed to criminally prosecute the defendants for their atrocities.

## Second Claim for Relief

### 18 USC § 1962(b), § 1962(c) and § 1962(d)

### 18 U.S. Code § 229 – Assault by Chemical Weapons

297.       Plaintiff incorporates by reference all the facts and assertions set forth above.

299.       This cause of action is brought against all defendants.

300.       The statute provides:
It shall be unlawful for any person knowingly—
(1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon.

301.       18 U.S. Code § 229F, in turn, defines:
(1) The term "chemical weapon" means the following, together or separately:
(A) A toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose.
(B) A munition or device, specifically designed to cause death or other harm through toxic properties of those toxic chemicals specified in subparagraph (A), which would be released as a result of the employment of such munition or device.
(C) Any equipment specifically designed for use directly in connection with the employment of munitions or devices specified in subparagraph (B).

302.       Plaintiff has been assaulted with a chemical weapon by the filthy scumbag Small that permanently injured Plaintiff in conspiracy with other rabid criminals, sued in this complaint. The scumbags covered up the crime using their filthy Louisiana "courts," filthy "boards" that are entirely controlled by the criminals, sued herein, and other filthy and corrupt government's puppets such as so-called "lawyers" and other various filth, sued in this complaint.

303.       Plaintiff and her precious Family have been countless times attacked with the chemical weapons by the rabid criminals, sued herein. The foul criminals have deliberately inflicted grave

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                                                          123

injuries on the Plaintiff, releasing neurotoxins, carcinogens, toxic chemicals and substances to murder, incapacitate, and disable. Plaintiff's complaint details that she was unable to stop those vicious attacks as the foul criminals conspired to deliberately harm her. The filthy nefarious scumbags ignored her reports of illegal activity for months and a foul lump of excrement, Fields, "chief judge" of the filthy Louisiana court together with countless fetid criminals it conspired with, had been rabidly violating the law and denying Plaintiff access to courts in order to continue harming her and her beautiful Family.

304.    The rabid criminals, sued herein, conspired to use chemical weapons, specifically designed to cause death or other harm through toxic properties of those toxic chemicals on Plaintiff and her Family and then continued their crimes by preventing Plaintiff and her Family from obtaining medical help and accurate diagnosis in order to cover up their atrocities. Therefore, Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law and the Court should appoint an attorney to criminally prosecute the defendants for their atrocities.


### Third Claim for Relief

### 18 USC § 1962(b), § 1962(c) and § 1962(d)


### 18 U.S. Code § 175 – Prohibitions with respect to biological weapons


305.    Plaintiff incorporates by reference all the facts and assertions set forth above.

306.    This cause of action is brought against all defendants.

307.    The statute provides that whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as

a weapon, or knowingly assists…any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both.

308.    The rabid criminals, sued herein, developed, produced, stockpiled, transferred, acquired, retained, or possessed some chemical toxins and biological weapons that they criminally and maliciously used to murder or harm Plaintiff and her Family and that induced severe poisoning and damage to Plaintiff and her Family's spleens and livers, among other things such as suppression of their immune systems and other multisystem damage.

309.    The rabid criminals and perverts continued criminally monitoring and controlling the state of health of Plaintiff and her Family, stealing records and bodily tissues, conspired with filthy "medical" workers who followed their criminal orders to withhold diagnosis, diagnostics, steal and destroy evidence such as removed organs and bodily tissues, falsify documents and records, and misinform and deceive Plaintiff in order to cover up their atrocities. Therefore, Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law and the Court should appoint an attorney to criminally prosecute the defendants for their atrocities.

### Fourth Claim for Relief

### 18 USC § 1962(b), § 1962(c) and § 1962(d)

### 18 U.S. Code § 201 - Bribery of public officials and witnesses

310.    Plaintiff incorporates by reference all the facts and assertions set forth above.

311.    This cause of action is brought against all defendants.

312.    18 U.S.C. § 201 describes another form of racketeering activity of the defendants' criminal enterprise:

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 125

(b) Whoever—
(1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—
(A) to influence any official act; or
(C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person;
(2) being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
(A) being influenced in the performance of any official act;
(C) being induced to do or omit to do any act in violation of the official duty of such official or person;
(3) directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court…or with intent to influence such person to absent himself therefrom;
(4) directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for being influenced in testimony under oath or affirmation as a witness upon any such trial, hearing, or other proceeding, or in return for absenting himself therefrom;

shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

313.    The entire quote applies to the defendants' acts and omissions – the bribes and other things of value have been promised and given to defendants "public officials" and such things have been accepted by defendants "public officials" in exchange for corrupt falsification of documents, simulation of the proceedings, fraudulent "rulings." There are countless such instances, detailed in this complaint. Therefore, Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law and the Court should appoint an attorney to criminally prosecute the defendants for their atrocities.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                 **126**

**Fifth Claim for Relief**

**18 USC § 1962(b), § 1962(c) and § 1962(d)**

**18 U.S. Code § 1341 – Frauds and swindles**

314.    Plaintiff incorporates by reference all the facts and assertions set forth above.

315.    This cause of action is brought against all defendants.

316.    Racketeering activity, related to mail fraud requires a fraudulent scheme in place and the use of mail in order to execute the scheme: "There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States*, 489 U.S. 705, 721 n. 10 (1989); *Pereira v. United States*, 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under…§ 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.").

316.    The defendants, sued for their criminal acts, have been violating the mail fraud statute on multiple occasions. Likely the most significant such criminal act is the stealing by the defendants of the Plaintiff's filing fee that she mailed to this Court and that was necessary for the commencement of this action. That atrocious act should be prosecuted under the obstruction of justice statute, frauds and swindles statue, and wire fraud statute, among others, because defendants certainly used wire communication in furtherance of their fraudulent scheme. Also, Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law.

### Sixth Claim for Relief

### <u>18 USC § 1962(b), § 1962(c) and § 1962(d)</u>

### 18 U.S. Code § 1343 – Fraud by Wire

317.    Plaintiff incorporates by reference all the facts and assertions set forth above.

318.    This cause of action is brought against all defendants.

319.    The statute provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire…communication in interstate…commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

320.    The elements of wire fraud under section 1343 are parallel to those of the mail fraud statute but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (*citing United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire); *see also, e.g., United States v. Profit*, 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used), *cert. denied*, 115 S.Ct. 2289 (1995); See also *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire fraud: (1) a

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                128

scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that

scheme).

321.    The wire fraud statute has been violated countless times by the defendants – every time

they used phone, messaging, internet, and all other forms of modern communication in

furtherance of the conspiracy, to advance their racketeering activity, obstruct justice, and injure

Plaintiff and her Family. Therefore, Plaintiff should be awarded relief as authorized by 18 U.S.C.

§ 1964(c) and other relevant law. The defendants should be prosecuted under relevant statutes

for their crimes and atrocities.

**Seventh Claim for Relief**

**<u>18 USC § 1962(b), § 1962(c) and § 1962(d)</u>**

**18 U.S. Code § 659 – Interstate or Foreign Shipments by Carrier**

322.    Plaintiff incorporates by reference all the facts and assertions set forth above.

323.    This cause of action is brought against all defendants.

324.    The statute provides:

> Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or
> deception obtains from any pipeline system, railroad car, wagon, motortruck, trailer, or
> other vehicle, or from any tank or storage facility, station, station house, platform or
> depot or from any steamboat, vessel, or wharf, or from any aircraft, air cargo container,
> air terminal, airport, aircraft terminal or air navigation facility, or from any intermodal
> container, trailer, container freight station, warehouse, or freight consolidation facility,
> with intent to convert to his own use any goods or chattels moving as or which are a part
> of or which constitute an interstate or foreign shipment of freight, express, or other
> property; or
>
> Whoever buys or receives or has in his possession any such goods or chattels, knowing
> the same to have been embezzled or stolen; or
>
> Whoever embezzles, steals, or unlawfully takes, carries away, or by fraud or deception
> obtains with intent to convert to his own use any baggage which shall have come into the
> possession of any common carrier for transportation in interstate or foreign commerce or
> breaks into, steals, takes, carries away, or conceals any of the contents of such baggage,

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                 129

or buys, receives, or has in his possession any such baggage or any article therefrom of whatever nature, knowing the same to have been embezzled or stolen; or

Whoever embezzles, steals, or unlawfully takes by any fraudulent device, scheme, or game, from any railroad car, bus, vehicle, steamboat, vessel, or aircraft operated by any common carrier moving in interstate or foreign commerce or from any passenger thereon any money, baggage, goods, or chattels, or whoever buys, receives, or has in his possession any such money, baggage, goods, or chattels, knowing the same to have been embezzled or stolen—

Shall be fined under this title or imprisoned not more than 10 years, or both, but if the amount or value of such money, baggage, goods, or chattels is less than $1,000, shall be fined under this title or imprisoned for not more than 3 years, or both. If the offense involves a pre-retail medical product (as defined in section 670), it shall be punished under section 670 unless the penalties provided for under this section are greater.

The offense shall be deemed to have been committed not only in the district where the violation first occurred, but also in any district in which the defendant may have taken or been in possession of the said money, baggage, goods, or chattels.

The carrying or transporting of any such money, freight, express, baggage, goods, or chattels in interstate or foreign commerce, knowing the same to have been stolen, shall constitute a separate offense and subject the offender to the penalties under this section for unlawful taking, and the offense shall be deemed to have been committed in any district into which such money, freight, express, baggage, goods, or chattels shall have been removed or into which the same shall have been brought by such offender.

To establish the interstate or foreign commerce character of any shipment in any prosecution under this section the waybill or other shipping document of such shipment shall be prima facie evidence of the place from which and to which such shipment was made. For purposes of this section, goods and chattel shall be construed to be moving as an interstate or foreign shipment at all points between the point of origin and the final destination (as evidenced by the waybill or other shipping document of the shipment), regardless of any temporary stop while awaiting transshipment or otherwise. The removal of property from a pipeline system which extends interstate shall be prima facie evidence of the interstate character of the shipment of the property.

325.    Because the defendants have been running their racketeering enterprise in secret, it is impossible at this time to say how many times defendants stole, unlawfully taken, concealed, carried away, and unlawfully by fraud and deception obtained any Plaintiff's goods and articles, in any way, described in 18 U.S. Code § 659. Plaintiff's mail, sent abroad from Oregon was never received by the addressee. Plaintiff's mail, sent to out of state laboratory with the samples that contained Plaintiff's tissues and DNA has been stolen and was never received by the

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **130**

addressee. The dirty defendants are notorious criminals and have been actively persecuting

Plaintiff, including by stealing, or unlawfully taking, carrying away, or concealing, and by fraud

or deception obtaining Plaintiff's interstate and foreign shipments for the purpose of advancing

their racketeering enterprise. Therefore, Plaintiff should be awarded relief as authorized by 18

U.S.C. § 1964(c) and other relevant law.

### Eighth Claim for Relief

### 18 USC § 1962(b), § 1962(c) and § 1962(d)
### 18 U.S. Code § 1951 – Interference with Commerce Under Color
### of Official Right or by Threats

326.     Plaintiff incorporates by reference all the facts and assertions set forth above.

327.     This cause of action is brought against all defendants.

328.     The statute provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

329.     Because defendants have been running their racketeering enterprise in secret, it is

impossible at this time to say how many times defendants in any way or degree obstructed,

delayed, and affected commerce or the movement of any Plaintiff's article or commodity in

commerce, by robbery or extortion, through conspiracy with other actors, and under color of

official right.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,
AND FOR DAMAGES**                                                    **131**

330.     Undoubtedly, that happened when they, under the color of official right, extorted Plaintiff's mail that consisted of the payment of filing fee, sent to clerk of court in Eugene for the purpose of initiating and properly commencing and being able to prosecute the above-entitled action.

331.     That criminal act has been done in order to obstruct Plaintiff's access to courts and prevent her from accessing courts. That rabid act has been done in close symbiotic cooperation of the Oregon-based coconspirators and the Louisiana based rabid criminals, sued herein. Not only it fits the description of 18 U.S. Code § 1951 – Interference with Commerce Under Color of Official Right – and obstructed, delayed, and affected commerce and the movement of the Plaintiff's article or commodity in commerce, but caused, as it intended, a great degree of fear, hopelessness, and distress in Plaintiff who has been persecuted by those filthy rabid criminals. Therefore, Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law.

### Ninth Claim for Relief

### 18 USC § 1962(b), § 1962(c) and § 1962(d)
### 18 U.S. Code § 1952 – Interstate Travel or Transportation in Aid of Racketeering Enterprises

332.     Plaintiff incorporates by reference all the facts and assertions set forth above.

333.     This cause of action is brought against all defendants.

334.     The statute provides:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
> (1) distribute the proceeds of any unlawful activity; or
> (2) commit any crime of violence to further any unlawful activity; or
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity

335.     The defendants have been furthering their unlawful activities of crime cover ups and have been aiding their racketeering enterprise by using transportation, interstate travel, and mail.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                      132

The unlawful interception and extortion of mail, sent by Plaintiff to clerk of court in order to abort commencing of this action as well to intimidate Plaintiff is just one example. Because the rabid criminals' goal is to entirely conceal their criminal dealings, the majority of such violations of 18 U.S.C. Section 1952 and other RICO statutes are being presently concealed by those criminals and their coconspirators.

336.    Those other countless acts of racketeering activity should be uncovered in discovery, and Plaintiff should be awarded relief as authorized by 18 U.S.C. § 1964(c) and other relevant law.

**Tenth Claim for Relief**

**42 U.S.C. § 1981 – Equal Rights Under the Law**

337.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

338.    This count / cause of action is brought against all defendants.

339.    Section 1981 provides: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property […]. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

340.    Acting under color of law, statute, ordinance, regulation, custom, internal policy, secret internal policy and usage of the city of Baton Rouge, East Baton Rouge parish, and state of Louisiana, defendants and its named and unnamed co-conspirators subjected Jane Doe to the deprivation of equal rights and privileges, secured by the Constitution and other laws, namely

fundamental rights to life, liberty, and property; rights of access to courts; rights to free speech and press; rights of crime victims.

341.    The unlawful deprivation of equal rights have been happening in the many situations when Plaintiff's and the wrongdoers and filthy government puppets' interactions were governed by some forms of contract when Plaintiff was specifically told or/and paid for some service to be done in a specific way, but was deceived, lied to, tricked, and her rights were being deliberately violated in accordance with criminal racketeering enterprise.

342.    Defendants have been depriving Jane Doe of her constitutional rights because of her national origin, gender, as well as in accordance with their conspiratorial agreement and plan of persecution of Plaintiff for her willingness to expose the filthy defendants' corruption and unlawful dealings. Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law.

### Eleventh Claim for Relief

### 42 U.S.C. § 1983 – Deprivation of Rights

343.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

344.    This count / cause of action is brought against all defendants.

345.    Acting under color of law, statute, ordinance, regulation, custom, internal policy, secret internal policy, and usage of the city of Baton Rouge, East Baton Rouge parish, and state of Louisiana, defendants and their named and unnamed co-conspirators subjected Jane Doe to deprivation of rights and privileges, secured by the Constitution and other laws, namely

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                 134

fundamental rights to life, liberty, and property; rights to privacy; rights of access to courts; rights to free speech and press; rights of crime victims.

346.    "Deprivation of Rights under the Color of Law – 18 U.S.C. Section 242 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege, protected by the Constitution or laws of the United States, including acts done by federal, state, or local officials within their lawful authority, as well as acts done beyond that authority, if they are done while the official is purporting to or pretending to act in the performance of his or her official duties." What defendants have done and have been doing is a crime and should be prosecuted criminally. The complaint details countless instances of the deprivation of rights by defendants and their named and unnamed co-conspirators. The defendants have been depriving Jane Doe of her constitutional rights because of her national origin, gender, as well as in accordance with their conspiratorial agreement and plan of persecution of Plaintiff for her willingness to expose their corruption and unlawful dealings. Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law.

### Twelfth Claim for Relief

### 42 U.S.C. § 1985 – Conspiracy to Interfere with Civil Rights

347.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

348.    This count / cause of action is brought against all defendants.

349.    Acting under color of law, statute, ordinance, regulation, custom, internal policy, secret internal policy, and usage of the city of Baton Rouge, East Baton Rouge parish, and state of

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                135

Louisiana, defendants and their named and unnamed co-conspirators conspired to interfere with Plaintiff's civil rights and subject Jane Doe to the deprivation of rights and privileges, secured by the Constitution and other laws, such as fundamental rights to life, liberty, and property; rights of access to courts; rights to privacy; rights to free speech and press; rights of crime victims.

350.    Section 1985 provides: "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws" and "if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law.

### Thirteenth Claim for Relief

### 42 U.S.C. § 1986 – Action for Neglect to Prevent

351.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

352.    This count / cause of action is brought against all defendants.

353.    Acting under color of law, statute, ordinance, regulation, custom, internal policy, secret internal policy, and usage of the city of Baton Rouge, East Baton Rouge parish, and state of

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                  136

Louisiana, defendants and their named and unnamed co-conspirators neglected to prevent harm being done to Plaintiff and deprivation of Plaintiff's rights and privileges, secured by the Constitution and other laws, namely: fundamental rights to life, liberty, and property; rights of access to courts; rights to privacy; rights to free speech and press; rights of crime victims.

354.    "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured […] for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action." Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law.

### Fourteenth Claim for Relief
### Murder and Attempted Murder

355.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

356.    This count / cause of action is brought against all defendants.

357.    Because of the foul, rabid criminals that are sued in this complaint and that agreed to deprive Plaintiff of her rights, persecute her, form a criminal racketeering enterprise to injure Plaintiff, obstruct justice, cover up crimes, destroy evidence of their crimes, obstruct courts, and

further abuse Plaintiff and deprive of her legal and constitutional rights, Plaintiff and her precious Family have sustained grave injuries

358.    Plaintiff and her beloved Family were thriving and did not have any chronic diseases or conditions until Plaintiff and her Family, as part of the persecution by the foul criminals, sued herein, started being attacked with neurotoxins, chemical weapons, chemical toxins, biological agents and weapons, secondhand and thirdhand smoke, synthetic exceptionally strong and foul deodorizers that the criminals also were pushing into Plaintiff's place of residence in attempt to mask their crimes and atrocities.

359.    Plaintiff submitted several dozens of complaints and reports, including to fetid management of the ghetto apartments where she and her Family were being attacked and assaulted by chemical weapons and toxins, to foul criminals of city-parish-state whose duty was to respond to the reports about such illegal activity, to foul scumbags in city parish and state Louisiana courts. The rabid criminals, in conspiracy to specifically murder and/or gravely injure Plaintiff and her Family, unlawfully ignored all reports and criminally suppressed all legal actions that Plaintiff initiated in order to stop horrific attacks by chemical weapons.

360.    Fetid criminals, sued herein, after inducing severe damage to Plaintiff's and her precious Family's internal organs, immune systems, and systemic and general health, continued their atrocities by destroying and falsifying "medical" records, blocking access to medical care, stealing removed organs and tissues and other laboratory samples and conspiring with their filthy puppets that work in the so-called "medical" and "veterinary" fields in Oregon, to lie to Plaintiff regarding her health and health of her beautiful Family, withhold proper diagnostic, steal and falsify "medical" record, including after the fact, in several months after the original records were manufactured.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **138**

361.     The rabid criminals have been preventing Plaintiff and her Family from accessing medical care and proper medical procedures in order to conceal and destroy evidence of their criminal attacks on Plaintiff and her Family by the chemical weapons as well as to cause death and/or more severe form of the disease when it becomes untreatable.

362.     This cause of action is closely and umbilically connected and intertwined with and stems from the criminal racketeering enterprise, formed by the defendants.

363.      The foul criminals, sued in this complaint, must be held responsible for their crimes and must be prosecuted under criminal statutes. Plaintiff must be awarded damages, as determined by the jury, for attacking and gravely Plaintiff and her Family with chemical weapons, chemical toxins, biological agents, secondhand and thirdhand smoke, and other harmful and dangerous substances Plaintiff and her Family were being subjected against their explicit protest and attempts to stop criminal activity.

### Fifteenth Claim for Relief
### Assault / battery by chemical weapon and infliction of permanent physical injuries – December 11, 2018

364.     Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

365.     This count / cause of action is brought against all defendants.

366.     After Plaintiff on December 4, 2018, stated to filthy "assistant district attorney" Fields that she will try to expose "the criminals that run Baton rouge police department and Louisiana department of justice," she was viciously attacked on December 11, 2018 by some filthy psychopath Small, a purported "ophthalmologist" in the purported "ophthalmological" office.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                139

Prior to the vicious, criminal attack, Plaintiff had never visited any "ophthalmologists," never had any issues with her eyes, never had any preexisting conditions at all, including that concern her eyes, and had healthy beautiful eyes and healthy, delicately and beautifully formed eyelids.

367.    The criminal attack was carried out by deceiving Plaintiff that she needs some injection that scumbag Small claimed was completely safe and has no side effects whatsoever. The criminal injected into the Plaintiff's eyelids some corrosive substance that immediately caused acute, horrific injury and chemical burns. The foul scumbag Small severely infected Plaintiff's face with some horrific infection that still eats through the Plaintiff's tissues and continues causing long-term inflammation. Prior to the vicious attack, Plaintiff never had any infections in her life, never was "treated" for any infections, and never used or took any antibiotics in her entire life.

368.    The filthy bastard that attacked Plaintiff in conspiracy with other foul criminals, sued herein, dissolved the portions of the Plaintiff's beautiful eyelids, causing permanent deformities, facial asymmetry, permanent pain, discomfort, deep wounds and scars that cut through the Plaintiff's eyeball and scratch it.

369.    Foul criminals sued in this complaint, criminally suppressed all proceedings such as obstructed and bribed filthy courts which work in tandem with corrupt criminals and corrupt governments; falsified and faked a purported "investigation," utilizing corrupt Louisiana agencies and corrupt purported "experts." The scumbags, sued herein, ensured that filthy Small is not investigated by the corrupt purported "medical" board.

370.    This cause of action and that criminal attack is closely connected, intertwined, and stems from the racketeering enterprise that defendants have been running. Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law

**Sixteenth Claim for Relief**

**Assault / battery and infliction of permanent
physical injuries and deformities – July 2017**

371.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

372.    This claim / cause of action is brought against all defendants.

373.    Each of the defendants-criminals, by joining a racketeering enterprise to obstruct courts, obstruct criminal justice, falsify records, facts, and pervert the law, simulate and falsify various proceedings, violate Plaintiff's constitutional rights of access to courts and equal rights and protections under the law, unlawfully prevent Plaintiff from recovering damages for the crimes, committed against her person is fully liable for the vicious physical attack on the Plaintiff.

374.    Therefore, each coconspirator that has been participating in racketeering enterprise and dirty schemes of discriminating against Plaintiff, abusing Plaintiff, and violating the Plaintiff's constitutional rights should be held liable, and Plaintiff should be awarded damages and other relief as authorized by the relevant law.

### Seventeenth Claim for Relief
### Assault / battery by dangerous weapon and infliction of permanent
### physical injury and deformity - June 2019

375.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

376.    This claim / cause of action is brought against all defendants.

377.    After Plaintiff protested the criminal discrimination of her based on her national origin and gender by the purported "law enforcement," and stated that she would try to expose their corruption, the criminals immediately started attacking Plaintiff physically (vicious attack with the chemical weapon) and interfering with her livelihood and peaceful living (secret and unlawful "discharging" from work at Louisiana state university; inability to live at and work from the house that prior to persecution was a perfectly safe place to live in).

378.    After the devastating attack by the chemical weapon that left Plaintiff with scars and deformities and broken spirit, stripped out of work and safe place to live, Plaintiff – per the defendants-criminals' plan – ended up in the ghetto where she became a victim of the unprovoked attack by a violent negro that approached Plaintiff from the back and violently hit her with a wooden block, permanently damaging and destroying the Plaintiff's right scapula.

379.    The ghetto was preventing Plaintiff from talking to police and when Plaintiff finally was able to talk to the police, the three filthy negroes with pit bull faces showed up and the purported report was entirely falsified in which the scumbags covered up even the fact that Plaintiff was brutally attacked by the filthy negro.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**

380.    The fetid scumbags, sued in this complaint, used that brutal attack that they criminally engineered and covered up, to start attacking Plaintiff and her Family with chemical weapons. Plaintiff tried to stop the attacks by using proper methods and submitting complaints to the ghetto managers, filthy city-parish and its appropriate departments whose duty is to stop illegal activities, and then to the scumbags in the Louisiana courts.

381.    The filthy criminals maliciously obstructed Plaintiff's efforts and continued bombarding Plaintiff and her Family with chemical weapon attacks and chemical- and bio-agent toxins. By conspiring with the filthy Oregon-based actors, the criminals have been stealing, destroying, and falsifying evidence of those attacks

382.    The cause of action of the brutal attack is umbilically and symbiotically connected to the entire racketeering enterprise by the defendants which they have formed to attack Plaintiff with chemical weapons and other dangerous weapons, obstruct justice, interfere with commerce under color of official right, for which they used, among other things, wire fraud, mail fraud, bribery within the meaning of section 201, and interstate travel and transportation. Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law.


### Eighteenth Claim for Relief

### Personal Injury, Loss of Health and Life, and continuous non-consensual assault / battery by toxic and carcinogenic chemicals and fumes

383.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

384.    This count / cause of action is brought against all defendants.

385.     This cause of action mimics the assault by chemical weapons action, and is a supplemental cause of action in addition to the already stated claim under 18 U.S. Code § 229. Plaintiff and her Family were continuously and maliciously attacked by chemical weapons, chemical toxins, bioagents, and secondhand and thirdhand smoke.

386.     The consequences of those criminal attacks have been devastating for Plaintiff and her Family. In continuation of the racketeering enterprise scheme, the dirty criminals have been preventing Plaintiff and her Family from obtaining diagnostic procedures, destroying and stealing bodily tissues, surgically removed organs, and other samples that would allow to clearly establish the same etiology of the disease among the three Victims – Plaintiff and her Family. Plaintiff should be awarded damages and other relief as authorized by the relevant law for the grave injuries, inflicted on her and her Family through the rabid, racketeering activity by those defendants.

## Nineteenth Claim for Relief

## Loss of Companionship and Property Damage

387.     Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

388.     This count / cause of action is brought against all defendants. The only portion of this cause of action that pertains to the injury of Forrest on the filthy and defective ghetto property is brought against ppqbr, bogan, brookins, carter, cardinal, con 1, city-parish, brpd exclusively.

389.     Due to the vicious activity of the racketeering enterprise that the defendants have been advancing, Plaintiff lost her Family. After the attacks by chemical weapons and toxic chemicals, defendants continued their racketeering enterprise of obstructing justice, bribery, recruiting more

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                     **144**

corrupt private actors that comply with orders of dirty "governments" in order to cover up their atrocities. Among other things, defendants deceived Plaintiff and lied to her about the diagnoses of her Family, concealed the truth from Plaintiff, deliberately lied to her and misinformed her, prevented her from obtaining proper diagnostic procedures, falsifying records, including after the fact and by stealing the original papers that were in Plaintiff's possession.

390.    Those crimes have been done to advance their racketeering activities and concealing the fact that those filthy scumbags attacked and injured Plaintiff and her Family and made them very sick. Due to those atrocities, committed by the defendants, Plaintiff lost precious and treasured companionship of her Family. Because due to the existing "laws" and definitions, Plaintiff's Family is classified as "property," Plaintiff lost her most precious, valued, and irreplaceable property. Therefore, Plaintiff should be awarded damages and other relief as authorized by the relevant law for the grave injuries and losses.

391.    In addition to the above, Plaintiff should be awarded damages for medical, surgical, and other expenses, including for injuries to her Family on then territory of the filthy ghetto.

### Twentieth Claim for Relief

### (42 U.S.C. § 1983 – *Monell* Policy Claim

392.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

393.    This count / cause of action is brought against city-parish, metrocouncil, and state of Louisiana.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                    **145**

394.    The criminals and/or unlawful acts and omissions of the city-parish-state workers and all their co-conspirators have been done pursuant to one or more interrelated de facto policies, practices, and/or customs of defendants the city of Baton Rouge and East Baton Rouge parish through its police department, fire department, city court, and its district attorney office, as well as policies and customs of 19 JD, Ladoj, and other various agencies and personnel:

a. failing to properly investigate, charge and prosecute, and otherwise engaging in acts of crime cover-ups, concealment, manufacturing, fabricating, suppression, and alteration of evidence in order to protect those the favor from criminal prosecution and civil liability;

b. filing false reports, giving false statements and testimony, and otherwise covering up the true facts;

c. perpetuating, encouraging, and condoning the unlawful police and city-parish-state worker code of silence, official misconduct, fabrication, suppression, and destruction of evidence;

d. refusing to properly investigate, arrest, and charge individuals whom the police favor, such as the Plaintiff's attacker scumbag Poulicek in accordance to its employers, the scumbags of Ladoj which pays millions of dollars annually to all other filthy and criminal establishments, such as city-parish, police, 19 JD, Louisiana "supreme court," and other numerous filth.

e. aided by other defendants-co-conspirators, physically attacking and disfiguring Jane Doe, eavesdropping on Plaintiff's online and virtually any other activities, stealing personal electronic/digital property, and doing whatever it takes – in accordance with their secret internal policy and custom – in order to avoid liability, avoid an appearance of committing crimes under color of law, and avoid being linked directly or indirectly to the crimes and wrongdoings, described in this complaint.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                146

f. pursuant to their customs, interrelated polices, secret internal policies, the co-conspirators intentionally put Plaintiff in danger of toxic exposure and were intentionally targeting her and attacking with chemical weapons, clastogenic toxins, and bioagents in order to induce cancer and/or any other devastating disease.

g. pursuant to their customs, interrelated polices, secret internal policies, the co-conspirators ignored Plaintiff's reports about toxic exposure and intentionally failed their duty and deliberately failed to act in order to put Plaintiff in grave danger; pursuant to the same customs, interrelated polices, secret internal policies, the co-conspirators ensured that access to courts is effectively denied to Plaintiff and she is unable to stop toxic exposure or be moved to safety, but instead be deceived, tortured, abused, and led on by those "courts."

395.    The interrelated policies, practices, and customs, including secret and internal policies, both individually and together, were maintained and implemented with deliberate indifference, encouraged hate crimes, persecution of Plaintiff and injuring Plaintiff, barbaric unlawful unconstitutional "surveillance" of Plaintiff, stealing of Plaintiff's personal digital and intellectual property, the construction and fabrication of statements, suppression, alteration, and destruction of evidence, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the state and federal courts, the maintaining of secret files, the holding of secret conversations while plotting and conspiring to deprive Plaintiff out of her civil and legal rights and silence her, the destruction of files – were, separately and together, a direct and proximate cause of, and moving force behind, the criminal and unconstitutional acts, committed by the city-parish-state defendants that caused injuries, suffered by Plaintiff.

396.    "Plaintiff may prove "the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir. 1992), *cert. denied,* 114 S. Ct. 345 (1993)." *Navarro v. Block,* 72 F.3d 712, 714 (9th Cir. 1995). In the instant case, the co-conspirators have been encouraged to continue constitutional violations and persecution of Plaintiff, and have been promoted for complying – all in line with the secret criminal policy, established and adhered to by those rabid criminals.

### Twenty-First Claim for Relief
### Intentional and Negligent Infliction of Emotional Distress
### and Conspiracy to Inflict Emotional Distress

397.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

398.    This count / cause of action is brought against all defendants.

399.    The defendants have been maliciously discriminating against Plaintiff, intentionally inflicting serious physical injuries and severe emotional distress on Plaintiff. The rabid criminals have been at all times acting outrageously and are responsible for intentional infliction of emotional distress for all their acts and ommissions. In the alternative, and for those acts and omissions in which either of defendants was not "intentionally" inflicting emotional distress on Plaintiff, as to be determined by the jury, the defendants are responsible for negligent infliction of emotional distress.

400.    The defendants have conspired to inflict emotional distress, and inflict severe emotional distress on Plaintiff and have been carrying out their dirty and unlawful agenda. Plaintiff should

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF,**
**AND FOR DAMAGES**                                                                148

be awarded damages as the law allows for intentional, malicious, treacherous infliction of emotional distress on Plaintiff.

## Twenty-Second Claim for Relief

### Fraud

401.   Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

402.   This count / cause of action is brought against all defendants.

403.   Fraud is described as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. There are countless instances of fraud, described in this complaint. Every time fraudulent representation was made, each defendant knew it was false. The representations were made with intent that Plaintiff should rely upon it and be deceived. Plaintiff relied upon the representation and suffered injury.

404.   Among the countless examples, that would be statements made to Plaintiff by filthy city-parish-state, filthy ghetto, filthy Chugg and Knipe, filthy Schr-Taden, Chaplin, Daly, Schluckebier while being directly controlled and ordered exactly what to say by the dirty Louisiana and Oregon "law enforcement" criminals. Plaintiff should be awarded damages as the law allows.

## Twenty-Third Claim for Relief

### Breach of Contract

405.   Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                    **149**

406.    This count / cause of action is brought against chugg, knipe, cranmer, kwok, morgan, burton, daly, schluckebier chaplin, peacehealth, echo hollow, Oregon veterinary referral associates, schr-taden, small, nelson, williamson, booth, lady of the lake physician group, ppqbr, bogan, brookins, carter, cardinal, con 1.

407.    Those listed above, had a contractual obligation to Plaintiff to perform or act in a certain manner. Those contractual obligations have been grossly violated to fulfill the ghastly racketeering schemes and the goals of the racketeering enterprise that those criminals have formed. Therefore, Plaintiff should be awarded damages as the law allows.

## Twenty-Fourth Claim for Relief
## Respondeat Superior

408.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

409.    This count / cause of action is brought against city-parish, metrocouncil, brpd, brfd, kwok, state of Louisiana, cardinal, ppqbr, echo hollow, Oregon veterinary referrals.

410.    Unlawful acts and omissions that injured Plaintiff have been committed by the wrongdoers, employed by one of the above-referenced entities. While acting within the scope of their employment, defendants-criminals followed unconstitutional and illegal policies of their employers and acted with explicit authorization, approval, and/or request by their employer. Their acts and omissions that violated the law and injured Plaintiff are directly chargeable to their employers pursuant to respondeat superior. Therefore, Plaintiff should be awarded damages as the law allows.

### Twenty-Fifth Claim for Relief

### The Fourth Amendment Violations – Unlawful Searches and Seizures

411.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

412.    This count / cause of action is brought against all defendants.

413.    This cause of action is closely connected and intertwined with the dealings of the racketeering enterprise that defendants and their unsued coconspirators have manufactured. The complaint presents factual allegations of unlawful eavesdropping, spying, stealing of private property, privacy violations, deleting Plaintiff's intellectual property and digital contents to which she had exclusive rights as to both creation and publishing, deactivating her accounts in order to prevent Jane Doe from letting anyone outside of the defendants' "circle" know what was happening to Plaintiff, unlawfully blocking the instant messaging, especially done in the languages other than English whereas instant messages would arrive in weeks-months after were sent or never arrive, taking a full control over the Plaintiff's smartphone, tampering with all Plaintiff's electronic devices, accessing, controlling, and modifying all digital contents Plaintiff looked at or worked with.

414.    Defendants have been using various methods to unauthorizedly access Plaintiff's computer including manipulating and tampering with the software, installed on the computer. Therefore, Plaintiff should be awarded damages and other relief as the law allows.

### Twenty-Sixth Claim for Relief
### The First Amendment Violations – Unlawful Censorship

415.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

416.    This count / cause of action is brought against

417.    By malicious, intentional, and continuous unconstitutional and unlawful actions of the defendants Plaintiff is being prevented from exercising her fundamental rights to life, liberty, and property. Defendants, by tampering with her electronic devices and all digital / online accounts and making her writings unsearchable and unviewable by general public, violate Plaintiff's First Amendment rights.

418.    After Plaintiff became domiciled in Oregon on July 1, 2020, the defendants continued persecuting Plaintiff, closely unlawfully monitoring all her electronic devices, deleting files, stored on her devices, tampering with her digital accounts, tampering with hardware and software, installed on her personal digital devices, making her writings unsearchable and unviewable to the general public, including any reviews, submitted on any third-party website in strict compliance with that third-party website rules and terms. The extent of criminal unconstitutional censorship of Plaintiff by those defendants and harm they have been causing to Plaintiff is shocking. Therefore, Plaintiff should be awarded damages and other relief as the law allows.

**Twenty-Seventh Claim for Relief**

**The Equal Protection Clause Violations of the Fourteenth Amendment,**

**Embedded in the Due Process Clause of the Fifth Amendment**

419.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

420.    This count / cause of action is brought against all defendants. The law is clear that co-conspirators are responsible for all acts and injuries of the criminal and/or civil conspiracy.

421.    Plaintiff was placed in danger by city-parish-state multiple times, as the complaint affirms, and has been intentionally kept in danger and subjected to further harm (ignoring toxic exposure reports and effectively denying access to court to obtain injunction for months; intentionally not documenting reports of negro's' threats of violence and manufacturing fraudulent reports when Plaintiff got violently attacked by that negro, and even declining to come after Plaintiff reported the attack and requested assistance, etc.) See *Balistreri v. Pacifica Police Dept*, 901 F.2d 696 (9th Cir. 1988).

422.    Plaintiff has not been treated by defendants in the same manner as other crime victims are treated in similar circumstances. Because of the Plaintiff's "social status," national origin, gender, she was not afforded the same protections of the laws that they would afford to other individuals. The city-parish-state, covering up violent crimes of a "policeman," Poulicek, manufactured false "investigation" and pretended to be investigating while were advancing crime cover up. In all other instances, city-parish-state have been also fraudulently concealing true facts, intentionally disregarding federal and state law, and their duties. See *Elliot-Park v. Manglona*, 592 F.3d 1003 (9th Cir. 2010). Therefore, Plaintiff should be awarded damages as the law allows.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                153

## Twenty-Eighth Claim for Relief
## Defamation

433.     Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

434.     This count / cause of action is brought against all defendants.

435.     The most shocking act of defamation, asserted in this complaint, would be the false claim of disgusting and filthy, foul lying negroes and drug dealers Bogan, Brookins, PPQBR, Cardinal, and Carter. After continuously assaulting murdering Plaintiff's Family, in conspiracy with filthy city-parish-state scumbags, by chemical weapon attacks, toxic chemicals, secondhand and thirdhand smoke of tobacco and marijuana as well as other illegal drugs and substances, the despicable frauds attempted to sully the Plaintiff and her Family with their own filth by outrageously lying that they were "evicting" Plaintiff for "smoking" and "unauthorized vehicles."

436.     To fulfill their criminal agendas, city-parish-state defendants have been smearing Plaintiff. In Costco, the filthy criminals presented Jane Doe as some kind of criminal "under surveillance." Foul and filthy Woodruff-White has been publicly defaming Plaintiff and fraudulently presenting her, the victim of violent crime, as "accused." The fraudulent medical record, manufactured by Sharp has been specifically manufactured to attack Plaintiff's credibility and defame her. All other fraudulent "medical records" such as the ones manufactured by Booth, Nelson, Williamson, Small, and Holloway have been aimed at discrediting, defaming, and covering up crimes while fraudulently securing unjust advantage for themselves. The entire fabricated Weber's report is the manifestation of defamation of Jane Doe. Our Lady of the Lake

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                                                 **154**

physician group manufactured lies about Plaintiff in order to justify the "discharge" of her as a

patient across the entire "physician group" because she audio recorded her appointments and the

contents were going against the criminal agenda of the criminals, sued herein.

437.    The co-conspirator LAMD has been misleading the public by perverting absolutely each

and every fact and thought of the Plaintiff's complaint, and also deceiving the public by making

false, fraudulent, and impermissible imaginary claims about Plaintiff and her action. Other filthy

courts have also been fabricating fraudulent rubbish in close conspiracy with the filthy

defendants and in order to assist the defendants in crime cover ups. The acts of defamation and

discrediting of Plaintiff are ubiquitous and countless, and may be found in the events, detailed in

the complaint.

**Twenty-Ninth Claim for Relief**

**The Unenumerated Rights Preserved by the Ninth Amendment**

438.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and

allegation set forth in her complaint.

439.    This count / cause of action is brought against all defendants.

440.    Plaintiff has been deprived by the defendants out of constitutionally guaranteed,

recognized, and protected rights. As other, implicitly protected liberties might be discovered

and/or outlined by Plaintiff during the course of this litigation, the Ninth Amendment claim is

being incorporated herein.

**Thirtieth Claim for Relief**

**Violation of 18 U.S. Code § 3771 and Deprivation of the Crime Victim Rights**

441.    Plaintiff hereby re-asserts and incorporates by reference each fact, assertion, and allegation set forth in her complaint.

442.    This count / cause of action is brought against all defendants.

443.    Defendants by covering up crimes, falsifying dockets, obstructing courts, corruptly and unlawfully suppressing and throwing out Plaintiff's legal actions for damages, injunctive relief, and to appoint a private attorney to prosecute the criminals that committed violent crimes against Plaintiff and prosecute criminals-public-officials that covered up those crimes, violated Plaintiff's rights under section 3771. Therefore, Plaintiff should be awarded damages and other types of requested relief as the law allows.

## REQUEST FOR RELIEF

Plaintiff requests relief as set forth below:

1. Pursuant to 28 U.S.C. § 2201, enter a judgment declaring that the defendants and their co-conspirators violated the law while acting under color of law, conspired to deprive Plaintiff of her constitutional rights and harm Plaintiff, and have formed a multidistrict racketeering enterprise to advance their crimes. That they have been engaged in crime cover-ups and persecution of Plaintiff, have been physically injuring Plaintiff and her Family, have been silencing Plaintiff and restricting her speech in order to keep secret and cover up their crimes and atrocities, and have been obstructing justice and Plaintiff's access to courts.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**                                                          156

2. Pursuant to the declaratory judgment and 28 U.S.C. § 2202, issue an injunction restraining the defendants from tampering with Plaintiff's electronic devices and any digital accounts by unlawfully accessing them and tampering in any way with their contents, including deleting files and making the contents, published online that relate in any way to the facts of this legal action unsearchable and unviewable to the public, and impeding Plaintiff's First Amendment rights to any degree. Additionally, issue and injunction, prohibiting recognition or enforcement of any orders or judgments that were declared unconstitutional.

3. Pursuant to the declaratory judgment and 28 U.S.C. § 2202, issue an injunction prohibiting defendants and their co-conspirators tampering with Plaintiff's medical diagnostic procedures and tests, such as blood work, laboratory examination, imaging tests, etc., including unlawfully blocking Plaintiff's access to any such test or procedure through criminal conspiracy with "medical" workers, stealing Plaintiff's tissue and other samples and replacing them with samples of someone else, or falsifying the results directly in order to continue covering up the grave harm, inflicted on the health of Plaintiff and her Family by those foul defendants.

4. Pursuant to the declaratory judgment and 28 U.S.C. § 2202, issue an injunction prohibiting defendants Google, LLC; Reddit, Inc.; Advameg, Inc. and city-data.com and all their co-conspirators from unlawfully removing, blocking, deactivating, shadowbanning any and all content, published by Plaintiff that relates to the events, described in this complaint.

5. Pursuant to the declaratory judgment, 28 U.S.C. § 2202, 18 U.S.C. § 1964(c), and all other applicable laws, enter judgment against all defendants for all claims/causes of action for compensatory, general, and punitive damages as well as for attorney fees, expert fees, and all costs, incurred by this litigation.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**

6. Pursuant to the declaratory judgment, 28 U.S.C. § 2202, and all other applicable laws, appoint an independent investigator(s) and prosecutor(s), in order to bring to justice and criminally prosecute the psychopath and criminals, that inflicted physical injuries on Plaintiff but whose crimes have been covered up by the foul criminals, sued herein as well as unsued/unnamed in this complaint, and prosecute those criminals under 18 U.S.C. Sections 241, 242, 1702, 1707, 21 U.S.C. section 848, and other applicable statutes for criminal conspiracy and various crimes in order to deprive Plaintiff of her rights and gravely injure Plaintiff under the guise of "authority" of any laws.

## JURY DEMAND

Plaintiff demands trial by jury on all triable issues.

SUBMITTED BY:

Jane Doe

*s/Jane Doe*

3055 NW Yeon Ave

Portland, OR 97210

1dissident@pm.me

541-556-9987

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND FOR DAMAGES**